FILED
U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA

02 JUN 17  PM 1: 26

CEDAR RAPIDS HOLDING. OFFICE

BY _____ _____

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF IOWA

-----------------------------------------------------------------x

IN RE MCLEODUSA INCORPORATED
SECURITIES LITIGATION

This Document Relates To:      All Actions

-----------------------------------------------------------------x

:   Civil Action No. C02-0001
:
:
:
:
:   **JURY TRIAL DEMANDED**
:
:
:
:

### CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
### FOR VIOLATION OF THE FEDERAL SECURITIES LAWS

Plaintiffs, individually and on behalf of all other persons similarly situated, allege upon personal

knowledge as to themselves and their own acts, and upon information and belief as to all other matters,

based upon, *inter alia*, the investigation made by and through their attorneys, which investigation

included, without limitation, communications with witnesses, including former employees of

McLeodUSA Incorporated ("McLeodUSA" or the "Company"), who are knowledgeable about

McLeodUSA's business, operations, accounting and business practices and/or about the industry and

markets in which McLeodUSA operated, and review and analysis of various public statements,

including documents filed with the Securities and Exchange Commission ("SEC"), news and media

reports, press releases, and reports by securities analysts. Plaintiffs believe that, after a reasonable

opportunity for discovery, further substantial evidentiary support for the allegations set forth herein will

be shown to exist.

27

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of: (a) all persons who purchased or otherwise

acquired McLeodUSA securities (the "Purchaser Class") between January 3, 2001 and December 3,

2001, inclusive (the "Class Period"), alleging violations of the Securities Exchange Act of 1934, 15

U.S.C. § 78 et seq. (the "Exchange Act"); and (b) all persons who acquired McLeodUSA common

stock (the "Merger Class") pursuant to a Registration Statement and Prospectus (the "Prospectus")

issued in connection with the Company's stock-for stock acquisition of Intelispan, Inc. ("Intelispan"),

alleging violations of the Securities Act of 1933, 15 U.S.C. § 77a et seq. (the "Securities Act").[1]

Defendants are four of McLeodUSA's senior officers who were responsible for the public

dissemination of materially false and misleading statements made during the Class Period.

2.      As alleged in detail below, during the Class Period, defendants knowingly and/or

recklessly issued to the investing public materially false and misleading financial statements, press

releases, and other information concerning McLeodUSA's acquisitions, sales, revenue, national

network and financial position.  Indeed, beginning on January 3, 2001, the first day of the Class Period,

defendants issued a materially false and misleading press release concerning the Company's

expectations for the fourth quarter and year-end 2000.  That same day the price of McLeodUSA

common stock rose from $12.00 per share to $16.75 per share, representing a 39.5% increase.  The

next day, on January 4, 2001, during an investor conference call, defendants McLeod, Gray, and

Patrick further misrepresented McLeodUSA's financial position and misleadingly provided guidance

---

[1]  The Purchaser Class and the Merger Class are, at times, referred to collectively herein as "the Classes."

and prospects for the Company without advising the investing public of materially adverse events which were already plaguing the Company's operations and prospects. As a result of these misrepresentations, on January 4, 2001, the price of McLeodUSA common stock rose from $16.75 per share to $19.87 per share, representing a 18.6% increase. During an evening broadcast of "Business Center" that same day, CNBC commented on the dramatic increase in the price of McLeodUSA shares, reporting, in pertinent part, as follows:

> Who's making money? Clark McLeod, chairman and CEO of McLeodUSA. Shares have got a boost today, adding 3 points after the telecommunications firm repeated that it expects to meet or exceed Wall Street's expectations for the fourth quarter and year-end 2000. His one-day gain on paper was more than $55 million.

3.      The materially false and misleading statements and omissions continued throughout the Class Period. Indeed, defendants repeatedly reported strong sales, revenue and EBITDA (earnings before interest, taxes, depreciation and amortization), touted the Company's purported "fully funded" status, and represented that McLeodUSA had successfully integrated two sizable acquisitions, which were purportedly providing additional synergy and growth. McLeodUSA was followed by numerous securities analysts who favorably commented on the Company and its potential, especially in light of defendants' repeated revenue announcements which consistently exceeded Wall Street analysts' expectations. Behind the positive numbers, however, there were significant problems which, as defendants knew or recklessly disregarded, threatened the Company's future viability.

4.      According to numerous former employees, the Company resorted to a myriad of improper revenue recognition practices to report favorable financial results which were in line with, or exceeded, analysts' estimates despite the significant, and worsening financial decline McLeodUSA was

3

then experiencing. Defendants' fraud involved: (a) failing to take necessary write-offs in order to avoid a charge to earnings; (b) recognizing revenue from sales and accounts that had been canceled by customers; (c) improperly recording revenue from fictitious sales; (d) falsifying orders for certain of its customers who never agreed to purchase McLeodUSA's product; and (e) back-dating contracts to recognize additional revenue at the end of a fiscal quarter. Further, defendants failed to disclose that the Company was in a state of chaos due to its failure to integrate McLeodUSA's sprawling operations, defendants had secretly abandoned the Company's plan for a nationwide network by August 2001, and McLeodUSA lacked the financial flexibility to avoid a restructuring, despite public assurances to the contrary.

5. Moreover, at all relevant times during the Class Period, McLeodUSA represented that its financial statements were prepared in accordance with Generally Accepted Accounting Principles ("GAAP"), and were purported to be fairly presented. These representations were materially false and misleading because defendants knew, or recklessly disregarded, that the Company issued financial statements which were not prepared in accordance with GAAP and were at odds with McLeodUSA's publicly-stated accounting policies. In failing to file financial statements with the SEC which conformed to the requirements of GAAP, defendants disseminated financial statements which were presumptively misleading and inaccurate.

6. On December 3, 2001, McLeodUSA issued a press release announcing that the Company had reached a recapitalization agreement with the investment firm Forstmann Little & Company ("Fortsmann Little") and certain of the Company's secured lenders. Contrary to defendants' repeated representations throughout the Class Period that it was "fully funded" -- and only two months

after defendants affirmatively stated that "McLeodUSA is confident in its future and has absolutely no intention of filing for bankruptcy" -- the Company announced that it had reached an agreement on a comprehensive recapitalization because McLeodUSA's indebtedness was strangling the Company. Under the terms of the recapitalization plan, current common McLeodUSA shareholders would be left with only 30% of the recapitalized company, down from 79%.

      7.      In response to this announcement the price of McLeodUSA common stock declined to $0.40 per share, a 98.1% decline from a Class Period high of $22.43 per share reached on January 11, 2001. Defendants announced on January 31, 2002 that the Company had filed for chapter 11 bankruptcy relief.

**JURISDICTION AND VENUE**

      8.      The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2) and 15 of the Securities Act, 15 U.S.C. § 77k, 77l(a)(2), and 77o, and Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78(a), and the rules and regulations promulgated thereunder by the Securities and Exchange Commission ("SEC"), including Rule 10b-5, 17 C.F.R. § 240.10b-5.

      9.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 1337, Section 22 of the Securities Act, 15 U.S.C. § 77v, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

      10.      Venue is proper in this District pursuant to Section 22 of the Securities Act, Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b). McLeodUSA maintains its principal place of business in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

5

11.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## THE PARTIES

12.     Water Island Capital LLC, New Millennium Growth Fund LLC, and Richard C. Chapman for the Chapman Trust were appointed as Lead Plaintiffs by this Court on April 16, 2002. As detailed in their certifications previously filed in this litigation, Lead Plaintiffs purchased or otherwise acquired McLeodUSA securities during the Class Period at prices that were artificially inflated by defendants' misrepresentations and omissions and suffered damages thereby.  As detailed in his certification previously filed in this litigation, Plaintiff Jeffrey Brandes is a former Intelispan shareholder who acquired McLeodUSA common stock pursuant to the materially false and misleading Registration Statement and Prospectus issued in connection with the Company's stock-for stock acquisition of Intelispan ( hereinafter defined as the "Merger"), and suffered damages thereby.

13.     McLeodUSA purports to provide "selected telecommunications services to customers nationwide."  McLeodUSA is a Delaware corporation with its principal place of business at McLeodUSA Technology Park, 6400 C Street, Cedar Rapids, Iowa.  On January 31, 2002 McLeodUSA announced that it had filed for relief under Chapter 11 of the United States Bankruptcy Code.  For this reason, and this reason alone, McLeodUSA has not been named as a defendant in this consolidated amended class action complaint.

6

14.     The defendants identified below, unless otherwise indicated, served at all times material

to the claims set forth herein, as senior officers and/or directors of McLeodUSA in the positions set

forth opposite their names:

| Name | Position |
|---|---|
| Clark E. McLeod ("McLeod") | Founder<br>Co-Chief Executive Officer<br>Chairman of the Board of Directors<br>Executive Committee Member |
| Stephen C. Gray ("Gray") | President<br>Co-Chief Executive Officer<br>Director<br>Executive Committee Member |
| J. Lyle Patrick ("Patrick") | Chief Financial and Accounting Officer<br>(until August 1, 2001) |
| Chris A. Davis ("Davis") | Chief Operating and Financial Officer<br>Director<br>Executive Committee Member<br>(since August 1, 2001) |

15.     Because of their executive and managerial positions with the Company, each of

defendant had access to the adverse undisclosed information about the business, operations, products,

operational trends, financial statements, markets and present and future business prospects of

McLeodUSA via access to internal corporate documents (including the Company's operating plans,

budgets and forecasts and reports of actual operations compared thereto), conversations and

connections with other corporate officers and employees, attendance at management and/or Board of

Directors' meetings and committees thereof and/or via reports and other information provided to them

in connection therewith.  In particular, a former group vice president in Chicago reported that actual

7

revenue numbers were submitted to management by the group vice presidents on a daily, weekly and

monthly basis. The same former employee advised that these reports memorialized the sales from each

of the regions. The former employee also reported that these daily reports, weekly totals, and monthly

reports were utilized to gauge how each region was performing. Similarly, a former group vice

president for the southwest region confirmed that sales were reported to upper management in Cedar

Rapids. Moreover, a former senior manager of marketing advised that the Company's sales figures

were available and monitored via McLeodUSA's internal network. The same former employee

reported that McLeodUSA kept month to date and year to date internal reports "which would show

how much business they[, McLeodUSA,] were actually doing." The former employee also advised

that the Company kept "pipeline" reports.

      16.     It is appropriate to treat the Defendants as a group for pleading purposes and to

presume that the false, misleading and incomplete information conveyed in the Company's public filings,

press releases and other publications as alleged herein are the collective actions of the narrowly defined

group of defendants identified above. Each of the above-listed officers of McLeodUSA, by virtue of

his or her high-level positions with the Company, directly participated in the management of the

Company, was directly involved in the day-to-day operations of the Company at the highest levels and

was privy to confidential proprietary information concerning the Company and its business, operations,

products, growth, financial statements, and financial condition, as alleged herein. Defendants were

involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and

information alleged herein, were aware, or recklessly disregarded, that the false and misleading

8

statements were being issued regarding the Company, and approved or ratified those statements, in violation of the federal securities laws.

17.    The statements made by defendants, as particularized below, were materially false and misleading when made. The true financial and operating condition of the Company, which was known or recklessly disregarded by defendants, remained concealed from the investing public throughout the Class Period. Defendants, who were under a duty to disclose those facts, instead misrepresented or concealed them during the relevant period herein. As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was traded under the symbol "MCLD" on the NASDAQ National Market (the "NASDAQ"), and governed by the provisions of the federal securities laws, defendants each had a duty to disseminate promptly, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information. Defendants' misrepresentation and omissions during the Class Period violated these specific requirements and obligations.

18.    Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with McLeodUSA, each defendant had access to the adverse

9

undisclosed information about McLeodUSA's business prospects and financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about McLeodUSA and its business issued or adopted by the Company materially false and misleading.

19.     Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each defendant is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

20.     Each of the defendants is liable as a direct participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers or acquirers of McLeodUSA securities during the Class Period by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding the Company's business, operations, management and intrinsic value of McLeodUSA securities; (ii) enabled McLeodUSA to acquire Intelispan, as described herein, using $40 million of its artificially inflated common stock as currency; and (iii) caused plaintiffs and other members of the Classes to purchase or otherwise acquire McLeodUSA securities at artificially inflated prices.

## CLASS ACTION ALLEGATIONS

21.     Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of: (a) the Purchaser Class consisting of all persons who purchased or otherwise acquired McLeodUSA securities during the Class Period (between January 3, 2001 and December 3, 2001), and were damaged thereby, alleging violations of Section 10(b) and 20(a) of the Exchange Act; and (b) the Merger Class consisting of all persons who acquired McLeodUSA common stock pursuant to the Registration Statement and Prospectus issued in connection with the Merger, and were damaged thereby, alleging violations of Sections 11, 12(a)(2), and 15 of the Securities Act. Excluded from these Classes are defendants, the officers and directors of the Company, at all relevant times, members of defendants' families, any entity in which any defendant has a controlling interest or is a parent or subsidiary of or is controlled by the Company, and the officers, directors, affiliates, legal representatives, heirs, predecessors, successors, or assigns of any of the defendants.

22.     The members of the Purchaser and Merger Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, McLeodUSA common shares were actively traded on the NASDAQ. As of December 31, 2000, the Company had more than 606 million shares of its class A common stock outstanding. Pursuant to the terms of the transaction, McLeodUSA issued up to 3.5 million new shares to complete the Merger. While the exact number of Purchaser and Merger Class members is unknown to plaintiffs at this time and can only be ascertained through appropriate discovery, plaintiffs believe that there are hundreds or thousands of members in the proposed Classes. Record owners and other members of the proposed Classes may be identified from

records maintained by McLeodUSA or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

23. Each of the plaintiffs' claims are typical of the claims of the members of the Classes they seek to represent because plaintiffs and all the Class members sustained damages which arose out of the defendants' unlawful conduct complained of herein.

24. Plaintiffs are representative parties who will fairly and adequately protect the interests of the members of the respective Classes. Plaintiffs have retained counsel competent and experienced in class and securities litigation. Plaintiffs do not have interests antagonistic to or in conflict with those of the other members of the Classes they seek to represent.

25. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members of the Classes is impracticable. Furthermore, as the damages suffered by individual members of the Classes may be relatively small, the expense and burden of individual litigation make it impossible for members of the Classes to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

26. There are questions of law and fact common to the Merger Class which predominate over any questions which may affect individual members. Among the questions of law and fact common to the Merger Class are:

(a) whether the Registration Statement and Prospectus omitted and/or misrepresented material facts;

12

(b)     whether the Securities Act was violated by defendants' acts as alleged herein; and

(c)     whether the members of the Merger Class have sustained damages, and, if so, what is the appropriate measure of damages.

27.     There are questions of law and fact common to the Purchaser Class which predominate over any questions which may affect individual members.  Among the questions of law and fact common to the Purchaser Class are:

(a)     whether the Exchange Act was violated by defendants' acts as alleged herein;

(b)     whether statements made by defendants to the investing public during the Class Period misrepresented and/or omitted material facts;

(c)     whether defendants acted with scienter in issuing materially false and misleading statements;

(d)     whether the market prices of McLeodUSA securities during the Class Period were artificially inflated due to the material nondisclosures and/or misrepresentations complained of herein; and

(e)     whether the members of the Class have sustained damages, and, if so, what is the appropriate measure of damages.

## SUBSTANTIVE ALLEGATIONS

28.     McLeodUSA purports to provide "integrated communications services, including local services, in 25 Midwest, Southwest, Northwest and Rocky Mountain states . . . [and] data and voice services in all 50 states." The Company describes itself as a facilities-based telecommunications

13

provider to selected business and residential customers and purports to be the largest competitive local

exchange carrier ("CLEC") in the United States. In most of the Company's markets, McLeodUSA

competes with the entrenched, traditional local phone companies by leasing its lines and switches.

McLeodUSA provides local and long distance services using their own facilities and by leasing capacity

from others. Moreover, McLeodUSA purports to be actively developing fiber optic communications

networks in many of the Company's target local markets to carry additional communications traffic on

their own network.

29.     The Company's purported core business includes local and long distance services, dial

and dedicated Internet access, higher bandwidth Internet access services, such as digital subscriber line

(DSL) and cable modem, value-added services such as virtual private networks and web hosting,

bandwidth leasing and colocation services, telephone and computer sales, leasing, networking and

installation, and other communications services such as video, cellular, operator, payphone, mobile

radio and paging. In addition, McLeodUSA purportedly derives revenue from services related to the

Company's core business including sale and advertising in print and electronic telephone directories,

traditional local telephone company services in east central Illinois and southeast South Dakota, and

telemarketing services.

30.     From 1996 through 2000, the Company experienced a rapid and expensive expansion

during which McLeodUSA completed several significant mergers and acquisitions. McLeodUSA

allegedly changed its corporate strategy by acquiring SplitRock Services, Incorporated ("SplitRock") in

March 2000.[2]  In connection with this acquisition, the Company announced that it was shifting

corporate strategy to a national-based strategy and would be using the newly acquired assets of

SplitRock to "build the nations largest data network."  McLeodUSA began actively marketing,

constructing, and allegedly developing enhancements to the Company's national network -- the One

Functional Network(SM).  The One Functional Network(SM) would purportedly provide voice and

data, local and long distance, narrow band and wide ban, and associated next-generation services "on

a single, efficient, integrated platform."  As part of the Company's then-current business plan to create

a national network, McLeodUSA acquired CapRock Communications Corporation ("CapRock") in

December 2000.[3]

31.     As alleged in detail below, beginning in January 2001 and continuing throughout the

Class Period, defendants knowingly and/or recklessly issued to the investing public materially false and

misleading statements concerning the Company's acquisitions, national network, sales, revenue, and

financial position.  Unbeknownst to investors, defendants' self-serving public statements concealed a

bleak reality: (i) the Company was engaged in improper accounting practices which had the effect of

materially overstating the Company's reported earnings; (ii) defendants knew but did not disclose, or

recklessly disregarded, that the Company was unable to properly manage the various acquisitions nor

adequately integrate them into McLeodUSA; (iii) defendants secretly abandoned plans for the national

---

[2]SplitRock is described by the Company as "a facilities-based provider of advanced data
communications services."

[3]CapRock is described by the Company as "a facilities-based integrated communications
provider, primarily to small and medium-sized business and carrier customers in the Southwest."

network by August 2001; and (iv) the Company was unable to service its substantial debt and lacked the financial flexibility to avoid a restructuring, despite public reassurances to the contrary.

**Undisclosed Adverse Information Regarding
McLeodUSA's Sales and Accounting Manipulations**

32.     According to several former employees, the Company misrepresented sales numbers and engaged in fraudulent accounting practices to materially inflate reported revenue throughout the Class Period.  For example, a former executive director of sales advised that "what they were reporting versus the revenue that was coming in were two different numbers."  Indeed, McLeodUSA resorted to a myriad of improper revenue recognition practices to report favorable financial results including recognizing revenue from sales and accounts that had been canceled by customers, improperly recording revenue from fictitious orders and fictitious customers, and back-dating contracts to recognize additional revenue at the end of a fiscal quarter.

### Canceled Sales and Accounts

33.     Numerous former employees reported that McLeodUSA regularly recognized revenue from sales and accounts that had been canceled by customers.  For example, a former employee based in the Chicago area reported that during the last week of September 2001 a customer referred to as "K & K Consulting" canceled a large contract.  The same former employed advised that he was specifically instructed by management not to report the cancellation until the next quarter "so they could make their numbers."

34.     A former director of sales for the east coast also reported that the Company booked large sales that were actually canceled by customers and that manipulation of sales figures appeared to be regular corporate practice.

### Fictitious Orders and Customers

35.     According to several former employees, McLeodUSA routinely recorded revenue from fictitious sales.  For example, a former employee in the Chicago area reported that during the Class Period the Chicago office, as a matter of regular practice, booked revenue from fictitious orders which would simply be canceled during the next quarter.

36.     In fact, the Company improperly recognized millions of dollars in revenue on fictitious orders from customers who never agreed to purchase McLeodUSA's product.  For example, a former executive director of sales advised that fictitious orders accounted for a substantial portion of the sales and revenue reported to investors and analysts during the Class Period.  The same former employee recalled that in a few months during the Class Period as much as 35% of the reported revenues were the result of a single fictitious order.  Via access to internal sales reports (see supra, ¶ 15), however, senior management knew that the order was fictitious or was reckless in not discovering that an order of that magnitude was fictitious.

37.     Moreover, numerous former employees reported that the Company not only recognized revenue from orders that did not exist, but also reported revenue from orders placed by fictitious customers.  In this regard, a former executive director of sales advised that the creation of fictitious customers was a regular practice during the Class Period.  A former senior manager in the data services division also confirmed that these type of accounting manipulations occurred throughout

17

the Class Period. For example, the same former employee advised that near the end of every month the Company "would pull something out to make the numbers."

38.     A former group vice president in Chicago advised that based on regularly updated reports it was clear that the numbers were manipulated and fraudulently reported to investors and analysts: "As the month would unfold, almost every month would show that we were behind on the numbers, and then out of nowhere, there may appear a line item on the report that would say 'Corporate Sales' and those sales would shoot up. Everyone would question, where the hell are they getting those sales?"

### Fraudulently Dated Contracts

39.     According to several former employees, McLeodUSA fraudulently back-dated contracts to recognize additional revenue at the end of a fiscal quarter. A former senior sales manager for the small business group advised that the manipulation of sales numbers was a "company-wide" practice. For example, the same former employee recalled that the Company back-dated contracts to recognize additional revenue at the end of the fiscal quarters.

### Undisclosed Adverse Information Regarding McLeodUSA's Failure to Integrate SplitRock or CapRock

40.     Numerous former employees also reported that the Company failed to successfully integrate the SplitRock and CapRock acquisitions as publicly proclaimed. For example, a former group vice president for the eastern region stated that the Company experienced significant problems with the acquisition of CapRock because "CapRock had inherent product and networkings failings." A former employee who was responsible for deploying and monitoring the switches for the national

network stated that there was no synergy recognized from the SplitRock or CapRock acquisitions because of McLeodUSA's failure to successfully integrate the acquisitions: "They never did combine things, all they did was cause more problems for McLeodUSA."

41.    A former employee responsible for managing part of the CapRock acquisition advised that from the beginning CapRock was a poor acquisition. The same former employee reported that senior management knew prior to the acquisition that McLeodUSA was getting a company that was not capable of performing as projected to investors and analysts. The former employee also reported that "[t]here was not synergy and all of CapRock's executives and middle managers were pretty much let go." Moreover, the same former employee stated that CapRock's billing system was a disaster: "Their billing system wasn't, that platform wasn't a very good platform to do the billing and you'd have two extremes, customers that they weren't billing at all and customers that had totally pitiful billing and couldn't get it correct." In addition, the former employee reported that the Company did not spend the money necessary to integrate CapRock's network with McLeodUSA's and "didn't invest in the necessary capital to fix the CapRock acquisition."

42.    Indeed, several former employees reported that Company's SplitRock and CapRock acquisitions did not provide the synergy reported to investors and analysts. For example, a former group vice president for the southwest region advised that defendants Gray and Patrick knew that the Company was unable to manage the acquisitions: "I could see that they were spending money like crazy and turning employees at an incredible rate, we weren't selling, we weren't hitting our numbers, and we were borrowing money like crazy."

43.     A former group vice president responsible for integrating CapRock confirmed that defendants Gray and Patrick knew the recent acquisitions did not perform as reported. The same former employee recalled that from the beginning it was obvious that the acquisition of CapRock was a major disaster. For example, the former employee advised that the Company faced "obvious impediments with customers and product because they couldn't integrate for billing or support." A former sales manager in the southwest region confirmed the billing integration problems.

44.     The Company's failure to successfully integrate these acquisitions resulted in lower than reported sales and revenue. A former group vice president in Chicago advised that a significant percentage of the revenue numbers actually reported from the CapRock acquisition were based on fictitious orders. Moreover, a former employee responsible for managing part of the CapRock acquisition advised that during the Class Period, "company-wide the sales were not what we were projecting" and specifically in the Southwest region, with the CapRock acquisition, sales were only about 50-65% of what was projected.

45.     A former senior sales engineer, who also worked for SplitRock prior to McLeodUSA's acquisition, advised that the data network and services department was not able to meet sales expectations. The former senior sales engineer reported that the Company intentionally misrepresented their data network and data services products to customers. The same former employee advised that the Company's failure to successfully integrate SplitRock resulted in customer dissatisfaction and lost contracts. A former senior sales manager for the small business group confirmed that the Company misrepresented the data product to customers and McLeodUSA knew "all along that the product was no good."

20

**Undisclosed Adverse Information**
**Regarding McLeodUSA's National Network**

46.     Although defendants publicly disclosed the Company's intention to abandon plans for

the national network on October 3, 2001, several former employees reported that internally, and

undisclosed to investors, defendants had abandoned plans for a national network no later than August

2001.  For example, even a former employee who was responsible for deploying and monitoring the

switches for the national network confirmed that McLeodUSA's decision to abandon the national

network was made well before defendants made the public announcement in October 2001.

47.     Indeed, a former director of sales for the east coast, a former group vice president for

the southwest region, a former group vice president in Chicago, as well as a former employee

responsible for managing part of the CapRock acquisition each independently advised that the decision

to abandon the national network occurred prior to August 2001.

**Undisclosed Adverse Information**
**Regarding McLeodUSA's Plans For Bankruptcy**

48.     McLeodUSA filed for chapter 11 bankruptcy relief on January 31, 2002.  As part of

the bankruptcy proceedings that ensued, Jonathan B. Cleveland, a Director of Houlihan Lokey Howard

& Zukin ("Houlihan Lokey"), an investment banking firm, submitted a declaration (the "Cleveland

Declaration") in support of the Amended Plan of Reorganization of McLeodUSA.  The Cleveland

Declaration states that Houlihan Lokey was engaged by McLeodUSA on October 25, 2001.  The

Cleveland Declaration makes clear that a plan of reorganization was contemplated, and indeed,

developed from the beginning of Houlihan Lokey's engagement:

> In summary, Houlihan Lokey dedicated a full-time team of four restructuring professionals to the McLeodUSA restructuring, and its efforts included: extensive due diligence with management, assistance in the assessment of strategies set forth in McLeodUSA's business plan, development of a financial restructuring model to project the expected financial performance of the Debtor giving effect to contemplated restructuring, assessing the appropriate capitalization of the Debtor in light of the projected cash sources and uses, negotiating with principal creditor constituencies to finalize a reorganization plan and assisting the Debtor in implementing the reorganization plan.

49.     Further, the Cleveland Declaration affirmatively states that the restructuring plan developed by Houlihan Lokey, working with management and a special committee of the board, identified the fact that some form of bankruptcy would be necessary to reorganize the Company's equity: "The Restructuring Plan identifies . . . (d) the division of the reorganized equity among the various creditor constituencies." Indeed, the Cleveland Declaration specifically states that the "restructuring model . . . . was necessary for assessing the feasibility and level of 'cushion' in the post-bankruptcy operating requirements."

50.     Revelations that defendants contemplated bankruptcy at least as early as October 2001 are at odds with the Company's public statements during the Class Period. Moreover, it is also clear that the defendants were aware of, or recklessly disregarded, the falsity of their public statements concerning the Company's financial condition at that time as the Cleveland Declaration documents defendants' involvement:

> The Restructuring Plan was developed through October and November with extensive assistance from Houlihan, who advised both management and a specially appointed subcommittee of the board of directors (the "Special Committee").
>
> ****
>
> In particular, beginning in early October, Houlihan Lockey began extensive due diligence in Cedar Rapids with all of the senior management team and a considerable

22

number of the middle management team that was responsible for developing the specific business initiatives set forth in the Business Plan.

****

The restructuring model is based on numerous specific operating and restructuring assumptions, each individually checked and confirmed with responsible operating management and senior management team members (including the Debtor's CEO and COO/CFO).

51.     Indeed, that defendants discussed bankruptcy and began work on a restructuring plan well prior to the announcement on December 3, 2001, is also confirmed by the admission of Ted Forstmann.  During a rebroadcast on the nightly news program by KGAN, Channel 2, a CBS affiliate in Cedar Rapids, of a news conference held by McLeodUSA on April 24, 2002, Ted Fortsmann commented on the restructuring of McLeodUSA admitting that "[w]e did start talking about this [bankruptcy restructuring plan] about a year ago."

**Materially False and Misleading
Statements and Omissions During the Class Period**

52.     The Class Period begins on January 3, 2001, the date McLeodUSA issued a press release regarding the Company's expectations for the fourth quarter and year-end 2000, the periods ended December 31, 2000 (the "January 3 Press Release").  Defendant Patrick commented on the Company's expectations stating in pertinent part that "the company will meet or exceed the average of the current market consensus for fourth quarter and year-end 2000."

53.     The January 3 Press Release also announced the proposed offering of $450 million of the Company's Senior Notes due 2009.  The January 3 Press Release was immediately followed by an additional press release on January 4, 2001 announcing an update concerning the Company's bond

offering (the "January 4 Press Release). The January 4 Press Release stated that "[t]he Company now plans to raise approximately $750 million due January 1, 2009 in a proposed offering of 11 3/8% Senior Notes."

54. The January 3 Press Release and January 4 Press Release were filed with the SEC on January 4, 2001, as an exhibit to a Current Report on Form 8-K (the "January 4 Form 8-K").

55. On January 4, 2001, during an investor conference call, defendants McLeod, Gray, and Patrick discussed the Company's fourth quarter 2000 and fiscal year 2000 expectations and proposed bond offering (the "January 4 Conference Call"). During the January 4 Conference Call, defendant Gray misrepresented McLeodUSA's financial position and provided false guidance and prospects:

> I think it is only appropriate in light of the debt transaction that we are proposing and kind of really through a macro perspective of what's going on in the telecom services arena that we comment on our fourth quarter expectations and I'd like to provide a little more guidance and clarity as far as that is concerned. First of all, the fundamentals of McLeodUSA have never been stronger, from one, a people perspective, two, an asset perspective and third, an execution perspective. Both operationally and financially. Let me give you a little bit more color on those financial expectations. We are expecting our revenue in the fourth quarter in 2000 to exceed $408 million dollars. We expect our EBITDA to be positive and exceed $26 million dollars. We expect our new or net new install access lines and service will exceed 88,000 access lines. Which should bring our total revenue for the year 2000 to exceeding $1.395 billion dollars and our EBITDA for the year 2000 to exceed $60 million dollars. This should also bring our total lines and service to approximately 1.1 million access lines.

> And I would really like to add emphasis on these results and point out a couple of other things. First of all, as all of you are aware of, we normally have or we did have in the fourth quarter of this year, approximately 90-93% of the normal business days in a calendar quarter. So better than expected results in a shorter quarter. In addition to that, for those of you who have been watching the weather channel, you will also recognize that we've been pretty hard hit in the Midwest with both our snowiest and our coldest December on record but we persevered and still put forward these great

24

results. Last but not least I would also note that the month of December did include several days of our acquired company CapRock. Net McLeodUSA once again, nineteen quarters of meeting or exceeding expectations, thirteen consecutive quarters of positive EBITDA and we would expect to provide more color on 2001, more guidance on 2001, after the definitive release of our fourth quarter results.

56.     An analyst on the January 4 Conference Call specifically asked Gray about the impact that CapRock had on the fourth quarter. Gray responded that the revenue line would include contributions from the CapRock acquisition:

> And by the way this is guidance, and of course, you recall that we, or I stated that we expect to exceed these numbers, but based upon our preliminary estimates, we would expect that the revenue line would include approximately $7 million of Caprock.

At the conclusion of the January 4 Conference Call, defendant McLeod commented on the Company's purported fully funded status:

> We are very excited about this opportunity and I think this is characteristic of our style of going into the markets at times when we can access the markets and at the same time running a very conservative financial plan if you will. A funded plan and one that certainly has head room in it for opportunities as well.

57.     On January 3, 2001, the price of McLeodUSA common stock rose from $12.00 per share to $16.75 per share, representing a 39.5% increase. On January 4, 2001 the price of McLeodUSA common stock rose from $16.75 per share to $19.87 per share, representing a 18.6% increase. In contrast, the NASDAQ Composite Index declined by 1.9% that same day.

58.     Securities analysts that followed McLeodUSA securities reacted positively to the Company's announcement of fourth quarter and fiscal year 2000 expectations and guidance. For example, Merrill Lynch Capital Markets ("Merrill Lynch") stated in an analyst report dated January 4, 2001: "We reiterate our intermediate- and long-term Buy opinion for McLeodUSA, given its fully

25

funded position, solid management and continued strong fundamental execution." Similarly, in an

analyst report dated January 5, 2001, Dain Rauscher Wessels ("Dain Rausher") reiterated its "Buy-

Aggressive" rating:

* MCLD pre-announced Q4 results that exceeded our and consensus estimates on both
  finanical and operational metrics.
* The company plans to issue $750 million of eight-year senior notes; proceeds will be used
  to pay down the revolver, and the size of the offering was increased by $300 million from
  the prior day.
* MCLD remains fully funded to positive free cash flow.
* We view both announcements positively and reiterate our Buy-Aggressive rating.

59.     On January 30, 2001, McLeodUSA issued a press release formally announcing its

financial results for the fourth quarter of 2000 and fiscal year 2000, the periods ended December 31,

2000 (the "January 30 Press Release"). The Company reported revenues of $1.4 billion and EBITDA

of $60.80 million. Defendant McLeod commented on the results, stating in pertinent part as follows:

> This was an extraordinary year for McLeodUSA as evidenced by our year-over-year
> accomplishments. That said looking back is never as energizing as looking ahead. We
> are very excited about the groundwork we have laid for our future. We began the year
> with the addition of industry veteran Roy Wilkens and ended the year with impressive
> growth in our network assets and team. A key component for our future is our One
> Functional Network (SM), providing voice and data, local and long-haul, narrow band
> and wide band, and end-to-end next generating services -- enabling us to take our core
> strategy of getting and keeping customers to the next level.

Defendant Gray also commented on the results, stating in pertinent part as follows:

> Our outstanding operational statistics establish 2000 as a year of consistent and
> impressive growth for the Company. We grew our number of competitive local service
> customers by 52 percent during the year, while growing telecommunications revenue by
> 72 percent. Further, we acquired and integrated two sizable publicly traded companies
> during the year, and although both were EBITDA negative, we achieved the desired
> synergies and posted positive EBITDA for the 13th consecutive quarter. Given the
> challenging market environment faced this year by companies in this sector, we are

especially pleased that our team was able to stay focused and post these continued strong results. [Emphasis added].

60.     Securities analysts that followed McLeodUSA securities continued to react positively to the Company's purported financial results. Indeed, Thomas Weisel Partners, LLC ("Thomas Weisel") stated in an analyst report dated January 31, 2001:

> With important business metrics like revenue-per-customer improving as expected, and with new data services beginning to contribute meaningfully to the top-line, we believe McLeodUSA will continue to meet or exceed our expectations . . . and we maintain this is one of the more undervalued stories in the CLEC universe. We reiterate our Buy rating.

Similarly, Ladenburg, Thalmann & Co. Inc. ("Ladenburg Thalmann") stated in an analyst report dated January 31, 2001:

> The company's strong results continue to prove that the company's business plan is working. We feel that the company's strong management and business plan are demonstrating results, and continued EBITDA positive results make it a good investment within the CLEC industry. We continue to rate the common stock of MCLD a near term and long term Buy.

Dain Rauscher, in an analyst report dated January 31, 2001, reported that McLeodUSA's fourth quarter 2000 results exceeded their revenue and EBITDA estimates, noted that the Company's then-current business model is fully funded to positive free cash flow, and reiterated its Buy-Aggressive rating. Likewise, Merrill Lynch reiterated its intermediate and long term Buy rating in an analyst report dated January 31, 2001.

61.     On February 20, 2001, McLeodUSA issued a press release announcing that it "reconfirmed" its financial guidance for fiscal year 2001 (the "February 20 Press Release"). The February 20 Press Release stated in pertinent part as follows:

27

Company management reiterated its year-end revenue and EBITDA targets of $2.1 billion and $225 million respectively. These figures represent a 50 percent increase in revenue and a 270 percent increase in EBITDA performance over 2000.

62.     Once again, based on the Company's announced guidance, Dain Rauscher reiterated its Buy-Aggressive rating in an analyst report dated February 22, 2001. The same day, the price of McLeodUSA common stock rose $1.56 per share to $13.06 per share, representing a 13.5% increase. In contrast, the NASDAQ Composite Index declined by 1.06% that same day.

63.     On March 29, 2001, McLeodUSA filed its Form 10-K for the year ended December 31, 2000 (the "Form 10-K") with the SEC, which was signed by defendants McLeod and Gray, among others. The Form 10-K reported revenue of $1.396 billion, and EBITDA of $60.7 million and purported to contain audited financial statements.

64.     The statements referenced in ¶¶ 52, 54-56, 59 and 61 above, were each materially false and misleading when made as they misrepresented and/or omitted the following adverse facts which then existed and were known to or recklessly disregarded by defendants, disclosure of which was necessary to make the statements made not false and/or misleading, including:

(a)     that McLeodUSA was engaged in improper accounting practices which had the effect of materially overstating the Company's reported earnings (as particularized in ¶¶ 32-39 above), including recognizing revenue from sales and accounts that had been canceled by customers; improperly recording revenue from fictitious sales; falsely booking orders to certain of its customers who never agreed to purchase McLeodUSA's product; and back-dating contracts to recognize additional revenue at the end of a fiscal quarter;

28

(b)     that the Company's financial statements issued during the Class Period were

not prepared in accordance with GAAP and/or McLeodUSA's publicly disclosed corporate policy (as

detailed in the section below entitled "McLeodUSA's Deceptive Accounting and Financial Reporting")

and were therefore materially false and misleading;

(c)     that McLeodUSA's business was deteriorating such that management was

employing and/or had actual knowledge of or recklessly disregarded improper accounting practices in

an effort to conceal this negative trend; and

(d)     that McLeodUSA had failed to successfully integrate SplitRock or CapRock

(as particularized in ¶¶ 40-45 above) and that the acquisitions did not provide the reported synergy and

growth.

65.     On April 19, 2001, defendants filed a Form S-4 Registration Statement for the

acquisition of Intelispan[4] with the SEC, signed by defendants McLeod, Gray, and Patrick, among

others. Then, on April 27, 2001, McLeodUSA filed the Prospectus with the SEC for the

McLeodUSA common stock to be issued in connection with the Company's acquisition of Intelispan.

The Prospectus purported to contain audited financial information for McLeodUSA.   Intelispan

disseminated the Prospectus as part of a Proxy Statement to Intelispan shareholders.

---

[4]On March 19, 2001, McLeodUSA issued a press release announcing that the Company had
agreed to acquire Intelispan for $40 million in McLeodUSA stock (the "March 19 Press Release").
According to the March 19 Press Release, Intelispan shareholders would receive approximately .03 of
a share of McLeodUSA Class A common stock in exchange for each share of Intelispan common
stock. The March 19 Press Release also stated that "McLeodUSA will issue up to 3.5 million new
shares in order to complete the transaction."

66.    The Prospectus, and Registration Statement, were materially false and misleading because they misrepresented and/or omitted the following adverse facts which then existed and were known to or recklessly disregarded by defendants, disclosure of which was necessary to make the statements made not false and/or misleading, including:

(a)    that McLeodUSA was engaged in improper accounting practices which had the effect of materially overstating the Company's reported earnings (as particularized in ¶¶ 32-39 above), including recognizing revenue from sales and accounts that had been canceled by customers; improperly recording revenue from fictitious sales; falsely booking orders to certain of its customers who never agreed to purchase McLeodUSA's product; and back-dating contracts to recognize additional revenue at the end of a fiscal quarter;

(b)    that the Company's financial statements issued during the Class Period were not prepared in accordance with GAAP and/or McLeodUSA's publicly disclosed corporate policy (as detailed in the section below entitled "McLeodUSA's Deceptive Accounting and Financial Reporting") and were therefore materially false and misleading;

(c)    that McLeodUSA had failed to successfully integrate SplitRock or CapRock (as particularized in ¶¶ 40-45 above) and that the acquisitions did not provide the reported synergy and growth; and

(d)    that the Company was failing to timely and properly recognize hundreds of millions of dollars in impairment losses in connection with certain acquisitions (as detailed in the section below entitled "McLeodUSA's Deceptive Accounting and Financial Reporting"), such as SplitRock and CapRock.

30

67.    Moreover, in a section on Risk Factors, entitled "McLeodUSA May Not Be Able to Successfully Integrate Acquired Companies, Including Intelispan, into its Operations, Which Could Slow Its Growth," the Prospectus stated:

> The integration of acquired companies, including the proposed acquisition of Intelispan, into the operations of McLeodUSA involves a number of risks, including:
>
>    -difficulty integrating operations and personnel
>
>    -division of management attention
>
>    -potential disruption of ongoing business
>
>    -inability to successfully incorporate acquired assets and rights into the service offerings of McLeodUSA
>
>    -inability to maintain uniform standards, controls, or vendors
>
> Failure to overcome these risks or any other problems encountered in connection with the merger or other similar transactions could slow the growth of McLeodUSA or lower the quality of its services, which could reduce customer demand and have a negative impact upon the price of the McLeodUSA Class A common stock that Intelispan shareholders receive in the merger.

68.    The statements in ¶ 67, above, were materially false and misleading because at the time these statements were made, some or all of the risks identified therein had already materialized. Specifically, as would be revealed later in the Class Period: (i) the Company was *already* unable to successfully integrate acquired companies (as particularized in ¶¶ 40-43 above); (ii) the Company's inability to successfully integrate SplitRock and CapRock had *already* slowed growth and negatively impacted revenue (as particularized in ¶¶ 44-45 above); and (iii) the Company *already* had hundreds of millions of dollars in impairment losses in connection with certain acquisitions, such as SplitRock and CapRock (as detailed in the section below entitled "McLeodUSA's Deceptive Accounting and

31

Financial Reporting"). Consequently, slowed growth and negatively impacted revenue, unsuccessful

integrations, and impaired assets, were not, at the time of the statements, merely a potential future risk,

but rather a reality that was negatively affecting the Company.

69.     On May 2, 2001, McLeodUSA issued a press release announcing its financial results

for the first quarter of 2001 (the "May 2 Press Release"). The May 2 Press Release, entitled

"McLeodUSA Posts Strong First Quarter 2001 Results," reported that "[r]evenues were $433.0

million for the quarter ended March 31, 2001, compared to $288.3 million for the same period one

year ago, an increase of 50 percent." The May 2 Press Release also reported that "EBITDA . . . for

the quarter was a positive $22.4 million, up from $18.0 million for the first quarter 2000."

70.     Defendant McLeod commented on the Company's quarterly results stating in pertinent

part, as follows:

> In an economic climate where solid dependable results have become increasingly
> scarce, McLeodUSA has continued to meet or exceed our key operating metrics as
> well as revenue and EBITDA performance. Our confidence in our ability to execute on
> our core business opportunities remains strong.
>
> ****
>
> As Steve and I stated in our Letter to Shareholders this year, we believe the market
> opportunity is enormous and our position to capitalize on the opportunity is as good or
> better than ever. This is the time for the strong to get stronger, and we continue to
> believe we have the ability to do so.

Defendant Gray affirmatively stated that the highlights of the Company's quarterly results included

"[m]eeting or exceeding revenue expectations for the 20th consecutive quarter, [and] [e]xtending our

unbroken string of EBITDA positive quarters to 14. . . ."

71.     The May 2 Press Release was filed with the SEC on May 4, 2001, as an exhibit to a

Current Report on Form 8-K (the "May 4 Form 8-K").

72.     On May 3, 2001, during an investor conference call, defendants McLeod, Gray, and

Patrick discussed the Company's first quarter 2001 results at length (the "May 3 Conference Call").

During the May 3 Conference Call, defendant Patrick misrepresented McLeodUSA's financial position

and falsely provided guidance and prospects as follows:

> I'll begin by saying that we exceeded our revenue and EBITDA forecast. For the
> quarter ending March 31, we had revenues of $433 million, an increase of over 50%
> over the same quarter in 2000 and $3 million than our forecast. The quality of revenues
> also continue to be strong with a 70% year over year increase in competitive telecom
> revenues from $197 million to $335 million and research comp. and access combined
> remained at around 4% for total revenues both billed at reasonable rates. For our
> competitive revenues, local and LD were approximately 71%, private line and data
> approximately 23% and other competitive services at about 6%. Of that same
> competitive revenue balance, approximately 72% would be retail and 28% wholesale.
> These percentages are all generally consistent with that forecast in February for this
> quarter.
>
> Other remaining categories, ILEC highlight, directory and other business revenues were
> in line with expectations. Competitive local customers grew to 333,000, or 50% year
> over year. We continue growth in our major matrix as is detailed in our press release.
> Specifically, we exceeded our expected sales head count by 180 persons, from 1600
> to almost 1800. We continued to pursue market share with a sales force focused on
> the opportunity in our footprint. Our route miles increased by over 6,000 miles and
> 23.6 that's 29.8 thousand and our co-loads exceeded our forecast for the quarter.
>
> We had positive EBITDA for the 14th straight quarter. The breakdown of our $22.4
> million of EBITDA was about $9.7 million from competitive telecom, $11.6 million
> from publishing, and about $8.4 million from the ILEC, with a negative $7.3 million for
> corporate operations. All of our entities were EBITDA positive. EPS was a negative
> 30-1/2 cents and slightly better than that forecast. As for key balance sheet items, at
> the end of the quarter we had cash on hand and equivalents, along with access to
> available secure deadlines totaling over $1.05 billion.

We had gross and net PP&E of $3.6 billion and $3.15 billion respectively. CapEx of approximately $347 million for the quarter, $247 from the core McLeodUSA operation, and $100 million incurred by the former CapRock entity that was paid in the first quarter. Outstanding debt as of 3/31 was $3.5 billion and finally, equity and total assets of $2.58 billion and $7.8 billion respectively. In summary, given our cash on hand and our available secure debt line, our plan remains funded to free cash flow break even. In 2002, we expect to have EBITDA that exceeds our fixed charges, interest and preferred dividends and in 2003 we expect to see free cash flow generated.

Defendant Gray also commented on the Company's purported fully funded status:

[W]e remain funded to free cash flow and we expect (a) our EBITDA will cover our fixed costs, interests and preferred dividends in 2002 and (b) as Lyle stated earlier, we will see free cash flow in 2003. So, in closing, (a) This company is facing a number of opportunities and challenges but we like the opportunity and the team that we have. This is a good business executing on a viable plan. Next, this company has a customer base which is continuing to build with a very strong run rate today throughout this year and into 2002.

Next, there is a focus sales team which is growing from the first quarter of 2000 of approximately 1000 people to today, 1750, almost 1800 people. We are more productive today than we were a year ago. Our productivity per rep. is up 10%. Even with the softness in the economy, we have another 10% in addition to that by selling our new data products and services. We are also keeping our industry leading churn at approximately a ½ a percent per month. Despite the acquisition of CapRock and the margin effect on that, the core business improving margins at both the gross margin level and the operating income level and last but not least, we will continue to monitor and update our plans and manage this company within our available cash resources.

We believe that the actions today have reduced our execution risk in 2001, we remain funded and we have strengthened our position within telecom services.

73.     An analyst on the May 3 Conference Call asked Gray about the transformation of the SplitRock business. Gray responded that the SplitRock acquisition had been successfully integrated and characterized SplitRock as a "Rolls Royce" asset:

I guess there are three comments. Number one, the asset and the teams have been <u>fully integrated into McLeodUSA and have been for quite some time</u>. Secondly, regarding

34

the asset itself. That is a very good asset. You know the metaphor that we have quite frankly discussed with others is we have a Rolls Royce asset, now the challenge of this team is making sure that we've got it on the right track. As opposed to having a fixer-upper asset with a very bad road as well. So our outlook quite frankly is optimistic. We have included some further downward revisions in the outlook that I just provided earlier and also quite frankly think that the acquisition of Intelispan will further lever this Rolls Royce asset that we have. [Emphasis added].

At the conclusion of the May 3 Conference Call, defendant McLeod commented on the Company's

purported fully funded status:

I would like to close the call today. Certainly our first quarter results, I think, were very, very strong and as we look forward into the remaining part of 2001 I think our growth in 2001 is going to be very strong. We've got a great team and a funded plan. And today I think we've taken some steps to de-risk our execution vis-a-vis that plan. We on the McLeodUSA team really truly hold ourselves very accountable to our shareholders to build that long term shareholder value and that's what we are doing today.

74.      Securities analysts that followed McLeodUSA securities confirmed the significance of

the Company's statements. For example, in an analyst report dated May 4, 2001, Dain Rauscher

maintained its Buy-Aggressive rating stating: "McLeodUSA remains fully funded to positive free cash

flow, which we expect to occur in 2003." Similarly, Robertson Stephens ("Robertson") initiated

coverage of McLeodUSA with a "Buy Rating" in an analyst report dated May 11, 2001. In the same

report, Robertson stated: "We believe McLeodUSA is on the best-positioned CLECs in the US and

expect the company to survive the current industry shakeout, emerging as a large national carrier over

the next decade."

75.      On May 15, 2001, McLeodUSA filed with the SEC its Form 10-Q for the first quarter

of 2001, the period ended March 31, 2001 (the "May 15 Form 10-Q"), signed by defendants Gray

and Patrick, among others. The May 15 Form 10-Q reported revenue of $433.1 million, and EBITDA

of $22.4. In addition, with respect to the financial statements contained therein, the May 15 Form 10-

Q stated:

> The financial statements and related notes as of March 31, 2001, and for the three
> month period ended March 31, 2001 and 2000, are unaudited, but in the opinion of
> management, include all adjustments, consisting only of normal recurring adjustments,
> necessary for a fair presentation of our financial position and results of operations.

76.     On May 30, 2001, McLeodUSA issued a press release reaffirming the revenue and

EBITDA guidance for 2001 provided during the May 3 Conference Call (the "May 30 Press

Release"). The May 30 Press Release also affirmatively stated that at McLeodUSA's May 30, 2001

Annual Meeting of Stockholders, the "Company will confirm having approximately $1 billion in cash

and available cash, and its expectation to achieve free cash flow in 2003."

77.     The May 30 Press Release was filed with the SEC on May 30, 2001, as an exhibit to a

Current Report on Form 8-K (the "May 30 Form 8-K").

78.     On July 10, 2001, McLeodUSA issued a press release entitled "McLeod Expresses

Confidence in Outlook" (the "July 10 Press Release"). The Company reported that it had drawn down

$175 million under a secured credit facility leaving an undrawn balance of $550 million. The July 10

Press Release further represented that the Company had sold certain PCS licenses for $90 million.

Defendant Gray commented on these developments stating in pertinent part as follows:

> The sale of these licenses, purchased in 1997 for approximately $30 million, will
> contribute approximately four times that amount to our cash flow position this year.
> Coupled with our cash on hand and our ability to access additional cash as needed
> under our Secured Credit Facility, we continue to operate a funded plan through free
> cash flow in 2003.
>
> . . . This management team remains absolutely committed to meeting the objectives we
> have established, including increasing investor value over the long term. We intend to

> maximize our cash flow, continue solid growth in a challenging market, and manage
> through tough industry conditions. We look forward to providing details about our
> second quarter performance and future plans in early August. In the meantime our
> team remains confident in the long-term outlook for McLeodUSA.

79. On August 1, 2001, McLeodUSA issued a press release entitled "McLeodUSA

Strengthens Senior Management and Board, Positioning Company for Future Growth" (the "August 1

Press Release"). The Company reported that Chris Davis has been appointed Chief Operating and

Financial Officer, Steve Gray became President and CEO (Clark McLeod to continue as Chairman),

four current and former CEOs named to Board and Ted Forstmann, of the investment firm of

Forstmann Little, appointed as Chairman of Executive Committee of Board. In the August 1 Press

Release, the Company also reported its financial results for the second quarter of 2001, the period

ending June 30, 2001. The Company reported revenues of $473.6 million and EBITDA of $34.2

million. Defendant Gray commented on the results stating in pertinent part as follows:

> We are very pleased with our quarterly results. In addition, we saw improvements in
> our leading revenue indicators of sales productivity, new data services sales and
> revenue per customer. McLeodUSA is now electronically bonded on 100 percent of
> all line-level conversions and new order processing with Qwest and Ameritech in their
> respective states. We are already seeing improvements in our customer provisioning
> intervals.

The Company also reported that the investment firm, Forstmann Little, had agreed to invest an

additional $100 million in the Company in the form of 36.4 million shares of common stock issued at a

price of $2.75 per share and that Forstmann Little had also agreed to exchange the convertible

preferred stock that it had acquired in 1999 for new convertible stock with no dividend thereby saving

the Company $175 million over the next five years. The August 1 Press Release also provided

guidance for 2001 and 2002 stating in pertinent part as follows:

37

McLeodUSA announced today that it expects its 2001 EBITDA to be $150 to $155 million, excluding one-time events, on revenues of approximately $1.9 billion

For 2002, the company has set initial revenue and EBITDA targets of approximately $2.1 billion to $2.3 billion and $300 to $325 million, respectively.

Defendant Gray commented, stating in pertinent part as follows:

The senior management and Executive Committee of the Board will evaluate the details of our 2002 targets over the next quarter. . . With the new Forstmann Little investment and the elimination of cash dividends together with sales of certain non-core assets, we will have substantially improved cash position of the company, remaining more than fully funded.

80.     The August 1 Press Release was filed with the SEC on August 1, 2001, as an exhibit to a Current Report on Form 8-K (the "August 1 Form 8-K").

81.     Again, securities analysts that followed McLeodUSA securities continued to react positively to the Company's alleged financial results for the second quarter of 2001, the period ended June 30, 2001. Merrill Lynch stated in an analyst report dated August 3, 2001 that "McLeodUSA's second-quarter 2001 results were solid, with both revenue and EBITDA slightly ahead of . . . estimates." In the same report, Merrill Lynch stated: "[W]e continue to believe that McLeod is funded into 2003."

82.     On August 14, 2001, McLeodUSA filed with the SEC its Form 10-Q for the second quarter of 2001, the period ended June 30, 2001 (the "August 14 Form 10-Q"), signed by defendant Gray, among others. The August 14 Form 10-Q reported revenue of $473.6 million, and EBITDA of $34.2. In addition, with respect to the financial statements contained therein, the August 14 Form 10-Q stated:

38

The financial statements and related notes as of June 30, 2001, and for the three month period ended June 30, 2001 and 2000, are unaudited, but in the opinion of management, include all adjustments, consisting only of normal recurring adjustments, necessary for a fair presentation of our financial position and results of operations.

83.     On September 27, 2001, McLeodUSA issued a press release which reaffirmed that the Company was in a strong financial position (the "September 27 Press Release"). The September 27 Press Release also specifically disavowed any rumors of bankruptcy:

While ordinarily it is the company's policy not to comment on rumor and speculation, McLeodUSA believes it is in the best interest of its customers, investors and employees to comment on recent inaccurate rumors about the viability of the company. The company believes its stock has been trading irrationally based on these groundless rumors. McLeodUSA is confident in its future and has absolutely no intention of filing for bankruptcy.

The company believes it has the fundamentals in place to navigate through this difficult environment, and in fact, maximize the company's significant opportunity. McLeodUSA is on track to complete its detailed review and will communicate its plans to shareholders in the next several weeks. [Emphasis added].

84.     On September 28, 2001 the price of McLeodUSA common stock rose from $0.31 per share to $0.76 per share, representing a 145% increase.

85.     The statements referenced in ¶¶ 69-73, 75-80, 82 and 83 above, were each materially false and misleading when made as they misrepresented and/or omitted the following adverse facts which then existed and were known to or recklessly disregarded by defendants, disclosure of which was necessary to make the statements made not false and/or misleading, including:

(a)     that McLeodUSA was engaged in improper accounting practices which had the effect of materially overstating the Company's reported earnings (as particularized in ¶¶ 32-39 above), including recognizing revenue from sales and accounts that had been canceled by customers;

improperly recording revenue from fictitious sales; falsely booking orders to certain of its customers who never agreed to purchase McLeodUSA's product; and back-dating contracts to recognize additional revenue at the end of a fiscal quarter;

(b)      that the Company's financial statements issued during the Class Period were not prepared in accordance with GAAP and/or McLeodUSA's publicly disclosed corporate policy (as detailed in the section below entitled "McLeodUSA's Deceptive Accounting and Financial Reporting") and were therefore materially false and misleading;

(c)      that McLeodUSA's business was deteriorating such that management was employing and/or had actual knowledge of or recklessly disregarded improper accounting practices in an effort to conceal this negative trend;

(d)      that McLeodUSA had failed to successfully integrate SplitRock or CapRock (as particularized in ¶¶ 40-45 above) and that the acquisitions did not provide the reported synergy and growth;

(e)      that the Company was failing to timely and properly recognize hundreds of millions of dollars in impairment losses in connection with certain acquisitions (as detailed in the section below entitled "McLeodUSA's Deceptive Accounting and Financial Reporting"), such as SplitRock and CapRock; and

(f)      that defendants abandoned plans for the national network by August 2001 (as particularized in ¶¶ 46-47 above).

86.      In addition, the statements in ¶ 83, above, were materially false and misleading when made because, as evidenced by, inter alia, Ted Fortsmann's admission, defendants had *already*

40

initiated discussions regarding bankruptcy and/or begun work on a restructuring plan (as particularized in ¶¶ 48-51 above).

87.     Only days later, on October 3, 2001, McLeodUSA issued a press release announcing that the Company was abandoning its plans for a national network and that it had identified non-strategic assets for sale (the "October 3 Press Release"). The Company also reported that Forstmann Little and the company had purportedly "mutually agreed" to abandon Forstmann Little's $100 million common stock purchase announced several weeks earlier. The Company also reported that it would be taking a $2.9 billion writedown of goodwill and other long-lived assets. Furthermore, McLeodUSA "revised" its financial forecast announcing that the Company now expected full year 2001 revenues of approximately $1.8 billion and EBITDA of $130 million. For 2002, the Company reported that it expects revenues to be approximately $1.8 billion and EBITDA of approximately $250-275 million. Despite these revelations, defendants continued to mislead the investing public by claiming that McLeodUSA maintains a "fully-funded" plan. In this regard, the October 3 Press Release stated in pertinent part as follows:

> Fully Funded Status Based on the significant cost reductions, expected asset and inventory sales and the elimination of cash dividends on the preferred stock, along with the $550 million that remains available to the company under its bank credit facility, the company believes its revised business plan is fully funded. It now expects to have cash and liquidity of approximately $400 million at year-end 2002.

88.     Following this announcement the price of McLeodUSA common stock dropped from $0.65 per share to $0.43 per share, representing a 33.3% decrease.

89.     On November 14, 2001, McLeodUSA issued a press release announcing its financial results for the third quarter of 2001, the period ending September 30, 2001 (the "November 14 Press

Release"). The Company reported revenues of $450.5 million and EBITDA of $25.7 million.

Defendant Gray commented on the results in pertinent part as follows:

> Since Chris Davis joined us 90 days ago, we have developed and begun implementing a strategic business plan designed to refocus our business on customers in our core areas of expertise while maximizing operating cash flow and profitability. We continue to make substantial progress, and are particularly pleased with the fact that our long distance and local migration projects, both integral in improving profitability, are on track for completion early in the first quarter of 2002.

Defendant Davis also commented on the results stating in pertinent part as follows:

> The initiatives we announced in early October are well underway and have already begun to positively impact our performance," Chief Operating and Financial Officer Chris Davis stated. "We are particularly pleased with the progress of the business process teams, which have identified substantial opportunities for operational improvement."

The Company also reiterated that McLeodUSA was fully funded stating in pertinent part as follows:

> For the full year of 2001, the Company continues to expect revenues of approximately $1.8 billion and EBITDA (excluding one-time non-cash charges) of approximately $130 million. The Company continues to believe its business plan is fully funded.

90. On November 14, 2001, McLeodUSA filed with the SEC its Form 10-Q for the third quarter of 2001, the period ended September 30, 2001 (the "November 14 Form 10-Q"), signed by defendants Gray and Davis, among others. The November 14 Form 10-Q reported revenue of $450.5 million. In addition, with respect to the financial statements contained therein, the November 14 Form 10-Q stated:

> The financial statements and related notes as of September 30, 2001, and for the three month period ended September 30, 2001 and 2000, are unaudited, but in the opinion of management, include all adjustments, consisting only of normal recurring adjustments, necessary for a fair presentation of our financial position and results of operations.

42

91.     Even late in the Class Period, securities analysts that followed McLeodUSA securities continued to react positively to the Company's purported financial results for the third quarter of 2001, the period ended September 30, 2001. Indeed, Thomas Weisel stated in an analyst report dated November 16, 2001 that the Company's reported third quarter revenue results were slightly above their estimate and "in-line with Street consensus." Moreover, in the same report, Thomas Weisel noted: "We continue to rate McLeod shares BUY."

92.     The statements referenced in ¶¶ 87, 89 and 90 above, were each materially false and misleading when made for the reasons stated above in ¶ 85. In addition, it was materially false and misleading to describe the Company's plans as "fully funded" as McLeodUSA lacked the finances to fund its plan and would necessarily need to restructure its debt obligations in order to remain solvent and avoid bankruptcy (as particularized in ¶¶ 48-51 above).

93.     On December 3, 2001, McLeodUSA issued a press release announcing that it had reached a recapitalization agreement with Forstmann Little and its secured lenders (the "December 3 Press Release"). Contrary to the Company's prior representations that it was "fully funded" the Company announced that it had reached an agreement on a comprehensive recapitalization because the Company's indebtedness was strangling the Company. Defendant Davis retreated from her prior representations regarding the Company's financial condition, stating in pertinent part as follows:

> Since announcing our revised business strategy to refocus McLeodUSA on its core business, we have made excellent progress. However, we believe that the Company's significant amount of debt and associated interest payments are an impediment to our ability to effectively execute our plan. This prompted us to explore with Forstmann Little and our senior lenders various options that would result in a more appropriate capital structure for the Company. We believe that the plan we are announcing today

presents the best approach to restructure the Company's debt in a timely, efficient manner.

The terms of the recapitalization were described in the December 3 Press Release as follows:

- Forstmann Little has committed to purchase McLeodUSA Publishing for $535 million with no financing contingency, subject only to customary closing conditions. Under the terms of the agreement with Forstmann Little, there is no break-up fee if the publishing business is purchased by another party, provided the recapitalization is completed.

- Forstmann Little will make an additional equity investment of $100 million in new preferred stock, which is mandatorily convertible to common stock. Upon completion of the recapitalization, Forstmann Little will convert its preferred Series D and Series E stock to new common stock and, including its new equity investment, will then hold approximately 45 percent of McLeodUSA post-recapitalization common stock.

- Theodore J. Forstmann, as Chairman of the McLeodUSA Executive Committee, will continue his substantial ongoing involvement with the Company.

- Chris A. Davis will remain Chief Operating and Financial Officer, Stephen C. Gray will remain President and Chief Executive Officer and Clark E. McLeod will remain chairman of the Board of Directors.

- In exchange for at least 95 percent of the outstanding $2,935 billion in bond debt, bondholders would receive their pro rata share of cash in an amount not less than $560 million. This cash payment will be funded by $535 million in net proceeds received from the sale of the publishing business and $25 million in cash from the new equity investment of Forstmann Little. Bondholders will also receive approximately 14 percent of the new McLeodUSA common stock upon completion of the recapitalization.

- The Series A existing public preferred stock, including accrued dividends, will also be converted in common stock pro rata according to liquidation preference, and are expected, after completion of the recapitalization, to hold 11 percent of the new common stock.

- Holders of existing Class A common stock are expected to retain 30 percent of the new shares.

- McLeodUSA and its Secured Lenders have agreed to amend their existing $1.3 billion senior secured credit facility to permit the use of proceeds from the sale of the publishing business to retire outstanding bond debt in connection with the recapitalization. McLeodUSA and its Secured Lenders have also agreed to modify the credit agreement to allow the company to

retain and use the proceeds from all currently identified future asset sales of non-core business and surplus assets for general working capital purposes in addition to capital expenditures.

- Additional terms and conditions of the transactions are outlined in the solicitation documentation, which will be sent to security holders.

94. In response to this announcement the price of McLeodUSA common stock declined to $0.40 per share, a 98.1% decline from a Class Period high of $22.43 per share reached on January 11, 2001.

## MCLEODUSA'S DECEPTIVE ACCOUNTING AND FINANCIAL REPORTING

95. Prior to the Class Period, McLeodUSA enjoyed exceptional revenue and earnings growth, resulting in a significant increase in the price of its common stock. However, when the demand for the Company's services began to stall and its business was faltering, defendants engaged in a series of manipulative accounting practices. These practices violated Generally Accepted Accounting Principles ("GAAP"), created a false impression about the demand for McLeodUSA's services and the value of McLeodUSA's assets.

96. GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time. As set forth in Financial Accounting Standards Board ("FASB") Statement of Concepts ("Concepts Statement") No. 1, one of the fundamental objectives of financial reporting is that it provide accurate and reliable information concerning an entity's financial performance during the period being presented. Concepts Statement No. 1, ¶ 42, states:

> Financial reporting should provide information about an enterprise's financial performance during a period. Investors and creditors often use information about the past to help in assessing the prospects of an

45

> enterprise. Thus, although investment and credit decisions reflect
> investors' and creditors' expectations about future enterprise
> performance, those expectations are commonly based at least partly on
> evaluations of past enterprise performance.

97.    Regulation S-X [17 C.F.R. § 210.4-01(a)(1)] states that financial statements filed with

the SEC that are not prepared in conformity with GAAP are presumed to be misleading and inaccurate.

The representations by the defendants that McLeodUSA's financial statements were prepared in

accordance with GAAP were materially false and misleading because the financial statements materially

inflated and distorted the Company's true financial performance during the Class Period.

98.    In an attempt to mask the waning demand for the Company's services, the defendants

caused McLeodUSA's employees to engage in a myriad of improper accounting practices, and/or

knowingly acquiesced in and condoned those practices. These practices concealed the truth about the

then current state and future prospects of the Company's business.

(a)    **McLeodUSA's Improper Recognition and Reporting Of Revenue**

99.    GAAP  provides that revenue should not be recognized until it is realized or realizable

and earned.  FASB Concepts Statement No. 5, ¶ 83. The conditions for revenue recognition

ordinarily are met when persuasive evidence of an arrangement exists, delivery has occurred or services

have been rendered, the seller's price is fixed or determinable, collectibility of the sales price is

reasonably assured and when the entity has substantially performed the obligations which entitle it to the

benefits represented by the revenue.  Generally, revenue should not be recognized until an exchange has

occurred and the earnings process is complete.  A transfer of risk has to occur in order to effect an

"exchange" for the purposes of revenue recognition.  SEC Staff Accounting Bulletin No. 101; FASB

Concept Statement Nos. 2 and 5; FASB Statement of Financial Accounting Standards ("SFAS") No.

48; Accounting Research Bulletin ("ARB") No. 43; Accounting Principles Board ("APB") Opinion No.

10; and American Institute of Certified Public Accountants ("AICPA") Statement of Position ("SOP")

97-2.

100.    McLeodUSA falsely represented that it complied with these accounting principles.  In

its December 31, 2000 Form 10-K, the Company disclosed the following with respect to its policy of

revenue recognition:

> Revenue recognition: Revenues for local and long-distance services are recognized
> when subscribers use telecommunications services. The revenue from long-term leases
> of fiber optic telecommunications networks is recognized over the term of the lease.
> Base annual revenue for telecommunications network maintenance is recognized on a
> straight-line basis over the term of the contract. Additional services provided under
> these contracts are recognized as the services are performed. The ILECs' toll revenue
> is provided through a combination of billed carrier access charges, traditional end-user
> billed toll revenues, interstate tariffed subscriber line charges and ICTC's share of
> revenues and expenses from the non- traffic sensitive pool administered by the National
> Exchange Carrier Association. The ILECs' prescribed rate of return on interstate
> access revenues for 2000 continues to be 11.25%, as it has been since the FCC's
> represcription order in December 1990. The FCC's rate of return rules also establishes
> a maximum for the overall interstate rate of return by allowing up to 0.25% over the
> prescribed rate, and also establishes a maximum rate of return for each individual
> access element by allowing up to 0.40% over the prescribed rate per element. Fees
> from telemarketing contracts are recognized as revenue in the period the services are
> performed. Revenues from directories are recorded upon publication. Customer
> deposits consist of cash received from customers at the time a sales contract is signed.
> They are recorded as revenue when the related directory is published or when the
> related service is performed. Effective January 1, 2000, pursuant to Securities and
> Exchange Commission Staff Accounting Bulletin No. 101 ("SAB No. 101"), the
> Company changed its accounting for certain activation and reactivation fees charged to
> its customers and for certain inducements paid to acquire new customers. The
> Company now defers these fees and inducements and records the related revenue and
> reduction of revenue over the average customer contract periods rather than recording
> the revenues and charges when received or paid. This change in accounting policy did
> not have a material effect on results of operations or financial position.

47

In general, the Company recognizes revenues at the time services are performed. On time and expense contracts, revenue is recognized as costs are incurred. On fixed-price contracts, revenues are recorded using the percentage-of-completion method of accounting by relating contract costs incurred to date to total estimated contract costs at completion. Contract costs include both direct and indirect costs.

101.   GAAP, in APB No. 22, ¶7, provides that the usefulness of financial statements in making economic decisions depends significantly upon the user's understanding of the accounting policies followed by a company. In fact, GAAP states that information about the accounting policies adopted by a reporting company is "essential" for financial statement users. (APB No. 22, ¶ 8) Accordingly, GAAP requires that financial statements identify and describe important judgments as to the appropriateness of principles relating to the recognition of revenue. (APB No. 22, ¶12)

102.   As noted above, the Company engage in widespread improper revenue recognition practices which violated GAAP and/or McLeodUSA's publicly disclosed policy of revenue recognition. Indeed, numerous former employees reported that the manipulation of the Company's sales figures appeared to be regular corporate practice. For example, McLeodUSA routinely recorded revenue from fictitious sales and regularly recognized revenue from sales and accounts that had been canceled by customers. In fact, numerous former employees reported that the Company, not only recognized revenue from orders that did not exist, but also reported revenue on fictitious customers. In addition, McLeodUSA fraudulently back dated contracts to recognize additional revenue at the end of a fiscal quarter.

103.   As a result of the forgoing practices during the Class Period, McLeodUSA materially inflated its operating results and violated its stated policy of revenue recognition and GAAP when it

48

recognized and reported revenue on such transactions because the "revenue" was not earned, services were not rendered, the collectibility of the sales price was not reasonably assured and the Company had not substantially performed the obligations which entitled it to the benefits represented by the revenue.

104.    To the detriment of unsuspecting investors, McLeodUSA's management directed or knowingly condoned and encouraged the process in which employees would improperly invoice orders, thereby inflating reported revenue. These practices masked the waning demand for McLeodUSA's services and created a false impression about the value of and prospects for McLeodUSA's business.

(b)    **McLeodUSA's Failure to Disclose Risks and Uncertainties**

105.    GAAP, requires that financial statements disclose existing uncertainties as to probable losses when it is at least reasonably possible (e.g., a greater than slight chance) that a loss may have been incurred. (SFAS No. 5, ¶ 10). The disclosure shall indicate the nature of the contingency and shall give an estimate of the possible loss, a range of loss or state that such an estimate cannot be made. Id.

106.    The SEC considers the disclosure of loss contingencies to be so important to an informed investment decision that it promulgated Article 10-01 of Regulation S-X, which provides that disclosures in interim period financial statements may be abbreviated and need not duplicate the disclosure contained in the most recent audited financial statements, except that, "where material contingencies exist, disclosure of such matters shall be provided even though a significant change since year end may not have occurred."

107.    In addition, GAAP, in the AICPA's Statement of Position No. 94-6, requires that financial statements disclose of significant risks and uncertainties associated with an entity's operations. (SOP 94-6, ¶8)

108.    In violation of GAAP, McLeodUSA failed to disclose the risks and uncertainties associated with its unsuccessful integration of the SplitRock and CapRock acquisitions. For example, former employees recounted numerous problems with McLeodUSA's attempt to integrate SplitRock and CapRock and confirmed that defendants Gray and Patrick knew the recent acquisitions did not perform as reported. The Company's failure to successfully integrate its acquisitions resulted in customer dissatisfaction, lost contracts and lower than expected sales and revenue.

109.    In violation of GAAP, the Company's financial statements improperly failed to inform investors about the risks and uncertainties associated with its inability to successfully integrate the SplitRock and CapRock. As a result, investors were denied information that was essential in assessing the value of McLeodUSA's securities and to an informed investment decision.

(c)    **McLeodUSA's Failure To Timely Record Impaired Goodwill**

110.    McLeodUSA's Class Period financial statements were otherwise materially false and misleading because the Company failed to timely record a loss due to an impairment in the value of its intangible assets. This was yet another way in which McLeodUSA's Class Period financial statements were not presented in conformity with GAAP or the rules and regulations of the SEC. As a result, the Company's true operating results were misrepresented and distorted.

111.    Indeed, McLeodUSA's March and June 2001 Forms 10-Q filed with the SEC were false and misleading as they represented the following regarding the Company's financial statements "in

the opinion of management include all adjustments, consisting only of normal recurring adjustments, necessary for a fair presentation of our financial position and results of operations. The information furnished herein includes all adjustments, which are, in the opinion of management, necessary for a fair presentation of results for these interim periods.".

112.     On March 30, 2000 and December 7, 2000, respectively, McLeodUSA acquired SplitRock and CapRock. The SplitRock acquisition was valued at $2.3 billion while the CapRock acquisition was valued at $579 million. The Company utilized the "purchase method" of accounting for the acquisitions. Pursuant to the purchase method required under GAAP, as set forth in APB Opinion No. 16, ¶11:

> The acquiring corporation records at its cost the acquired assets less liabilities assumed. A difference between the cost of an acquired company and the sum of the fair values of tangible and identifiable intangible assets less liabilities is recorded as goodwill.

113.     The purchase method also requires that the cost of the acquisition be allocated to individual net assets acquired based on their respective fair values. Accordingly, the Company allocated the cost of the mergers to net assets, including goodwill.

114.     GAAP provides that financial statements recognize and report a charge to income when: (a) information existing at the date of the financial statements indicates that it is probable (e.g., a likely chance) that an asset had been impaired and, (b) the amount of such loss can be reasonably estimated. In addition, FASB's SFAS No. 121 required that where events or changes in circumstances indicate that the carrying value of the asset may not be recoverable, then: (1) the entity shall estimate the future undiscounted cash flows resulting from the use of the asset and its disposition, and (2) compare the estimated future cash flows against the carrying (i.e., the reported) value of the asset. If the sum of

the expected future cash flows is less than the carrying value, the entity shall record an impairment loss. Pursuant to SFAS No. 121, if goodwill is associated with the assets subject to an impairment loss, the carrying value of goodwill is reduced to zero via a charge against earnings before an impairment loss is charged against the carrying value of the impaired asset.

115.    McLeodUSA's March 31, 2001 financial statements valued the assets it classified as goodwill, other intangibles and networks in progress assets at $5.054 billion. However, on or about May 15, 2001, when the Company filed such financial statements with the SEC the market valued the entire company at only $3.4 billion.

116.    Similarly, the Company's June 30, 2001 financial statements valued the assets it classified as goodwill, other intangibles and networks in progress assets at $4.710 billion. However, on or about August 14, 2001, when the Company filed such financial statements with the SEC the market valued the entire company at only $1.4 billion.

117.    The 65% decline in the market value of Company from January 30, 2001 to May 15, 2001 was a circumstance or event that indicated that the value of McLeodUSA's intangible goodwill assets were impaired at March 31, 2001. Between January 30, 2001 and August 14, 2001, when the Company filed its June 30, 2001 Form 10-Q, the market value of Company declined by more than 85%. Although the market, at that time, valued the entire Company at $1.4 billion, McLeodUSA's financial statements valued its goodwill, other intangibles and networks in progress assets at $4.710 billion.

118.    Ultimately the Company filed for relief under Chapter 11 of the Bankruptcy Code in January 2002. Shortly before, in October 2001, only after realizing it could no longer inflate its

operating results by ignoring the impairment in the value of its goodwill, the Company reported a $2.9 billion charge to write down the value of its goodwill and other long-lived assets.

119.    As a result of the foregoing accounting improprieties, McLeodUSA presented its financial results during the Class Period in a manner which violated numerous provisions of GAAP.  In addition to the accounting improprieties stated above, McLeodUSA presented its financial statements during the Class Period in a manner which also violated at least the following provisions of GAAP:

(i)       The concept that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions (Concepts Statement No. 1, ¶ 34);

(ii)      The concept that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that change resources and claims to those resources (Concepts Statement No. 1, ¶ 40);

(iii)     The concept that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (Concepts Statement No. 1, ¶ 50);

(iv)     The concept that financial reporting should provide information about an enterprise's financial performance during a period.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit

decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (Concepts Statement No. 1, ¶ 42);

(v)     The concept that financial reporting should be reliable in that it represents what it purports to represent. That information should be reliable as well as relevant is a notion that is central to accounting (Concepts Statement No. 2, ¶¶ 58-59);

(vi)     The concept of completeness, which means that nothing is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (Concepts Statement No. 2, ¶ 79);

(vii)     The concept that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (Concepts Statement No. 2, ¶¶ 95, 97).

120.     The foregoing accounting improprieties caused McLeodUSA to issue financial statements that materially falsified its financial performance to the detriment of unsuspecting investors and further masked the problems the Company was experiencing during the Class Period.  In failing to file financial statements with the SEC which conformed to the requirements of GAAP, McLeodUSA defendants repeatedly disseminated financial statements of McLeodUSA which were presumptively misleading and inaccurate.  Indeed, the numerous accounting machinations detailed herein evidence the defendants intent to deceive investors during the Class Period and misrepresent the truth about the

54

Company and its business, operations and financial performance to detriment of those who relied on them.

121.   The Company's Class Period Forms 10-Q reports were also materially false and misleading in that they failed to disclose known trends, demands, commitments, events, and uncertainties that were reasonably likely to have a materially adverse effect on the Company's liquidity, net sales, revenues and income from continuing operations, as required by Item 303 of Regulation S-K.

**Defendants' Materially False and Misleading Statements and Omissions
Were the Cause of the Damages Suffered by Plaintiffs and the Classes**

122.   The market for McLeodUSA's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, McLeodUSA's securities traded at artificially inflated prices during the Class Period.  Plaintiffs and other members of the Classes purchased or otherwise acquired McLeodUSA's securities in reliance upon the integrity of the market price of McLeodUSA's securities and market information relating to McLeodUSA, and have been damaged thereby.

123.   During the Class Period, defendants materially misled the investing public, thereby inflating the price of McLeodUSA's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

124.    At all relevant times, the material misrepresentations and omissions particularized in this

Complaint directly or proximately caused or were a substantial contributing cause of the damages

sustained by Plaintiffs and the other members of the Classes.  As described herein, during the Class

Period, defendants made or caused to be made a series of materially false or misleading statements

about McLeodUSA's financial condition, business, prospects and operations.  These material

misstatements and omissions had the cause and effect of creating in the market an unrealistically positive

assessment of McLeodUSA and its financial condition, business, prospects and operations, thus

causing the Company's securities to be overvalued and artificially inflated at all relevant times.

Defendants' materially false and misleading statements during the Class Period resulted in Plaintiffs and

the other members of the Classes purchasing or otherwise acquiring the Company's securities at

artificially inflated prices, thus causing the damages complained of herein.

### Additional Facts or Circumstances
### That Demonstrate That Defendants Acted with Scienter

125.    As alleged herein, defendants acted with scienter in that defendants knew or recklessly

disregarded that the public documents and statements issued or disseminated in the name of the

Company were materially false and misleading; knew or recklessly disregarded that such statements or

documents would be issued or disseminated to the investing public; and knowingly and substantially

participated or acquiesced in the issuance or dissemination of such statements or documents as primary

violations of the federal securities laws.  As set forth elsewhere herein in detail, defendants, by virtue of

their receipt of information reflecting the true facts regarding McLeodUSA, their control over, and/or

receipt and/or modification of McLeodUSA's allegedly materially misleading misstatements and/or their

56

associations with the Company which made them privy to confidential proprietary information

concerning Metromedia, were active and culpable participants in the fraudulent scheme alleged herein.

Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information

which they caused to be disseminated to the investing public.  The ongoing fraudulent scheme described

herein could not have been perpetrated during the Class Period without the knowledge and complicity

or, at least, the reckless disregard of the personnel at the highest levels of the Company, including

defendants.

126.    As particularized herein, defendants' public statements regarding the Company's

acquisitions, national network, funding status, sales, revenue, and financial position were lacking in a

reasonable basis at all relevant times.  During the Class Period, defendants issued a series of public

statements announcing strong sales, revenue and positive EBITDA.  In truth, the Company was

engaged in improper accounting practices which had the effect of materially overstating the Company's

reported earnings.  Defendants announced that the Company had successfully integrated SplitRock and

CapRock, both acquisitions formerly EBITDA negative.  In fact, the Company was unable to properly

manage the various acquisitions and the SplitRock and CapRock acquisitions did not provide the

synergy reported to investors and analysts.  Defendants did not publicly disclose that McLeodUSA was

abandoning its national network until October 2001 although several former employees stated that

McLeodUSA made the decision to abandon the Company's plans for a national network by August

2001.  Defendants repeatedly stated that the Company's then-current business plan was fully funded.

In reality, the Company was unable to service its substantial debt and lacked the financial flexibility to

avoid a restructuring. Nonetheless, defendants' public statements caused the price of McLeodUSA securities to be artificially inflated during the Class Period, thereby damaging Plaintiffs and the Classes.

127. Each defendant possessed substantial motives for misrepresenting McLeodUSA's financial status, revenue, operations, and future prospects throughout the Class Period. For example, the success of the Company's bond offering was dependent on defendants' fraudulent scheme. Defendants were further motivated to conceal the adverse facts detailed herein in order to acquire Intelispan using artificially inflated McLeodUSA stock as currency.

128. Moreover, defendants had strong motivation to manage McLeodUSA's revenue to create the illusion that the Company was meeting the declared revenue expectations of Wall Street analysts. Defendants knew that the failure to meet such expectations would have resulted in a drastic decline in stock price. As McLeodUSA's record of meeting Wall Street expectations became more and more consistent, quarter after quarter, its apparent success became more material to the Company's stock price. Indeed, McLeodUSA's apparent success in meeting Wall Street's revenue expectations was touted by securities analysts as a reason for buying the stock. For example, in an analyst report dated January 5, 2001, Dain Rauscher specifically noted that their "positive outlook on the [McLeodUSA] stock is rooted in the strength of the MCLD management team, which has demonstrated consistent execution, and an efficient, fully-funded network deployment and market penetration template." [Emphasis added]. Following McLeodUSA's false and misleading January 30 Press Release, Thomas Weisel stated in an analyst report dated January 31, 2001, that "[w]ith important business metrics like revenue-per-customer improving as expected, and with new data services beginning to contribute meaningfully to the top-line, we believe McLeodUSA will continue to

meet or exceed our expectations." [Emphasis added]. Similarly, in an analyst reported dated January 31, 2001, Ladenburg Thalmann identified McLeodUSA's success in meeting Wall Street's expectations as a reason for buying the Company's stock: "The company's strong results continue to prove that the company's business plan is working. We feel the company's strong management and business plan are demonstrating results, and continued EBITDA positive results make it a good investment within the CLEC industry. We continue to rate the common stock of MCLD a near term and long term Buy."

129.   Indeed, the Company itself continually trumpeted its ability to meet expectations. In this regard, during the January 4 Conference Call, defendant Gray stated: ". . . Net McLeodUSA once again, nineteen quarters of meeting or exceeding expectations, thirteen consecutive quarters of positive EBITDA . . . ." See supra, ¶ 55. Similarly, in the May 2 Press Release Defendant Gray, commenting on the Company's quarterly results, listed among the quarterly highlights, "[m]eeting or exceeding revenue expectations for the 20th consecutive quarter, [and] [e]xtending our unbroken string of EBITDA positive quarters to 14 . . . ." See supra, ¶ 70. Thus, defendants themselves were guiding Wall Street with respect to what quarterly figures were material.

130.   As defendants had planned and expected, securities analysts focused on McLeodUSA's apparent consistency in meeting Wall Street expectations as a reason to buy the stock throughout the Class Period. For example, in an analyst report dated May 2, 2001, Salomon Smith Barney noted that defendants reported first quarter 2001 results "exactly in line" with expectations and stated that McLeodUSA "remains one on our short list of real names that have good assets, good management, good liquidity, and clear execution capabilities in the market. We clearly would be buyers of the stock currently, especially if there is any near term stock price disruption." Likewise, Dain

Rauscher stated in an analyst report dated May 4, 2001, that "McLeod reported 1Q01 results that were in line to slightly better than our expectations on most metrics." In truth, had defendants not falsely inflated McLeodUSA's revenue, the Company would have failed to meet Wall Street expectations.

131.    Not surprisingly, securities analysts also focused on McLeodUSA's consistent performance in meeting Wall Street expectations during the second and third quarters of 2001. For example, Merrill Lynch stated in an analyst report dated August 3, 2001 that "McLeodUSA's second-quarter 2001 results were solid, with both revenue and EBITDA slightly ahead of our estimates." In an analyst report dated November 15, 2001, Merrill Lynch commented on McLeodUSA's better than expected third quarter 2001 revenues: "McLeodUSA reported third quarter revenues of $451 million, down 5% sequentially, an expected decline as the company announced intentions to pull back from its national strategy to concentrate on its 25 state footprint, but 2% above our expectations." Similarly, Thomas Weisel stated in an analyst report dated November 16, 2001 that "McLeod reported 3Q01 revenue of $450.5 million, slightly above our $446.7 million estimate and in-line with Street consensus. . . . We continue to rate McLeod shares a BUY."

132.    If defendants had not continued the Company's improper accounting practices throughout the Class Period, McLeodUSA would have failed to meet Wall Street projections for each of the first three quarters of 2001. Such conduct is exactly the type of wrongful conduct which violates the federal securities laws.

### Applicability Of Presumption of Reliance:
### Fraud-On-The-Market Doctrine

133.   Pursuant to their claims under Section 10(b) of the Exchange Act and Rule 10b-5

thereunder, Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-

market doctrine such that:

(a)   defendants made public misrepresentations or failed to disclose material facts

during the Class Period;

(b)   the omissions and misrepresentations were material;

(c)   the securities of the Company traded in an open and efficient market;

(d)   the misrepresentations and omissions alleged would tend to induce a reasonable

investor to misjudge the value of the Company's securities; and

(e)   Plaintiffs and the other members of the Classes purchased or otherwise

acquired their McLeodUSA securities between the time defendants failed to disclose or misrepresented

material facts and the time the true facts were disclosed, without knowledge of the omitted or

misrepresented facts.

134.   At all relevant times, the market for McLeodUSA's securities was an efficient market

for the following reasons, among others:

(a)   McLeodUSA's stock met the requirements for listing, and was listed and

actively traded on the NASDAQ, a highly efficient and automated market;

(b)   As a regulated issuer, McLeodUSA filed periodic public reports with the SEC

and the NASD;

(c)     McLeodUSA regularly communicated with public investors via established

market communication mechanisms, including through regular disseminations of press releases on the

national circuits of major newswire services and through other wide-ranging public disclosures, such as

communications with the financial press and other similar reporting services; and

(d)     McLeodUSA was followed by several securities analysts employed by major

brokerage firms who wrote reports which were distributed to the sales force and certain customers of

their respective brokerage firms.  Each of these reports was publicly available and entered the public

marketplace.

135.    As a result of the foregoing, the market for McLeodUSA's securities promptly digested

current information regarding McLeodUSA from all publicly available sources and reflected such

information in McLeodUSA's stock price.  Under these circumstances, all purchasers of

McLeodUSA's securities during the Class Period suffered similar injury through their purchase of

McLeodUSA's securities at artificially inflated prices and a presumption of reliance applies.

<u>**Inapplicability of Statutory Safe Harbor**</u>

136.    The statutory safe harbor provided for forward-looking statements under certain

circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.  The

statements alleged to be false and misleading herein all relate to then-existing facts and conditions.

Moreover, the specific statements pleaded herein were not identified as "forward-looking statements"

when made.   To the extent that any of the statements identified herein as materially false and misleading

are held by the Court to be forward-looking statements, there were no meaningful cautionary

statements identifying important then-present factors that could, and indeed did, cause actual results to

62

differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those materially false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer or director of McLeodUSA who knew that those statements were false when made.

## COUNT I

### Violations Of Section 11 Of The Securities Act
### Against All Defendants (excluding Chris Davis)

137.   Plaintiffs repeat and reallege each of the foregoing paragraphs as if fully set forth herein, except to the extent any allegations above contain any facts which are unnecessary or irrelevant for purposes of stating a claim under this Section, including allegations that may be interpreted to sound in fraud or relating to any state of mind on the part of defendants other than strict liability or negligence.

138.   This Count is brought by plaintiff Jeffrey Brandes on behalf of the Merger Class, pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, against all defendants (excluding Chris Davis). This claim does not sound in fraud and should be read to exclude any reference in the preceding paragraphs to recklessness, fraud, or intentional acts by the defendants.

139.   The Registration Statement in connection with the Merger transaction, was inaccurate and misleading, contained untrue statements of material facts (including but not limited to, false financial results), omitted to state other facts necessary to make the statements made not misleading, and concealed and failed adequately to disclose material facts as described above.

140.   McLeodUSA is the registrant for the shares issued in connection with the Merger. The defendants named in this Count were responsible for the contents and dissemination of the Registration Statement issued in connection with the Merger of Intelispan by and into McLeodUSA and caused it to be filed with the SEC. Each of the defendants named in this count signed the Registration Statement.

141.   Plaintiff Jeffrey Brandes and other members of the Merger Class acquired McLeodUSA shares issued in exchange for their Intelispan shares.

142.   None of the defendants named in this Count made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement and the Prospectus were true and without omissions of any material facts and were not misleading. Each of the defendants named in this Count acted negligently in issuing the Registration Statement and Prospectus.

143.   Defendants named in this Count issued, caused to be issued and participated in the issuance of materially false and misleading written statements to the investing public which were contained in the Registration Statement, which misrepresented or failed to disclose, inter alia, the facts set forth above. By reasons of the conduct herein alleged, each defendant violated, and/or controlled a person who violated, Section 11 of the Securities Act.

144.   At the times they acquired McLeodUSA shares, plaintiff Jeffrey Brandes and other members of the Merger Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts.

145.    As a result of the foregoing, plaintiff Jeffrey Brandes and members of the Merger Class have sustained damages. The value of McLeodUSA shares has declined substantially subsequent to and due to defendants' violations.

146.    This Count has been brought within one year after the discovery of the untrue statements or omissions, or after such discovery could have been made by the exercise of reasonable diligence, and within three years after the security was bona fide offered to the public.

## COUNT II

### Violations Of Section 12(a)(2) Of The Securities Act
### Against All Defendants (excluding Chris Davis)

147.    Plaintiffs repeat and reallege each of the foregoing paragraphs as if fully set forth herein, except to the extent any allegations above contain any facts which are unnecessary or irrelevant for purposes of stating a claim under this Section, including allegations that may be interpreted to sound in fraud or relating to any state of mind on the part of defendants other than strict liability or negligence.

148.    This Count is brought by plaintiff Jeffrey Brandes  pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l, on behalf of himself and other members of the Merger Class who acquired McLeodUSA common stock pursuant to the Registration Statement and Prospectus issued in connection with the Company's stock-for stock purchase of Intelispan, against all defendants (excluding Chris Davis). This claim does not sound in fraud and should be read to exclude any reference in the preceding paragraphs to recklessness, fraud, or intentional acts by the defendants.

149.    Defendants (excluding Chris Davis) were sellers and offerors of the shares offered pursuant to the Prospectus.

150. The Prospectus contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed to disclose material facts. Defendants' actions of solicitation included participating in the preparation of the false and misleading Prospectus.

151. The defendants named in this Count were obligated to make a reasonable and diligent investigation of the statements contained in the Prospectus, to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. These defendants in the exercise of reasonable care should have known of, the misstatements and omissions contained in the Prospectus as set forth above.

152. Plaintiff Jeffrey Brandes and other members of the Merger Class acquired McLeodUSA shares pursuant to the defective Prospectus. Plaintiff Jeffrey Brandes and the other members of the Merger Class did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions contained in the Prospectus.

153. By reason of the conduct alleged herein, these defendants violated, and/or controlled a person who violated, Section 12(a)(2) of the Securities Act. Accordingly, plaintiff Jeffrey Brandes and members of the Merger Class are entitled to damages pursuant to Section 12(a)(2).

154. This Count has been brought within one year after the discovery of the untrue statements or omissions, or after such discovery could have been made by the exercise of reasonable diligence, and within three years after the security was bona fide offered to the public.

## COUNT III

### Violation Of Section 15 Of The Securities Act
### Against All Defendants (excluding Chris Davis)

155.    Plaintiffs repeat and reallege each of the foregoing paragraphs as if fully set forth herein, except to the extent any allegations above contain any facts which are unnecessary or irrelevant for purposes of stating a claim under this Section, including allegations that may be interpreted to sound in fraud or relating to any state of mind on the part of defendants other than strict liability or negligence.

156.    This Count is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o against defendants (excluding Chris Davis). This Count does not sound in fraud.

157.    Each defendant (excluding Chris Davis) was a control person of McLeodUSA by virtue of their position as directors and/or senior officers of the Company. Defendants, excluding Chris Davis, each had a series of direct and/or indirect business and/or personal relationships with other directors and/or major shareholders of McLeodUSA.

158.    McLeodUSA, as issuer of the Registration Statement, would have been charged under Section 11 but for the Company's filing under Chapter 11 of the United States Bankruptcy Code. Each defendant named in this Count was a culpable participant in the violations of Sections 11 and 12(a)(2) of the Securities Act alleged in Counts I and II above, based on their having signed the materially false and misleading Registration Statement and having otherwise participated in the Merger.

## COUNT IV

### Violations Of Section 10(b) Of The Exchange Act
### And Rule 10b-5 Promulgated Thereunder Against All Defendants

159.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set

forth herein.

160.    This claim is asserted against all defendants for violations of Section 10(b) of the

Exchange Act and Rule 10b-5 promulgated thereunder.

161.    During the Class Period, defendants carried out a plan, scheme and course of conduct

which was intended to and, throughout the Class Period, did:  (i) deceive the investing public, including

plaintiffs and other Purchaser Class members, as alleged herein; (ii) enable McLeodUSA to acquire

Intelispan, as described herein, using $40 million of its artificially inflated common stock as currency;

and (iii) cause plaintiffs and other members of the Purchaser Class to purchase or otherwise acquire

McLeodUSA's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and

course of conduct, defendants, and each of them, took the actions set forth herein.

162.    Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue

statements of material fact and/or omitted to state material facts necessary to make the statements not

misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and

deceit upon the purchasers of the Company's securities in violation of Section 10(b) of the Exchange

Act and Rule 10b-5.  All defendants are sued either as primary participants in the wrongful and illegal

conduct charged herein or as controlling persons as alleged below.

163.    Defendants, individually and in concert, directly or indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of McLeodUSA as specified herein.

164.    Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of McLeodUSA's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about McLeodUSA and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of McLeodUSA securities during the Class Period.

165.    Each defendants' primary liability, and controlling person liability, arises from the following facts:  (i) defendants were high level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about

69

the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

166.    The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing McLeodUSA's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by defendants' overstatements and misstatements of the Company's business, operations and earnings throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discovery whether those statements were false or misleading.

167.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of McLeodUSA's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of McLeodUSA's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants but not disclosed in public statements by defendants during the Class Period,

plaintiffs and the other members of the Purchaser Class acquired McLeodUSA securities during the

Class Period at artificially high prices and were damaged thereby.

168.    By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act,

and Rule 10b-5 promulgated thereunder.

169.    As a direct and proximate result of defendants' wrongful conduct, plaintiffs and the

other members of the Purchaser Class suffered damages.

## COUNT V

### Violations Of Section 20(a) Of
### The Exchange Act Against All Defendants

170.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set

forth herein.

171.    Defendants acted as controlling persons of McLeodUSA within the meaning of Section

20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership

and contractual rights, participation in and/or awareness of the Company's operations and/or intimate

knowledge of the false financial statements filed by the Company with the SEC and disseminated to the

investing public, defendants had the power to influence and control and did influence and control,

directly or indirectly, the decision-making of the Company, including the content and dissemination of

the various statements which plaintiff contends are false and misleading.  Defendants were provided

with or had unlimited access to copies of the Company's reports, press releases, public filings and other

statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were

issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

172.    In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

173.    As set forth above, McLeodUSA violated Section 10(b) and Rule 10b-5, but was not charged with such violations because the Company has filed for protection under Chapter 11 of the United States Bankruptcy Code.  By virtue of their positions as controlling persons of McLeodUSA, defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of defendants' wrongful conduct, plaintiff and other members of the Purchaser Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

**WHEREFORE**, plaintiffs, individually and on behalf of the Classes, pray for relief and judgment, as follows:

(a)    Declaring that this action is a proper class action and certifying Lead Plaintiffs and plaintiff Jeffrey Brandes as class representatives pursuant to Rule 23 of the Federal Rules of Civil Procedure;

(b)    Declaring and determining that defendants violated the federal securities laws by reason of their conduct as alleged herein;

(c)     Awarding compensatory damages in favor of plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(d)     Awarding plaintiffs and the Classes their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(e)     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: June 17, 2002

**THE TOM RILEY LAW FIRM, P.L.C.**

By:_____

Tom Riley, Esq. (#LI0004610)
Peter C. Riley, Esq. (#LI0004605)
4040 First Avenue NE
P.O. Box 998
Cedar Rapids, Iowa  52406-0998
Telephone:  (319) 363-4040
Facsimile:  (319) 363-9789

**Liaison Counsel for the Class**

Sanford P. Dumain, Esq.
Christopher M. Huck, Esq.
**MILBERG WEISS BERSHAD HYNES &
  LERACH LLP**
One Pennsylvania Plaza
New York, New York  10119
Telephone:  (212) 594-5300
Facsimile:  (212) 868-1229

Darren Check, Esq.
David Kessler, Esq.
**SCHIFFRIN & BARROWAY, LLP**
Three Bala Plaza East, Suite 400
Bala Cynwyd, Pennsylvania 19004
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

**Co-Lead Counsel for the Class**

Laurence D. Paskowitz, Esq.
**ABRAHAM & PASKOWITZ**
One Penn Plaza, Suite 1910
New York, New York 10119-0165
Telephone: (212) 714-2444
Facsimile: (212) 279-3655

Mel E. Lifshitz, Esq.
Gregory M. Egelston, Esq.
**BERSTEIN LIEBHARD & LIFSHITZ, LLP**
10 East 40th Street, 22nd Floor
New York, New York 10016
Telephone: (212) 779-1414
Facsimile: (212) 779-3218

Evan Smith, Esq.
**BRODSKY & SMITH, LLC**
11 Bala Avenue, Suite 39
Bala Cynwyd, Pennsylvania 19004
Telephone: (610) 668-7987
Facsimile: (610) 660-0450

Steven E. Cauley, Esq.
Randall K. Pulliam, Esq.
**CAULEY GELLER BOWMAN & COATES**
P.O. Box 25438
Little Rock, Arkansas 72221-5438
Telephone: (501) 312-8500
Facsimile: (501) 312-8505

Paul J. Geller, Esq.
Jonathan M. Stein, Esq.
Jack Reise, Esq.
**CAULEY GELLER BOWMAN & COATES**
2255 Glades Road, Suite 421A
Boca Raton, Florida 33431
Telephone: (561) 750-3000
Facsimile: (561) 750-3364

Steven J. Toll, Esq.
Andrew N. Friedman, Esq.
**COHEN, MILSTEIN, HAUSFELD & TOLL**
1100 New York Avenue, NW
Washington, D.C. 20005-3934
Telephone: (202) 408-4600
Facsimile: (202) 408-4699

Kenneth A. Elan, Esq.
**LAW OFFICES OF KENNETH A. ELAN**
217 Broadway, Suite 404
New York, New York 10007
Telephone: (212) 617-0261
Facsimile: (212) 385-2707

Brian M. Felgoise, Esq.
**LAW OFFICES OF BRIAN M. FELGOISE**
230 South Broad Street, Suite 404
Philadelphia, Pennsylvania 19102
Telephone: (215) 735-6810
Facsimile: (215) 735-5185

Marc S. Henzel, Esq.
**LAW OFFICES OF MARC S. HENZEL**
273 Montgomery Avenue, Suite 202
Bala Cynwyd, Pennsylvania 19004
Telephone: (610) 660-8000
Facsimile: (610) 660-8080

Charles J. Piven, Esq.
**LAW OFFICES OF CHARLES J. PIVEN, P.A.**
The World Trade Center - Baltimore
401 East Pratt Street, Suite 2525
Baltimore, Maryland 21202
Telephone: (410) 332-0030
Facsimile: (410) 685-1300

Richard A. Lockridge, Esq.
Karen M. Hanson, Esq.
**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
100 Washington Avenue South, Suite 2200
Minneapolis, Minnesota 55401
Telephone: (612) 339-6900

Richard L. Pazdernik, Jr., Esq.
**NAZETTE, MARNER, WENDT, KNOLL &**
 **USHER L.L.P.**
100 First Street Southwest
Cedar Rapids, Iowa 52404
Telephone: (319) 364-0124

Marvin L. Frank, Esq.
**RABIN & PECKEL LLP**
275 Madison Avenue
New York, New York 10016
Telephone: (212) 682-1818
Facsimile: (212) 682-1892

David L. Baker, Esq.
**RICCOLO & BAKER, P.C.**
Suite 1140, APAC Building
425 Second Street, S.E.
Cedar Rapids, Iowa 52401
Telephone: (319) 365-9200
Facsimile: (319) 365-1114

Andrew M. Schatz, Esq.
Jeffrey S. Nobel, Esq.
Patrick A. Klingman, Esq.
Wayne T. Boulton, Esq.
**SCHATZ & NOBEL**
330 Main Street, 2nd Floor
Hartford, Connecticut 06106
Telephone: (860) 493-6292
Facsimile: (860) 493-6290

Jay P. Saltzman, Esq.
**SCHOENGOLD & SPORN, P.C.**
19 Fulton Street, Suite 406
New York, New York 10038
Telephone: (212) 267-8137
Facsimile: (212) 267-8137

David R. Scott, Esq.
**SCOTT & SCOTT LLC**
108 Norwich Avenue
P.O. Box 192
Colchester, Connecticut 06415
Telephone: (860) 537-3818
Facsimile: (860) 537-4432

Robert C. Susser, Esq.
**ROBERT C. SUSSER, P.C.**
6 E 43rd Street, Suite 1900
New York, New York 10017
Telephone: (212) 808-0298

Jules Brody, Esq.
Aaron Brody, Esq.
**STULL, STULL & BRODY**
6 East 45th Street
New York, New York 10017
Telephone: (212) 687-7230
Facsimile: (212) 490-2022

77

Steven P. Wandro, Esq.
**WANDRO, LYONS, WAGNER & BAER, P.C.**
2501 Grand Avenue, Suite B
Des Moines, Iowa  50312
Telephone:  (515) 281-1475

Joseph H. Weiss, Esq.
Joseph D. Cohen, Esq.
**WEISS & YOURMAN**
551 Fifth Avenue, Suite 1600
New York, New York  10176
Telephone:  (212) 682-3025
Facsimile:  (212) 682-3010

David L. Phipps, Esq.
**WHITFIELD & EDDY**
317 6th Avenue, Suite 1200
Des Moines, Iowa  50309-4195
Telephone:  (515) 288-6041
Facsimile:  (515) 246-1474

Gregory Mark Nespole, Esq.
Fred Taylor Isquith, Esq.
Katherine B. DuBose
**WOLF HALDENSTEIN ADLER FREEMAN &
  HERZ LLP**
270 Madison Avenue
New York, New York  10016
Telephone:  (212) 545-4600
Facsimile:  (212) 545-4653

Robert R. Hopper, Esq.
Carolyn G. Anderson, Esq.
**ZIMMERMAN REED, P.L.L.P.**
651 Nicollet Mall, Suite 500
Minneapolis, Minnesota  55402
Telephone:  (612) 341-0400

**Counsel for Plaintiffs**

78

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF IOWA
## CEDAR RAPIDS DIVISION

IN RE McLEODUSA INCORPORATED   )        Civil Action No. C02-0001
SECURITIES LITIGATION          )
                               )
--------------------------------------------------   )
                               )
This Document Relates to:  All Actions   )
                               )
--------------------------------------------------   )

## CERTIFICATE OF SERVICE

I certify that on June 17, 2002, a copy of the foregoing was served on counsel for Defendants:

Kevin H. Collins
Richard S. Fry
SHUTTLEWORTH & INGERSOLL, P.L.C.
500 Firstar Bank Building
PO Box 2107
Cedar Rapids, IA 52406-2107

by hand-delivery, and

Richard I. Werder, Jr., Esq.
JONES, DAY, REAVIS & POGUE
North Point
901 Lakeside Avenue
Cleveland, OH 44114

by overnight mail. I further certify that a courtesy copy was delivered to:

Attorney Kelly R. Baier
BRADLEY & RILEY, P.C.
2007 1st Avenue SE
PO Box 2804
Cedar Rapids, IA 52406-2804, Counsel for McLEODUSA INCORPORATED.

By:_____
            Peter C. Riley