RECEIVED AUG 0 8 2003

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CEDAR RAPIDS DIVISION

FILED
U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA
03 AUG -8 AM 10: 06
CEDAR RAPIDS HDQTRS. OFFICE

|  |  |  |
|---|---|---|
| IN RE MCLEODUSA INCORPORATED SECURITIES LITIGATION | ) ) ) ) ) ) | Civil No. C02-0001 |
|  |  | REPORT AND RECOMMENDATION FOR DEFENDANTS' MOTION TO DISMISS CONSOLIDATED AMENDED COMPLAINT |

## I. INTRODUCTION

This is a class action alleging violations of federal securities law. In general, plaintiffs allege defendants repeatedly lied to the investing public to conceal the financial deterioration of McLeodUSA Incorporated ("McLeodUSA"), a provider of telecommunications services. Presently before the court is Defendants' Motion to Dismiss the Consolidated Amended Class Action Complaint (Clerk's No. 29). Pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), the case was referred to this magistrate judge for further proceedings. (See Clerk's No. 43.) Oral arguments were heard and, for the reasons set forth below, it is recommended that defendants' motion be denied.

## II. SUMMARY OF AMENDED COMPLAINT

### A. Substantive Allegations

Plaintiffs filed a Consolidated Amended Class Action Complaint for Violation of the Federal Securities Laws (Clerk's No. 27)("Amended Complaint") on June 17, 2002. The action was brought on behalf of two classes: the "Purchaser Class" consisting of persons who purchased or otherwise acquired McLeodUSA securities from January 3, 2001 to December 3,

2001 (the "Class Period"); and the "Merger Class" consisting of persons who acquired

McLeodUSA common stock pursuant to a registration statement and prospectus issued in

connection with the company's stock-for stock acquisition of Intelispan, Inc. (Amended

Complaint ¶ 1.) The Purchaser Class alleges violations of the Securities Exchange Act of 1934,

15 U.S.C. § 78 *et seq.* ¶ 1. The Merger Class alleges violations of the Securities Act of 1933, 15

U.S.C. § 77a *et seq.* ¶ 1.

Plaintiffs allege defendants are four of McLeodUSA's senior officers who were

responsible for the public dissemination of materially false and misleading statements made

during the Class Period. ¶ 1. They are McLeodUSA's founder, Clark E. McLeod, who also

served as Co-Chief Executive Officer, Chairman of the Board of Directors, and as an Executive

Committee Member at times material to plaintiffs' claims; Stephen C. Gray who served as

President, Co-Chief Executive Officer, Director and Executive Committee Member; J. Lyle

Patrick who served as Chief Financial and Accounting Officer until August 1, 2001; and Chris A.

Davis who has served as Chief Operating and Financial Officer, Director, and Executive

Committee Member since August 1, 2001. ¶ 14. McLeodUSA was not named a defendant in the

complaint because it had filed for relief under Chapter 11 of the United States Bankruptcy Code.

¶ 13.

Plaintiffs allege that "beginning in January 2001 and continuing throughout the Class

Period, defendants knowingly and/or recklessly issued to the investing public materially false and

misleading statements concerning the Company's acquisitions, national network, sales, revenue,

and financial position." ¶ 31. Plaintiffs' allegations center around four general categories: (1)

McLeodUSA was engaged in improper accounting practices which had the effect of materially

2

overstating the company's reported earnings; (2) McLeodUSA was unable to properly manage various acquisitions or adequately integrate them into the company; (3) defendants secretly abandoned plans for a national network; and (4) McLeodUSA "was unable to service its substantial debt and lacked the financial flexibility to avoid a restructuring, despite public reassurances to the contrary." ¶ 31.

### 1. Alleged Sales and Accounting Manipulations

Plaintiffs allege that "according to several former employees," McLeodUSA misrepresented sales numbers and engaged in fraudulent accounting practices to materially inflate reported revenue throughout the Class Period." ¶ 32. As an example, plaintiffs allege "a former executive director of sales advised that 'what they were reporting versus the revenue that was coming in were two different numbers.'" ¶ 32. Plaintiffs claim "McLeodUSA resorted to a myriad of improper revenue recognition practices to report favorable financial results including recognizing revenue from sales and accounts that had been canceled by customers, improperly recording revenue from fictitious customers, and back-dating contracts to recognize additional revenue at the end of a fiscal quarter." ¶ 32.

In support of the allegation that "McLeodUSA regularly recognized revenue from sales and accounts that had been canceled by customers," plaintiffs allege

> a former employee based in the Chicago area reported that during the last week of September 2001 a customer referred to as "K & K Consulting" cancelled a large contract. The same former employed [sic] advised that he was specifically instructed by management not to report the cancellation until the next quarter "so they could make their numbers."

> A former director of sales for the east coast also reported that the Company booked large sales that were actually cancelled by customers and that manipulation of sales figures appeared to be regular corporate practice.

3

¶¶ 33, 34.

The allegations supporting plaintiffs' claim that McLeodUSA routinely recorded revenue

from fictitious sales include the following:

> [A] former employee in the Chicago area reported that during the Class Period the
> Chicago office, as a matter of regular practice, booked revenue from fictitious orders
> which would simply be canceled during the next quarter.

> [A] former executive director of sales advised that fictitious orders accounted for a
> substantial portion of the sales and revenue reported to investors and analysts during
> the Class period. The same former employee recalled that in a few months during
> the Class Period as much as 35% of the reported revenues were the result of a single
> fictitious order. Via access to internal sales reports, however, senior management
> knew that the order was fictitious or was reckless in not discovering that an order of
> that magnitude was fictitious.

> [A] former executive director of sales advised that the creation of fictitious customers
> was a regular practice during the Class Period. A former senior manager in the data
> services division also confirmed that these type of accounting manipulations occurred
> throughout the Class Period. For example, the same former employee advised that
> near the end of every month the Company "would pull something out to make the
> numbers."

> A former group vice president in Chicago advised that based on regularly updated
> reports it was clear that the numbers were manipulated and fraudulently reported to
> investors and analysts: "As the month would unfold, almost every month would show
> that we were behind on the numbers, and then out of nowhere, there may appear a
> line item on the report that would say 'Corporate Sales' and those sales would shoot
> up. Everyone would question, where the hell are they getting those sales?"

¶¶ 35-38.

In regard to the claim that "McLeodUSA fraudulently back-dated contracts," plaintiffs

contend

> a former senior sales manager for the small business group advised that the
> manipulation of sales numbers was a "company-wide" practice. For example, the
> same former employee recalled that the Company back-dated contracts to recognize
> additional revenue at the end of the fiscal quarters.

¶ 38.

### 2. Alleged Failure To Properly Manage or Adequately Integrate Various Acquisitions

The Amended Complaint states that "numerous former employees" reported that

McLeodUSA failed to successfully integrate the acquisitions of SplitRock Services, Incorporated

("SplitRock") and CapRock Communications Corporation ("CapRock") as publically proclaimed.

¶ 40.

> For example, a former group vice president for the eastern region stated that the Company experienced significant problems with the acquisition of CapRock because "CapRock had inherent product and networking failings." A former employee who was responsible for deploying and monitoring the switches for the national network stated there was no synergy recognized from the SplitRock or CapRock acquisitions because of McLeodUSA's failure to successfully integrate the acquisitions: "They never did combine things, all they did was cause more problems for McLeodUSA."

¶ 40. Plaintiffs make several similar allegations regarding this claim. *See* ¶¶ 41-45.

### 3. Alleged Failure to Disclose Information About National Network

According to plaintiffs, defendants publicly disclosed McLeodUSA's intention to abandon

plans for a national network on October 3, 2001. Plaintiffs allege that "several former employees

reported that internally, and undisclosed to investors, defendants had abandoned plans for a

national network no later than August 2001." ¶ 46.

> For example, even a former employee who was responsible for deploying and monitoring the switches for the national network confirmed that McLeodUSA's decision to abandon the national network was made well before defendants made the public announcement in October 2001.

> Indeed, a former director of sales for the east coast, a former group vice president for the southwest region, a former group vice president in Chicago, as well as a former employee responsible for managing part of the CapRock acquisition each independently advised that the decision to abandon the national network occurred prior to August 2001.

¶¶ 46, 47.

5

#### 4. Alleged Failure to Disclose Information Regarding Bankruptcy

McLeodUSA filed for Chapter 11 bankruptcy relief on January 31, 2002. ¶ 48.  An investment banking firm was engaged by McLeodUSA on October 25, 2001. ¶ 48.  Plaintiffs allege that a plan of reorganization was contemplated and developed from the beginning of the firm's engagement. ¶ 48.  They rely upon the following excerpt from a declaration submitted by the firm in support of the Amended Plan of Reorganization of McLeodUSA:

> In summary, Houlihan Lokey dedicated a full-time team of four restructuring professionals to the McLeodUSA restructuring, and its efforts included: extensive due diligence with management, assistance in the assessment of strategies set forth in McLeodUSA's Business plan, development of a financial restructuring model to project the expected financial performance of the Debtor giving effect to contemplated restructuring, assessing the appropriate capitalization of the Debtor in light of the projected cash sources and uses, negotiating with principal creditor constituencies to finalize a reorganization plan and assisting the Debtor in implementing the reorganization plan.

¶ 48.  Plaintiffs allege that defendants' contemplations of bankruptcy as early as October 2001 is at odds with McCleodUSA's public statements during the Class Period. ¶ 50.  Plaintiffs also rely on a comment by Ted Fortsmann during a news conference held by McLeodUSA on April 24, 2002.  Plaintiffs allege Fortsmann admitted that "[w]e did start talking about this [bankruptcy restructuring plan] about a year ago." ¶ 51.

#### 5. Other Supporting Allegations

After discussing the four categories, the Amended Complaint sets forth numerous other supporting allegations which will be briefly summarized.  Paragraphs 52 through 94 of the Amended Complaint contains allegations of materially false and misleading statements and omissions during the class period.  Plaintiffs begin with a press release issued by McLeodUSA on January 3, 2001, wherein defendant Patrick commented that "the company will meet or exceed the

average of the current market consensus for fourth quarter and year-end 2000." ¶ 52.  Plaintiffs

continue to make similar allegations based on press releases and investor conference calls.

Plaintiffs allege that on April 19, 2001, defendants filed a Form S-4 registration statement

of Intelispan with the SEC, signed by defendants McLeod, Gray, and Patrick, among others. ¶ 65.

On April, 27, 2001, McLeodUSA filed the prospectus with the SEC for the McLeodUSA common

stock to be issued in connection with the acquisition of Intelispan. ¶ 65.  Plaintiffs allege that the

registration and the prospectus were materially false and misleading because they misrepresented

and omitted adverse facts which were known to or recklessly disregarded by defendants. ¶ 66.

Plaintiffs identified the alleged adverse facts as follows:

> (a) that McLeodUSA was engaged in improper accounting practices which had the
> effect of materially overstating the Company's reported earnings . . . ;
>
> (b) that the Company's financial statements issued during the Class period were
> not prepared in accordance with GAAP and /or McLeodUSA's publicly disclosed
> corporate policy . . . ;
>
> (c) that McLeodUSA had failed to successfully integrate SplitRock or CapRock . . ;
>
> (d) that the Company was failing to timely and properly recognize hundreds of
> millions of dollars in impairment losses in connection with certain acquisitions . . .,
> such as SplitRock and CapRock.

¶ 66.

In paragraphs 95 through 121, plaintiffs allege deceptive accounting and financial

reporting practices including improper recognition and reporting of revenue (¶¶ 99-104), failure to

disclose risks and uncertainties (¶¶ 105-109), and failure to timely record impaired goodwill (¶¶

110-121).  Paragraphs 122 through 124 allege that defendants' materially false and misleading

statements and omissions were the cause of the damages suffered by plaintiffs.  In paragraphs 125

through 132, plaintiffs allege additional facts that demonstrate that defendants acted with scienter.

Plaintiffs address the applicability of the presumption of reliance under the fraud-on-the-market doctrine in paragraphs 133 through 135 and, finally, assert the inapplicability of statutory safe harbors in paragraph 136.

## B. Legal Counts

Following the substantive allegations, the Amended Complaint sets forth five counts.

Count I is brought on behalf of the Merger Class and alleges violations of section 11 of the Securities Act, 15 U.S.C. § 77k. ¶ 138. Section 11 provides in pertinent part as follows:

> In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security (unless it is proved that at the time of such acquisition he knew of such truth or omission) may . . . sue–
>
> (1) every person who signed the registration statement;
>
> (2) every person who was a director of (or person performing similar functions) or partner in the issuer at the time of the filing of the part of the registartion statement with respect to which his liability is asserted.

15 U.S.C. § 77k.

Count II is also brought on behalf of the Merger Class and alleges violations of section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l. ¶ 148. Section 12(a)(2) provides that any person who

> offers or sells a security . . . by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could have known, of such untruth or omission, shall be liable . . . to the person purchasing such security from him . . . .

15 U.S.C. § 77l(a)(2).

Count III asserts that defendants are liable as "controlling persons" within the meaning of

section 15 of the Securities Act, 15 U.S.C. § 77o. Section 15 provides in pertinent part as

follows:

> Every person who . . . controls any person liable under sections 77k or 77l of this title,
> shall also be liable jointly and severally with and to the same extent as such controlled
> person to any person to whom such controlled person is liable, unless the controlling
> person had no knowledge of or reasonable ground to believe in the existence of the
> facts by reason of which the liability of the controlled person is alleged to exist.

15 U.S.C. § 77o. Counts I, II and II are brought against all defendants except Davis. ¶¶ 138, 148,

156.

Count IV alleges violations of section 10(b) of the Exchange Act and Rule 10b-5

promulgated thereunder. ¶ 160. Section 10(b) provides that it shall be unlawful

> To use or employ, in connection with the purchase or sale of any security registered
> on a national securities exchange or any security not so registered, or any securities-
> based swap agreement (as defined in section 206B of the Gramm-Leach-Bliley Act),
> any manipulative or deceptive device or contrivance in contravention of such rules and
> regulations as the Commission may prescribe as necessary or appropriate in the public
> interest or for the protection of investors.

15 U.S.C. § 78j(b). Rule 10b-5 provides that it is unlawful

> (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue
> statement of a material fact or to omit to state a material fact necessary in order to
> make the statements made, in the light of the circumstances under which they were
> made, not misleading, or ©) To engage in any act, practice, or course of business
> which operates or would operate as a fraud or deceit upon any person, in connection
> with the purchase or sale of any security.

17 C.F.R. 240.10b-5.

Count V charges defendants with "control person" liability under section 20(a) of the

Exchange Act. Section 20 provides as follows:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). Counts IV and V are brought against all defendants.

### C. Defendant's Response to Substantive Allegations

In their memorandum, defendants challenged numerous substantive allegations set forth in the Amended Complaint. This report will note only a few of these contentions at this point and further discuss defendants' arguments when analyzing the legal issues.

In general, defendants argue that plaintiffs ignore the history and developments that contributed to the steady decline of McLeodUSA's stock, specifically the recession, tumultuous stock market, and severe pressure paced on stocks of telecommunications companies throughout 2001. (Defendants' Memorandum at 1.) Defendants also contend that the complaint "glosses over repeated and intense disclosures of the risks confronting McLeodUSA's business, and omits any reference to company-specific bad news that was published throughout 2001." *Id.* at 2.

Defendants point out that in the January 4, 2001 prospectus supplemental (referenced in ¶ 53 of the Complaint) McLeodUSA "candidly discussed the many substantial risks its investors faced." *Id.* at 4. The prospectus included items like "Our High Level of Debt Could Limit Our Flexibility," "Failure to Raise Necessary Capital Could Restrict Our Ability to Develop Network and Services and Engage in Strategic Acquisitions," "We May Not Be Able to Successfully Integrate Acquired Companies," and "We Expect to Incur Significant Losses Over the Next Several Years." *Id.* at 4-5.

Defendants further note that the 2000 Form 10-K repeated these warnings and mentioned McLeodUSA's previous losses and potentially volatile stock. *Id.* at 5. Specifically, the 10-K stated that "[t]he market price of our . . . common stock is extremely volatile and has fluctuated over a wide range . . . . The market price may continue to fluctuate significantly in response to various factors" including "market conditions in the industry," "quarterly variations in operating results or growth rates," "changes in estimates by securities analysts," and "general economic conditions." (Defendant's Ex. 3.) Defendants also note that the April 19, 2001 registration statement and prospectus for the Intelispan acquisition repeated the warnings, including that the market price of McCleodUSA stock was "extremely volatile." *Id.* at 6.

To support their arguments, defendants relied on information that, while not set forth in the Amended Complaint, is contained in documents relied upon in the Amended Complaint. Normally, a "court's decision to consider matters outside of the pleadings will transform a motion to dismiss for failure to state a claim into a motion for summary judgment." *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 546 n. 9 (8th Cir. 1997)(citing Fed. R. Civ. P. 12(b)(6)). Courts may consider, however, "all portions of documents relied upon in plaintiffs' complaints and of undisputed authenticity even though they are not physically attached to the pleading." *In re Engineering Animation Sec. Litig.*, 110 F.Supp.2d 1183, 1189 (S.D. Iowa 2000). In addition, where a plaintiff alleges a claim based on a prospectus, the court may consider the prospectus even if it was not attached to the complaint. *Parnes*, 122 F.3d at 546 n. 9.

Under these principles, this magistrate judge did consider the information relied upon by defendants. A New York attorney general's complaint against defendant Clark, which defendants challenge, was not considered as requested by plaintiffs. *See Kushner v. Beverly Enterprises, Inc.*,

317 F.3d 820, 830, 831-32 (8th Cir. 2003)(disputed papers should not be the subject of judicial

notice on a motion to dismiss).

## III.  LEGAL ANALYSIS

Under Federal Rule of Civil Procedure 12(b)(6), the court may dismiss all or a portion of a

claim for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).

When considering a motion to dismiss under Rule 12(b)(6), the court "will assume the facts

pleaded are true and will construe those facts in the light most favorable to the plaintiffs."

*Gebhardt v. Conagra Foods, Inc.*, 335 F.3d 824, 2003 WL 21488018 * 3 (8th Cir. 2003).  A

complaint should not be dismissed unless it appears beyond doubt that plaintiffs can prove no set

of facts in support of their claim which would entitle them to relief. *Parnes v. Gateway 2000, Inc.*,

122 F.3d 539, 546 (8th Cir. 1997).  As a practical matter, dismissal "'is likely to be granted only in

the unusual case in which a plaintiff includes allegations that show on the face of the complaint

that there is some insuperable bar to relief.'" *Id.* (quoted citation omitted).  In addition to these

general standards for dismissal under Rule 12(b)(6), plaintiffs' claims are subject to heightened

pleading requirements which are discussed in detail below. *See Kushner v. Beverly Enterprises,*

*Inc.*, 317 F.3d 820, 826 (8th Cir. 2003).

This report will address the issues in the same format briefed by the parties, beginning

with count IV which alleges a violation of section 10(b) of the Exchange Act.  Next, counts I and

II, which allege violations of sections 11 and 12(a)(2) of the Securities Act, are addressed.

Finally, counts III and V under which plaintiffs claim "control person" liability under section 15

of the Securities Act and section 20(a) of the Exchange Act are addressed.

## A.  Count IV: Violation of Exchange Act § 10(b)

Simply put, section 10(b) and Rule 10b-5 prohibit "fraudulent conduct in the sale and purchase of securities." *Kushner*, 317 F.3d at 826. In order to proceed on these claims, plaintiffs are required to show: "(1) misrepresentations or omissions of material fact or acts that operated as a fraud or deceit in violation of the rule;  (2) causation, often analyzed in terms of materiality and reliance;  (3) scienter on the part of the defendants;  and (4) economic harm caused by the fraudulent activity occurring in connection with the purchase and sale of a security." *In re K-tel International, Inc. Sec. Litig.*, 300 F.3d 881, 888 (8th Cir. 2002); *see also, e.g., In re Navarre Corp. Sec. Litig.*, 299 F.3d 735, 741 (8th Cir. 2002)(setting forth similar elements); *Engineering Animation*, 110 F.Supp.2d at 1190 (same).

The parties spend much of their arguments on the applicable pleading standards for a section 10(b) claim.  In *Kushner*, the Eighth Circuit discussed in depth the special heightened pleading standards applicable to the claim under the Private Securities Litigation Reform Act of 1995 ("Reform Act"):

> As always, we must view the factual allegations in the light most favorable to the plaintiff, *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 546 (8th Cir. 1997), but at the same time, in the context of securities fraud, we must "disregard 'catch-all' or 'blanket' assertions that do not live up to the particularity requirements of the [Reform Act]," [*Florida State Bd. of Admin. v. Green Tree Financial Corp.*, 270 F.3d 645, 660 (8th Cir. 2001)].
>
> * * *
>
> Congress enacted two heightened pleading requirements in the Reform Act. First, the Reform Act requires the plaintiff's complaint to specify each misleading statement or omission and specify why the statement or omission was misleading. 15 U.S.C. § 78u-4(b)(1) (Supp. IV 1998). If the allegation "is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." *Id.* Similarly, Rule 9(b) of the Federal Rules of Civil Procedure has long required that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."  The text of the Reform Act was designed "to

embody in the Act itself at least the standards of Rule 9(b)." *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 193 (1ˢᵗ Cir. 1999).

Second, Congress stated in the Reform Act that a plaintiff's complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2); *Green Tree*, 270 F.3d at 654. The Reform Act requires the court to dismiss the complaint if these requirements are not met. 15 U.S.C. § 78u-4(b)(3). "[U]nder the Reform Act, a securities fraud case cannot survive unless its allegations collectively add up to a strong inference of the required state of mind." *Green Tree*, 270 F.3d at 660.

> "Congress has effectively mandated a special standard for measuring whether allegations of scienter survive a motion to dismiss. While under Rule 12(b)(6) all inferences must be drawn in plaintiffs' favor, inferences of scienter do not survive if they are merely reasonable . . . . Rather, inferences of scienter survive a motion to dismiss only if they are both reasonable and 'strong' inferences."

*Id.* (quoting *Greebel*, 194 F.3d at 195-96)(alterations in original).

*Kushner*, 317 F.3d at 824, 826; *see also K-tel*, 300 F.3d at 889 (discussing pleading requirements under Reform Act); *Navarre*, 299 F.3d at 741-42 (same; noting plaintiffs technically do not need to meet requirements of both Rule 9(b) and the Reform Act, as the Act "supercedes reliance on 9(b) in securities fraud cases and embodies the standards of 9(b)").

These heightened pleading standards were adopted to eliminate abusive securities fraud litigation and to end "pleading fraud by hindsight." *Kushner*, 317 F.3d at 826, 829. The Reform Act does not change the traditional pleading rules with respect to the issues of materiality and loss causation. *Gebhardt*, * 4, n. 3. Here, defendants assert that plaintiffs fail to sufficiently plead fraud, materiality, scienter, and reliance.

### 1. Circumstances Constituting Fraud

To state the circumstances of the fraud with particularity, the complaint should include "'such matters as the time, place and contents of false representations, as well as, the identity of

the person . . . and what was obtained or given thereby . . . . This means the who, what, when, where, and how.'" *K-tel*, 300 F.3d 890 (quoting *Parnes*, 122 F.3d at 549-50). Defendants argue that plaintiffs fail to plead fraud with the required particularity.

Specifically, they contend that plaintiffs' allegations of improper treatment of sales (Amended Complaint ¶¶ 32-34, 39) or fictitious orders and customers (¶¶ 35-38) or acquisition troubles (¶¶ 40-45) fail to provide any specificity. Defendants assert that the complaint does not tell the source for each of these allegations sufficiently to judge their reliability or discover where, when, and with respect to what transactions they are supposed to have taken place. They also note that the complaint fails to quantify the effect of each of these alleged problems on McLeodUSA's financial statement.

Defendants argue that any failure to follow GAAP is insufficient alone to state a claim. In their view, any particular accounting decision on an issue, even if open to debate, is not necessarily improper or intentionally misleading. They assert that to adequately plead improper revenue recognition plaintiffs must identify specific improper transactions, including specific persons involved, particular dollar amounts, and particular financial reports, citing *Parnes*, 122 F.3d at 550. Defendants also claim that plaintiffs' acquisition-related claims merely allude in general terms to the typical kinds of issues that would arise in any acquisition or merger of two substantial companies. They contend there are no allegations of the severity, frequency or scope of the alleged problems, or how they affected McLeodUSA's operations or results. With respect to the national network, defendants take issue with plaintiffs' reliance of the fact a charge was taken in October 2001. In their opinion, plaintiffs generally aver that various revenues and assets were misstated but never specify what the supposedly correct numbers should have been.

In their resistance, plaintiffs assert that the Amended Complaint contains particularized

facts demonstrating that (1) McLeodUSA engaged in accounting improprieties that violated

GAAP; (2) defendants knew but did not disclose McCleodUSA's inability to manage and

integrate the SplitRock and CapRock acquisitions; (3) defendants secretly abandoned plans for the

national network before McCleodUSA's official announcement; and (4) defendants failed to

properly disclose the impending bankruptcy and McCleodUSA's failing financial condition. This

magistrate judge agrees.

In regard to the GAAP violations, plaintiffs point out the Amended Complaint contains

allegations that McLeodUSA recognized revenue from sales and accounts that had been cancelled

by customers (¶¶ 33-34), recorded revenue from fictitious orders and customers (¶¶ 35-38), and

back-dated contracts to recognize additional revenue at the end of a fiscal quarter (¶¶ 39).

Plaintiffs assert that these alleged facts directly contradict representations where McLeodUSA

claimed to follow GAAP, such as its December 31, 2000, Annual Report. As set forth in the

Amended Complaint, the Report stated, in part, that

> the Company recognizes revenues at the time services are performed. On time and
> expense contracts, revenue is recognized as costs are incurred. On fixed-price
> contracts, revenues are recorded using the percentage-of-completion method of
> accounting by relating contract costs incurred to date to total estimated contract costs
> at completion.

(¶ 100.) Plaintiffs further note that the Amended Complaint identifies other false and misleading

statements, including SEC filings, press releases, and conference calls, through which defendants

affirmatively furthered the fraud or failed to disclose the truth to investors. (*See* ¶¶ 52-94.) The

Amended Complaint identifies the alleged deceptive accounting practices including specific

provisions of GAAP. (*See* ¶¶ 95-104.) In plaintiffs' view, these allegations sufficiently identifies

who made the statement, where and when each statement was made, and why the statements were false and misleading.

Plaintiffs argue courts have "routinely held" that alleging contravention of GAAP with fraudulent intent constitutes sufficient pleading for securities fraud. The Eighth Circuit has repeatedly held that "[a]llegations of GAAP violations are insufficient to state a securities fraud claim unless coupled with evidence of corresponding fraudulent intent." *Kushner*, 317 F.3d at 831 (citing *K-tel*, 300 F.3d at 894; *Navarre*, 299 F.3d at 745; *Novak*, 216 F.3d at 309). Here, as discussed below in addressing the element of scienter, this magistrate judge finds that the Amended Complaint does set forth sufficient allegations of corresponding fraudulent intent on the part of defendants. Therefore, plaintiffs' allegations of GAAP violations are sufficient.

Plaintiffs also contend that contrary to defendants' argument they need not plead the exact amounts of the overstatements or the precise details of each specific transaction making up the financial fraud at issue. This magistrate judge agrees. The *Navarre* court agreed with the plaintiffs there that "they need not plead the exact amounts of the overstatements and/or the precise details of each specific transaction especially where the subject matter of the fraud is uniquely within the defendants' knowledge or control." *Navarre*, 299 F.3d at 744. The court emphasized, however, that plaintiffs must still allege with particularity the alleged fraudulent scheme. *Navarre*, 299 F.3d at 744, 745.

In regard to the integration of SplitRock and CapRock, plaintiffs contend the Amended Complaint identifies two occasions (January 30, 2001 and May 3, 2001) when McLeodUSA, through defendant Gray, fraudulently stated that the company had successfully integrated CapRock and SplitRock. (*See* ¶¶ 59, 73.) Plaintiffs further identify 6 SEC filings, 12 press

17

releases and 2 conference calls that omitted any reference to the failings of SplitRock and CapRock or the difficulties accompanying their integration with McCleodUSA. (*See* ¶¶ 52, 53, 55, 56, 59, 61, 63, 65, 69, 72, 73, 75, 76, 78, 79, 82, 83, 87, 89, 90, and 93.)  They also point out statements from former employees illustrating why defendants' misrepresentations and omissions were misleading. (*See* ¶¶ 40, 41, 42, 45.)

In regard to the abandonment of the national network, plaintiffs point to allegations that defendants repeatedly touted the importance to McCleodUSA of its national network strategy (¶¶ 30, 55, 70, 72, 73); that defendants provided numerous updates on its status and the success of the SplitRock and CapRock integration efforts (¶¶ 59, 73, 78, 83); that defendants did not advise investors that McCleodUSA was abandoning the national network until October 3, 2001 (¶¶ 46, 87); that five former employees independently confirmed that defendants secretly abandoned the national network before August 2001 (¶¶ 46, 47); and that defendants had ample opportunity to publicly disclose their abandonment intentions between August and October 2001, including two press releases and one SEC filing (¶¶ 79, 82, 83).

Plaintiffs also assert that the Amended Complaint contains particularized facts that demonstrate defendants knew of overwhelming impairment losses associated with the SplitRock and CapRock acquisitions but failed to take a timely write-down in contravention of Statement of Financial Account Standards Nos 5 and 121 and, therefore, GAAP. (*See* ¶¶ 15, 40-45, 115-116, 119.)

In regard to McLeodUSA's overall financial condition, plaintiffs allege how the company considered a financial reorganization of the company a year before its official announcement on December 3, 2001 (¶¶ 48-51) but continually represented that the company was fully funded,

18

"running a very conservative financial plan," and had "the fundamentals in place to navigate through this difficult environment and, in fact, maximize the company's significant opportunity." (*See* ¶¶ 56, 70, 72,73,74,78, 83.)  According to plaintiffs, defendants falsely reported on November 14, 2001, two weeks before filing for bankruptcy, that "[t]he Company continues to believe its business plan is fully funded." (*See* ¶ 89.)

Defendants argue that many of these allegations are insufficient because plaintiffs do not identify their sources by naming individuals.  This magistrate judge disagrees. *See Green Tree*, 270 F.3d at 667-68 (allegations that quoted individual and described him generally, but not by name, satisfied particularity requirement for scienter claims); *Novak v. Kasaks*, 216 F.3d 300, 314 (2nd Cir. 2000)(sources need not be named, only "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged"). *But see Engineering Animation*, 110 F.Supp.2d at 1192 (where allegations are based only on information and belief, complaint must set forth source of information and reasons for belief).

After reviewing the Amended Complaint, this magistrate judge concludes that plaintiffs have sufficiently plead their fraud claims with particularity.  Although the Amended Complaint does contain some "catch-all" or "blanket" assertions that do not live up to the particularity requirements, there are numerous allegations which specify the misleading statements and omissions and specify why the statements or omissions were misleading.  Contrary to defendants' assertions, this magistrate judge believes plaintiffs' allegations set forth the who, what, when, where and how of the alleged fraud and, therefore, are sufficient to meet the heightened pleading requirements of the Reform Act.

### 2. Materiality

Defendants argue that Count IV fails to meet the materiality standard for two reasons: (1) the safe harbor provisions of the Reform Act and (2) in light of all of the information available about McLeodUSA, the alleged misstatements and omissions could not have been material.

Defendants argue all of plaintiffs' claims except those relating to allegedly improper revenue sharing must be dismissed under the Reform Act's safe harbor provisions, 15 U.S.C. § 77z-2(c). Beginning with the first safe harbor provision, defendants are not liable with respect to any "forward-looking statement" that is "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement."15 U.S.C. § 77z-2(c)(1)(A)(i). Defendants contend that throughout the Class Period the McLeodUSA market was deluged with meaningful cautionary statements explaining the substantial risks the company faced.

Under the second safe harbor provision, defendants are not liable for a forward-looking statement if plaintiffs fail to prove that the statement was made with actual knowledge that the statement was false or misleading. 15 U.S.C. § 77z-2(c)(1)(B)(i). Defendants argue that plaintiffs' allegations do not meet this standard.

In their resistance, plaintiffs point out that only certain statements such as forecasts and projections qualify as "forward-looking." In plaintiffs' view, defendants' repeated assurances that SplitRock and CapRock is "fully integrated" and that McLeodUSA is "fully-funded" cannot qualify as forward-looking because they are statements of fact about current business conditions. Plaintiffs also argue that even if the statements were forward-looking, they still do not qualify for

20

the safe harbor because they were not couched within "meaningful cautionary statements." 15 U.S.C. § 77z-2(c)(1)(A)(1). In response to defendants' assertion that investors were "deluged" with cautionary statements, plaintiffs point out that defendants refer only to the "fine print" statements in the January 4, 2001 prospectus supplement, March 29, 2001 10-K, and April 19, 2001 Registration Statement concerning the potential problems with SplitRock and CapRock and the amount of debt carried by McCleodUSA. Plaintiffs argue that these statements did not accompany the "fully integrated" and "fully funded" misrepresentations but, instead, were buried in voluminous SEC filings disclosed to the public several months before many of the alleged misrepresentations.

In regard to the second safe harbor provision, plaintiffs claim that defendants knew the statements were false when they made them and, therefore, do not qualify for this safe harbor. *See* 15 U.S.C. § 77z-2(c)(1)(B)(I). They point to their allegations in paragraphs 32 through 39 of the Amended Complaint wherein they allege defendants knew of and intentionally masked the effects of McLeodUSA's suffocating debt on its business plan and the SplitRock and CapRock integration problems when they praised the financial health of the company and the incorporation of the SplitRock and CapRock acquisitions.

This magistrate judge agrees with plaintiffs and concludes that defendants are not entitled to dismissal of any claims based on the Reform Act's safe harbor provisions. While the safe harbor provisions create a legal defense, they do not constitute a complete bar at this stage when there are substantial material factual disputes.

This magistrate judge also finds that defendants second ground, that in light of all of the information available about McLeodUSA, the alleged misstatements and omissions could not

21

have been material, also fails. As recently stated by the Eighth Circuit, materiality is ordinarily a
question of fact for the jury. *Gebhardt*, 335 F.3d 824, * 3. "A fact is deemed material if there is a
substantial likelihood that the disclosure of the omitted fact would have been viewed by the
reasonable investor as substantially altering the mix of information available to the investor." *Id.*
Stated differently, material facts are those which "'would have assumed actual significance in the
deliberations of the reasonable shareholder.'" *K-tel*, 300 F.3d at 897 (quoted citation omitted). In
contrast, facts are "immaterial '[w]here a reasonable investor could not have been swayed' by the
misrepresentation." *Id.* (quoting *Parnes*, 122 F.3d at 546). Statements that are immaterial
"include vague, soft, puffing statements or obvious hyperbole." *Id.*

The importance of misrepresented facts are not to be judged with the advantage of
hindsight. *Gebhardt*, 335 F.3d 824, * 4. Instead, the court is required "to look at the information
from the perspective of a reasonable investor at the time of the misrepresentation, not form the
perspective of a reasonable investor looking back on how events unfolded." *Id.*

The court has recognized an exception "in cases where the false information is so
insignificant, in relation to the total mix of data available, that it would not have mattered to a
reasonable investor." *Id.* * 3. The *Gebhardt* court explained the exception in light of its previous
decision in *Parnes*, a case heavily relied upon by defendants:

> We addressed the propriety of deciding materiality as a matter of law in *Parnes v.
> Gateway 2000, Inc.*, *supra*, in which we affirmed the grant of a motion to dismiss a
> 10(b) claim. The defendant in *Parnes* overstated its assets by $6.8 million. We
> observed that the information misrepresented was insignificant because of its context -
> the investment at issue was a rapid-growth company that presented investors with
> great risk and great opportunity for reward. *Id.* at 547. In the present case, the
> defendants overstated their revenues by roughly forty times as much. However, any
> comparison of quantitative measures, either in ConAgra's or the plaintiffs' favor,
> misses the lesson of *Parnes*. The question of materiality hinges on the particular
> circumstances of the company in question . . . .

*Id.*

After considering the particular circumstances of McLeodUSA, this magistrate judge does not believe the exception applies here. Instead, there are many facts alleged in the Amended Complaint where, in this judge's opinion, there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by a reasonable investor as substantially altering the mix of information available to the investor. Consequently, plaintiffs have sufficiently pled materiality.

### 3. Scienter

"Scienter means the intent to deceive, manipulate, or defraud." *Green Tree*, 270 F.3d at 653 (internal quotations omitted). In addition to the standards set forth above, the *Kushner* court further discussed the specific pleading requirements for scienter:

> Although the Reform Act's heightened pleading rules require a showing of a "strong inference" of scienter, Congress did not codify any particular methods of satisfying that requirement. Thus, we believe that the Reform Act was not intended to alter the substantive nature of the scienter requirement, and our prior case law on the issue remains instructive.

> In general, inferences of scienter tested under the Reform Act will not survive a motion to dismiss if they are only reasonable inferences - the inferences must be "both reasonable and strong.'" Cases from other circuits suggest that a strong reference of the required scienter may arise where the complaint sufficiently alleges that the defendants (1) benefitted in a concrete and personal way from the purported fraud, (2) engaged in deliberately illegal behavior, (3) knew facts or had access to information suggesting that their public statements were not accurate, or (4) failed to check information they had a duty to monitor. "[W]e look to how other circuits have interpreted the strong-inference-of-scienter language as valuable guidance about what factors help to establish such an inference, but take care to use subsidiary formulae as an aid to interpreting the strong-inference standard and not as a substitute for it."

23

*Id.* at 827 (citations omitted).  The Eighth Circuit has stated that in general, "the issue of whether a particular intent existed is a question of fact for the jury." *K-tel*, 300 F.3d at 893-94 (discussing methods to establish scienter).

In *Kushner*, the Eighth Circuit held that the complaint at issue there did not meet the heightened standard because it made "no particular assertion of which defendant was responsible for which statement or omission, or how any defendant participated in the alleged scheme." *Kushner*, 317 F.3d at 827.  The court stated:

> Without allegations of particular facts demonstrating how the defendants knew of the scheme at the time they made their statements of compliance, that they knew the financial statements overrepresented the company's true earnings, or that they were aware of a GAAP violation and disregarded it, a showing in hindsight that the statements were false does not demonstrate fraudulent intent.  "Mere allegations of fraud are insufficient."  "[R]ote allegations that the defendants knowingly made false statements of material fact" fail to satisfy the heightened pleading standard of the Reform Act."

*Id.* at 827-28.

Here, defendants argue that plaintiffs have failed to plead scienter with the particularity demanded by the Reform Act.  They point out that the Amended Complaint does not charge anyone with insider trading, unusual economic incentives, or with selling stock in a way that would have reflected management pessimism unmatched by public disclosures.  Defendants assert that given the absence of such allegations, the absence of any strong inference of scienter follows *a fortiori*.  Defendants also note that defendant Gray spent over half a million dollars of his own cash to buy McLeodUSA stock in May 2001, in the middle of the alleged fraud.  They believe this fact negates any inference of motive to defraud.

Defendants also challenge any reliance by plaintiffs on the size of McLeodUSA's October 2001 $2.9 billion write-down.  In their view, the write-down was, in market terms, a non-event

because the market had already recognized the deteriorating business developments and incorporated them into the pricing of McLeodUSA stock. They note that on the date of the write-down's announcement the stock closed at 43 cents per share (Amended Complaint ¶ 88) and had been trading well below a dollar since early September (¶ 84).

Plaintiffs, on the other hand, contend that they have adequately alleged facts demonstrating conscious misbehavior and/or recklessness by the defendants. Specifically, plaintiffs point to allegations that defendants engaged in and/or knew and failed to disclose improper accounting practices (¶¶ 32-39), knew and failed to disclose that McLeodUSA was unable to properly manage and integrate the various corporate acquisitions (¶¶ 40-45), secretly abandoned plans for the national network (¶¶ 46-47), and knew and failed to disclose that McLeodUSA was unable to service its substantial debt and lacked the financial flexibility to avoid a restructuring, despite their public reassurances to the contrary (¶¶ 48-51). In addition, plaintiffs set forth the types of internal sales reports available to management. (*See* ¶ 15.)

In regard to the integration of acquisitions, plaintiffs allege that "a former group vice president for the southwest region advised that defendants Gray and Patrick knew that the Company was unable to manage the acquisitions." (*See* ¶ 42.) The Amended Complaint also states that "[a] former senior sales manager for the small business group confirmed that the Company misrepresented the data product to customers and McLeodUSA knew 'all along that the product was no good.'" (¶ 45.)

Although viewed as a close call, this magistrate judge believes plaintiffs' allegations of scienter raise both a reasonable and strong inference of the required state of mind. As noted, to establish scienter plaintiffs rely in part on assertions that defendants were reckless. The Eighth

Circuit has concluded that the Reform Act did not alter the substantive nature of the scienter requirement, which includes a measure of recklessness. *Kushner*, 317 F.3d at 828.

> Specifically, scienter may be demonstrated by severe recklessness involving "highly unreasonable omissions or misrepresentations" amounting to "an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." Recklessness, then, may be shown where unreasonable statements are made and the danger of misleading investors is so obvious that the defendant must have been aware of it. "[S]ecurities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements." Also, recklessness is shown where alleged facts demonstrate that the defendants failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud.

*Id.* (quoted citations omitted).

Again, this magistrate judge finds that it is a close call but ultimately concludes that plaintiffs have stated a claim based on recklessness. Consequently, plaintiffs have sufficiently plead scienter under the heightened pleading requirements of the Reform Act as set forth by the Eighth Circuit.

### 4. Reliance (As to Claimed Omissions)

To establish the element of reliance for their 10(b) claims, plaintiffs rely in part on the "fraud on the market theory." *See Basic Inc. v. Levinson*, 485 U.S. 224, 241-50, 108 S.Ct. 978, 99 L.Ed.2d 194 (holding fraud on the market theory is applicable to meet reliance element where corporations make materially misleading statements in an impersonal and efficient market); *see also Engineering Animation*, 110 F.Supp.2d at 1193 (finding reliance element met under fraud on the market theory). The doctrine "permits a Plaintiff to establish a rebuttable presumption of reliance based upon the premise that 'the market price of shares traded on well-developed markets reflects all publicly available information, and hence, any material misrepresentations.'" *Appletree*

*Square I, Ltd. Partnership v. W.R. Grace & Co.*, 29 F.3d 1283, 1287 (8th Cir. 1994)(quoting

*Levinson*, 485 U.S. at 246). Here, plaintiffs believe they are entitled to the presumption because

they have alleged that McLeodUSA traded on an open and highly efficient market and that the

misrepresentations and omissions alleged were material, citing paragraphs 133 through 135 of the

Amended Complaint.

Defendants concede that as to any misstatements the efficient market in McLeodUSA

stock establishes a presumption of reliance. As to any omissions, however, defendants contend

they are not covered by the fraud on the market doctrine unless the parties deal directly with one

another in face-to-face transactions, citing *In re NationsMart Corp. Sec. Litig.*, 130 F.3d 309 (8th

Cir. 1997) and *Engineering Animation.*

> In *NationsMart*, the court stated:
>
> Reliance typically requires plaintiffs to prove that alleged misrepresentations induced
> them to do something different from what they would otherwise have done in making
> investment decisions. In some situations, courts may presume reliance. In a case
> involving a failure to disclose information to investors, courts will presume reliance
> if the omitted information is shown to be material. The presumption of reliance in
> failure -to-disclose cases has been limited to situations where the parties deal directly
> with one another face-to-face transactions. Reliance may also be presumed under a
> fraud-on-the-market theory, "where materially misleading statements have been
> disseminated into an impersonal, well-developed market for securities."

*NationsMart*, 130 F.3d at 321 (citations omitted). Because the complaint in *NationsMart* alleged

no direct contact between plaintiffs and defendants, the court held that the plaintiffs were not

entitled to the presumption or reliance for the non-disclosure of material information. *Id.* at 322.

As for the fraud-on-the-market theory, the court held the doctrine did not apply because the

complaint "did not allege specific facts showing that a large number of people could buy or sell

the stock; that trading information on the stock was widely available; and that the market rapidly

reflected new information in price." *Id.*

The Southern District of Iowa, in *Engineering Animation*, noted:

If this had been a situation where the parties dealt directly with each other, a presumption of reliance would be allowed so long as information omitted by Defendants was shown to be material. *See In re NationsMart Corp. Securities Litig.*, 130 F.3d 309, 321 (8th Cir. 1997). That is not this case, however.

*Engineering Animation*, 110 F.Supp.2d at 1193 n. 15. The court found, however, that plaintiffs

met the reliance element based upon implicit allegations that plaintiffs "relied on the market price

every day during the relevant period, and that every day that price was affected by the amount of

the acquisitions . . . ." *Id.* at 1193. The court found that the alleged misstatements at issue there

were materially misleading. *Id.*

This magistrate judge agrees with defendants to the extent that, based on *NationsMart* and

*Engineering Animation*, plaintiffs are not entitled to a presumption of reliance for the non-

disclosure of material information. This conclusion, however, does not end the analysis on the

element of reliance. This magistrate judge agrees with plaintiffs' assertion that the fraud-on-the-

market presumption is not limited to those circumstances involving face-to-face transactions.

Instead, the doctrine applies here because plaintiffs allege that materially misleading statements

have been disseminated into an impersonal, well-developed market for securities. (*See* ¶¶ 133-35.)

Accordingly, plaintiffs have sufficiently pled reliance.

In sum, plaintiffs have sufficiently plead, under the heightened pleading requirements, the

essential elements to state a claim under section 10(b) of the Exchange Act. Therefore, it is

recommended that defendants' motion to dismiss as to count IV be denied.

### B. Counts I and II: Violations of Securities Act sections 11 and 12(a)(2)

Counts I and II are based upon allegations regarding the prospectus and registration statement issued in connection with McLeodUSA's May 2001 acquisition of Intelispan. These claims do not incorporate any of the complaint's charges of fraud. (*See* Amended Complaint ¶¶ 138, 148.)

The Eighth Circuit explained a section 11 claim under the Securities Act as follows:

> Section 11 imposes civil liability on persons preparing and signing materially misleading registration statements. A registration statement is materially misleading if it contains an untrue statement of material fact or if it omits a material fact necessary to prevent the statement from being misleading. Any person who purchases a registered security is entitled to sue under this section. Section 11 imposes "a stringent standard of liability on the parties who play a direct role in a registered offering." To establish a prima facie § 11 claim, a plaintiff need show only that he bought the security and that there was a material misstatement or omission. Scienter is not required for establishing liability under this section. The liability of the issuer of a materially misleading registration statement is "virtually absolute, even for innocent misstatements." Persons beside the issuer who face liability under § 11—which includes anyone who signed the registration statement, such as officers, directors, and underwriters—must prove that, after reasonable investigation, they had reasonable grounds to believe that the statement was not materially misleading."

*NationsMart*, 130 F.3d at 314-15 (citations omitted); *see also Alpern v. UtiliCorp United, Inc.*, 84 F.3d 1525, 1541 (8th Cir. 1996)(§ 11 claim "does not require proof of reliance, causation, or scienter, but only materiality and damages"). Because proof of fraud or mistake is not a prerequisite to establishing liability, the particularity requirement of Rule 9(b) does not apply to claims under section 11. *NationsMart*, 130 F.3d at 314.

Section 12(a)(2) of the Securities Act "creates a private remedy for the buyer of a security against the seller for material misrepresentations in connection with the offer and the sale." *NationsMart*, 130 F.3d at 318. Once the buyer establishes privity with the seller, "the buyer need prove only that there was a material misstatement or omission in the prospectus or oral

communication." *Id.* A "seller's only defense is that he did not know of the false material

misstatement and, in the exercise of due diligence, could not have discovered the misstatement."

*Id.* (citing 15 U.S.C. § 77*l*(2)). Reliance, fraud, and scienter are also not elements of a section

12(a)(2) claim. *Id.* Thus, as in the case of section 11, Rule 9(b) does not apply to claims brought

under section 12(a)(2). *Id.* at 319. Unlike section 11, section 12(a)(2) "imposes liability for

misstatements and omissions made after the public offering, as well as those made in the offering

materials." *Id.*

Defendants argue that Counts I and II should be dismissed because they are limited to

allegations that are immaterial as a matter of law. Defendants primarily rely upon *Parnes*. There,

the Eighth Circuit stated:

> A misrepresentation or omission is material if there is "a substantial likelihood that
> the disclosure of the omitted fact would have been viewed by the reasonable investor
> as having significantly altered the total mix of information made available." In many
> circumstances, of course, this presents a factual question for the jury to decide. Where
> a reasonable investor could not have been swayed by an alleged misrepresentation,
> however, a court may determine, as a matter of law, that the alleged misrepresentation
> is immaterial."

*Parnes*, 122 F.3d at 546 (citations omitted). The court noted that "[t]here are a variety of reasons why

an alleged misrepresentation or omission may, as a matter of law, be immaterial":

> Some matters are such common knowledge that a reasonable investor can be
> presumed to understand them. . . . Alleged misrepresentations may also present or
> conceal such insignificant data that, in the total mix of information, it simply would
> not matter to a reasonable investor. . . . [S]ome statements are so vague and such
> obvious hyperbole that no reasonable investor would rely upon them.

*Id.* at 546-47.

Defendants argue that all of plaintiffs' section 11 and section 12(a)(2) claims are

immaterial for one or more of the *Parnes* reasons.  They believe the "bespeaks caution doctrine"

is the most obvious.  That doctrine provides

> "when an offering document's forecasts, opinions or projections are accompanied by
> meaningful cautionary statements, the forward-looking statements will not form the
> basis for a securities fraud claim if those statements did not affect the "total mix" of
> information the document provided investors.  In other words, cautionary language,
> if sufficient, renders the alleged omissions or misrepresentations immaterial as a
> matter of law."

*Parnes*, 122 F.3d at 548 (quoted citation omitted); *see also NationsMart*, 130 F.3d at 317

("specific cautionary statements in offering materials which disclose potential investment risks

may defeat a plaintiff's claim that the offering materials were materially misleading").

To be sufficient, "[t]he cautionary language must 'relate directly to that by which plaintiffs

claim to have been misled.'" *Parnes*, 122 F.3d at 548 (quoted citation omitted).  A dismissal

should be granted under this doctrine only if "'the documents containing defendants' challenged

statements include *enough* cautionary language or risk disclosure that reasonable minds could not

disagree that the challenged statements were not misleading.'" *Id.* (quoted citation omitted;

emphasis in original).

The *Parnes* court found the prospectus at issue there "'truly bespeaks caution because, not

only does the prospectus generally convey the riskiness of the investment, but its warnings and

cautionary language directly address the substance of the statement[s] the plaintiffs challenge.'"

*Id.* at 548 (quoting *In re Trump*, 7 F.3d at 372).  Defendants contend the prospectus here is as

effective as the *Parnes* prospectus.

In their resistance, plaintiffs assert that the Amended Complaint alleges numerous

mistatements and omissions that significantly affected the "total mix" of information available to

plaintiffs. Plaintiffs further contend that the Amended Complaint identifies numerous examples of defendants' material misrepresentations and omissions in the registration statement and prospectus. This magistrate judge agrees.

As an example, they note the failure of the prospectus to disclose that McCleodUSA was overstating its financial results by failing to write-down billions of dollars of impaired assets and was engaged in improper accounting practices. (¶ 66.) In their view, there is no doubt that a reasonable investor would have considered the information "material." They believe investors confirmed the materiality of the impaired asset information as the price of the company's common stock dropped 33 percent following the October 3, 2001 announcement that the company was taking a $2.9 billion write-down of goodwill and other long-lived assets. (¶ 87.)

Plaintiffs also argue that the facts of *Parnes* distinguish the case from the present litigation. For example, plaintiffs point out that in *Parnes* the court held that Gateway 2000, Inc.'s alleged overstatement of assets by $6.8 million was immaterial when compared to the company's total assets and, thus, would not have impacted investors' decision-making. *Parnes*, 122 F.3d at 547. Here, plaintiffs contend defendants overstated total assets by $2.9 billion.

This magistrate judge also agrees with plaintiffs argument that the "bespeaks caution" doctrine does not shelter defendants' statements. As noted by plaintiffs, the doctrine only applies to forward-looking statements - not misstatements or omissions of existing facts as alleged by plaintiffs. Cautionary statements "cannot be general risk warnings or mere boilerplate; they must be detailed and specific." *NationsMart*, 130 F.3d at 317. The "bespeaks caution" doctrine cannot immunize defendants from liability if they omitted material information from the offering materials. *Id.* at 318. Because the Amended Complaint here includes allegations that defendants

32

omitted material information from the registration statement and prospectus, the doctrine cannot

defeat plaintiffs' claims under sections 11 and 12(a)(2). *See id.* at 318, 319.

In sum, this magistrate judge concludes that plaintiffs have sufficiently alleged factual and

legal bases for section 11 and section 12(a)(2) claims under the Securities Act. Thus, there is no

basis at this junction for the court to dismiss either Count I or Count II of the Amended

Complaint.

### C.  Counts III and V: "Control Person" Liability

Plaintiffs assert "control person" liability under section 15 of the Securities Act (Count III)

and section 20(a) of the Exchange Act (Count V).  Defendants argue, correctly, that if plaintiffs'

claims for violation of sections 11 and 12(a)(2) of the Securities Act and section 10(b) of the

Exchange Act  are subject to dismissal, then the corresponding claims under sections 15 and 20(a)

for control person liability must also be dismissed. *See Parnes*, 122 F.3d at 550 n.12.  Because it

is recommended above that plaintiffs' primary claims should survive this motion, however,

Counts III and V should also survive.

Defendants also assert, without citing to authority, that the "control person" counts should

be dismissed because plaintiffs have not pled any claims against the supposed primary violator,

McLeodUSA. (*See* Defendants' Reply Memorandum (Clerk's No. 42) at 36.)  The Southern

District of Iowa, however, addressed the issue in *Briggs v. Sterner*, 529 F.Supp. 1155 (S.D. Iowa

1981), rejecting defendants argument there that the adjudication of the corporation's underlying

liability is essential to extending vicarious liability to corporate officers and directors. *Id.* at 1170-

71. The *Briggs* court stated:

> In keeping with the broad remedial purpose of the securities laws . . . the Court will
> not permit officers and directors of a bankrupt corporation whose actions are alleged

33

to have contributed to that condition to avoid the possible imposition of liability under such laws by asserting the lack of a prior adjudication against the controlled person as a basis for dismissal.

The primary liability of the controlled person is merely a required element of proof before a controlling person can be held vicariously liable.

*Id.* at 1171 (denying defendants motions to dismiss and for summary judgment). Accordingly, it is recommended that this court reject defendants' argument to dismiss Counts III and V for "control person" liability on this ground.

## IV. RECOMMENDATION

For the reasons stated in this report, it is recommended that Defendants' Motion to Dismiss the Consolidated Amended Class Action Complaint (Clerk's No. 29) be denied.

**IT IS ORDERED** that, pursuant to 28 U.S.C. § 636(b)(1), the parties have to and including **August 28, 2003** in which to file written objections, unless an extension of time for good cause is obtained. *See Thompson v. Nix*, 897 F.2d 356, 357 (8th Cir. 1990). Such extensions will be freely granted. Any objections must specify the specific portions of this Report and Recommendation to which objections are made, and set forth the basis for such objections. *See.* FED. R. CIV. P. 72. Failure to timely file objections may constitute a waiver of a party's right to appeal questions of fact. *Thompson*, 897 F.2d at 357.

Signed this 7th day of August, 2003.

Respectfully submitted,

Copies mailed on __8/8/03__
to counsel of record or pro se
parties as shown on the docket
sheet.                    *LRR*

Deputy Clerk

THOMAS J. SHIELDS
UNITED STATES MAGISTRATE JUDGE

34