UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

————————————————————————x
                                        :
IN RE McLEODUSA INCORPORATED            :     Civil Action No. C02-0001-MWB
SECURITIES LITIGATION                   :
————————————————————————      :
                                        :
This Document Relates To:   ALL ACTIONS :
                                        :
————————————————————————x

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF FINAL APPROVAL OF SETTLEMENT, PLAN OF ALLOCATION, AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES <u>TO PLAINTIFFS' COUNSEL</u>

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ iii

I.     INTRODUCTION ............................................................................................ 1

II.    HISTORY AND BACKGROUND OF THE ACTION .................................. 3

III.   THE SETTLEMENT ...................................................................................... 3

       A.    Summary Of The Settlement ................................................................ 3

       B.    The Settlement Is Fair, Reasonable And Adequate ............................ 4

             1.    The Merits Of Plaintiffs' Case Balanced Against The
                   Terms Of Settlement ................................................................ 6

                   a.    The Likelihood Of Plaintiffs' Success On The Merits Is
                         Uncertain As Plaintiffs Face Substantial Hurdles To
                         Proving Liability ............................................................ 7

                   b.    Plaintiffs' Ability To Prove Loss Causation Is Uncertain .................. 10

             2.    Defendants' Financial Condition ............................................ 12

             3.    Continued Litigation Would Be Long, Complex And Expense .................. 14

             4.    The Class Members' Reaction Supports Approval Of
                   The Settlement ........................................................................ 16

       C.    The Settlement Merits Approval ........................................................ 16

IV.    CERTIFICATION OF A SETTLEMENT CLASS IS APPROPRIATE AND
       WARRANTED ................................................................................................ 17

       A.    The Requirements Of Rule 23 Are Met .............................................. 18

             1.    Numerosity .............................................................................. 18

             2.    Commonality ........................................................................... 20

             3.    Typicality ................................................................................. 20

             4.    Adequacy Of Representation ................................................... 22

       B.    The Requirements Of Rule 23(b)(3) Are Satisfied ............................ 23

1.     Common Legal And Factual Questions Predominate ................................. 23

2.     A Class Action Is The Superior Means To Adjudicate Plaintiffs' Claims .. 24

V.    PLAN OF ALLOCATION ............................................................................ 24

VI.   THE COURT SHOULD APPROVE THE REQUESTED ATTORNEYS' FEES AND EXPENSES AS FAIR AND REASONABLE ........................................... 25

    A.    The Common-Fund Approach Is The Preferred Method For Awards Of Attorneys' Fees In Class Actions ....................................... 26

    B.    Factors In Determining Appropriate Fee Awards ................................ 27

        1.     The Value Of The Benefit Obtained .......................................... 28

        2.     The Risks Assumed By Counsel ................................................. 29

        3.     The Difficulty And Novelty Of The Litigation ........................... 32

        4.     The Professional Skill And Standing Of Respective Counsel .................... 35

        5.     The Time And Labor Involved (The Lodestar/Multiplier Cross-Check) .................................................................... 36

        6.     The Reaction Of The Class ........................................................ 38

        7.     Fees Customarily Charged For Similar Legal Services ............... 38

    C.    Reimbursement Of Expenses ................................................................ 41

VII.  CONCLUSION ............................................................................................ 42

# TABLE OF AUTHORITIES

*In re AOL Time Warner, Inc. Securities and ERISA' Litigation*,
   No. 02-Civ.-5575, 2006 U.S. Dist LEXIS 78101
   (S.D.N.Y. Sept. 28, 2006) ................................................................................ passim

*In re AOL Time Warner, Inc. Securities and 'ERISA' Litigation*,
   2006 U.S. Dist. LEXIS  17588 (S.D.N.Y. April 6, 2006) ................................. passim

*AUSA Life Ins. Co. v. Ernst & Young*,
   No. 00-9472, 2002 U.S. App. LEXIS 13845 (2d Cir. July 8, 2002)......................... 30

*In re Acceptance Ins. Cos. Sec. Litig.*,
   325 F. Supp. 2d 940 (D. Neb. 2004) .......................................................................... 8

*In re Aetna Inc. Sec. Litig.*,
   MDL No. 1219, 2001 U.S. Dist. LEXIS 68 (E.D. Pa. Jan. 4, 2001) ........................ 35

*In re Airline Ticket Comm'n Antitrust Litig.*,
   953 F. Supp. 280 (D. Minn. 1997)...................................................................... 28, 39

*Alpern v. UtiliCorp United*,
   84 F.3d 1525 (8th Cir. 1996) ...................................................................... 18, 20, 21

*Amchem Prods., Inc. v. Windsor*,
   521 U.S. 591 (1997)........................................................................ 17, 18, 21, 23

*Bentley v. Legent Corp.*,
   849 F. Supp. 429 (E.D. Va. 1994), *aff'd sub nom*,
   *Herman v. Legent Corp.*, 50 F.3d 6 (4th Cir. 1995) ................................................ 31

*Biben v. Card*,
   No. 84-0844-CV-W-6, 1986 U.S. Dist. LEXIS 30808
   (W.D. Mo. Jan. 6, 1986) ........................................................................................... 21

*Boyd v. Ozark Air Lines, Inc.*,
   568 F.2d 50 (8th Cir. 1977) ..................................................................................... 18

*Brissette v. Heckler*,
   784 F.2d 864 (8th Cir. 1986) .............................................................................. 30, 36

*Camden I Condo. Ass'n v. Dunkle*,
   946 F.2d 768 (11th Cir. 1991) .................................................................................. 26

*In re Cardizem CD Antitrust Litig.*,
   218 F.R.D. 508 (E.D. Mich. 2003) ........................................................................... 40

*Carlson v. C.H. Robinson Worldwide, Inc.*,
   Civ. No. 02-3780 (JNE/JJG), 2006 U.S. Dist. LEXIS 67108
    (D. Minn. Sept. 18, 2006) .............................................................. 15, 16, 17, 26, 38

*Carpe v. Aquilla, Inc.*,
   No. 02-0388-CV-W-FJG, 2004 U.S. Dist. LEXIS 21590
   (W.D. Mo. Sept. 13, 2004) ............................................................................ 20, 31

*Central Bank, N.A. v. First Interstate Bank, N.A.*,
   511 U.S. 164 (1994) ................................................................................................ 31

*In re Chrysler Motors Corp. Overnight Evaluation Litig. Program*,
   736 F. Supp. 1007 (E.D. Mo. 1990) ..................................................................... 30

*In re Charter Comm. Inc. Sec. Litig.*,
   MDL Docket No. 1506, 2005 U.S. Dist. LEXIS 14772
   (E.D. Mo. June 30, 2005) ........................................................................................ 11

*Class Plaintiffs v. Seattle*,
   955 F.2d 1268 (9th Cir. 1992) ............................................................................... 14

*In re Clorox Co. Secs. Litig.*,
   238 F. Supp. 2d 1139 (N.D. Cal. 2002) ................................................................ 31

*See Cohn v.* Nelson, 375 F. Supp. 2d 844, 862 (E.D. Mo. 2005) ......................................... 37

*In re Combustion, Inc.*,
   No. 94 MDL 4000, 1997 U.S. Dist. LEXIS 15041 (W.D. La. June 4, 1997)........... 39

*In re Continental Ill. Sec. Litig.*,
   962 F.2d 566 (7th Cir. 1992) ................................................................................. 40

*In re Convergent Techs. Sec. Litig.*,
   721 F. Supp. 1133 (N.D. Cal. 1988), *aff'd*, No. 90-15156,
   1991 U.S. App. LEXIS 19733 (9th Cir. Aug. 27, 1991),
   *amended*, 948 F.2d 507 (9th Cir. 1991) ................................................................ 31

*Cooper v. Miller Johnson Steichen Kinnard, Inc.*,
   No. 02-1236 (RHK/AJB), 2003 U.S. Dist. LEXIS 6946 (D. Minn. 2003)............... 18

*In re Corrugated Container Antitrust Litig.*,
   659 F.2d 1322 (5th Cir. 1981) ................................................................................. 4

*Cullen v. Whitman Med. Corp.*,
   197 F.R.D. 136 (E.D. Pa. 2000)............................................................................ 39

*DeBoer v. Mellon Mortgage Co.*,
64 F.3d 1171 (8th Cir. 1995) ............................................................ 6, 14, 16, 19, 20

*Deposit Guaranty Nat'l Bank v. Roper*,
445 U.S. 326 (1980) .............................................................................................. 24

*Dirks v. Clayton Brokerage Co.*,
105 F.R.D. 125 (D. Minn. 1985) ............................................................................ 23

*Donaldson v. Pillsbury Co.*,
554 F.2d 825 (8th Cir. 1977) ................................................................................ 20

*Dura-Bilt Corp. v. Chase Manhattan Corp.*,
89 F.R.D. 87 (S.D.N.Y. 1981) .............................................................................. 23

*Dura Pharma., Inc. v. Broudo*, 544 U.S. 336 (2005) ............................................... 10

*EEOC v. McDonnell Douglas Corp.*,
894 F. Supp. 1329 (E.D. Mo. 1995) ...................................................................... 14

*Eisenstadt v. Centel Corp.*,
113 F.3d 738 (7th Cir. 1997) ................................................................................ 31

*In re Employee Benefit Plans Sec. Litig.*,
No. 3-92-708, 1993 U.S. Dist. LEXIS 21226 (D. Minn. June 2, 1993) ............ passim

*In re Endotronics*,
No. 4-87-130, 1988 U.S. Dist. LEXIS 745 (D. Minn. Jan. 28, 1988) ................ 19, 23

*In re Engineering Animation Sec. Litig.*,
203 F.R.D. 417 (S.D. Iowa 2001) ......................................................................... 38

*Farmer Cooperative Elevator Co., v. Akzo Nobel, Inc., et al.*,
No. LACV035453 (Iowa Dt. Ct., Carroll County, May 10, 2006) .......................... 38

*Fielder v. Credit Acceptance Corp.*,
175 F.R.D. 313 (W.D. Mo. 1997) .................................................................... 19, 20

*Flight Transp. Corp. Sec. Litig.*,
685 F. Supp. 1092 (D. Minn. 1987) ...................................................................... 29

*Freedman v. Value Health, Inc.*,
34 Fed. Appx. 408 (2d Cir. 2002) ......................................................................... 31

*Goldsmith v. Technology Solutions Co.*,
92 C 4374, 1995 U.S. Dist. LEXIS 15093 (N.D. Ill. October 11, 1995) .................. 28

*Gompper v. VISX, Inc.,*
    298 F.3d 893 (9th Cir. 2002) ................................................................ 30

*Gottlieb v. Barry,*
    43 F.3d 474 (10th Cir. 1994) ............................................................... 26

*Grasty v. Amalgamated Clothing & Textile Workers Union,*
    828 F.2d 123 (3d Cir. 1987)................................................................. 22

*Great Neck Capital Appreciation Investment Partnership, LLP v.*
    *PricewaterhouseCoopers,* 212 F.R.D 400 (E.D. Wis. 2002)............................. 12, 14

*Grove v. Principal Mut. Life Ins. Co.,*
    200 F.R.D. 434 (S.D. Iowa 2001) ........................................................... 4

*Harman v. Lyphomed, Inc.,*
    945 F.2d 969 (7th Cir. 1991) ............................................................... 26

*Hawkins v. Throp Loan & Thrift Co.,*
    No. 85-6074, 1992 WL 585727 (D. Minn. Feb. 21, 1992)....................................... 30

*Hensley v. Eckerhart,*
    461 U.S. 424 (1983)......................................................................... 28

*Herbst v. Able,*
    47 F.R.D. 11 (S.D.N.Y. 1969) .............................................................. 22

*In re Heritage Bond Litig.,* 2005 U.S. Dist. LEXIS 13555 (C.D. Ca. June 10, 2005).......... 40

*Howard v. Everex Systems, Inc.,*
    228 F.3d 1057 (9th Cir. 2000), *rev'd remanded, Howard v. Hui,*
    No. C9203742 CRB, 2001 U.S. Dist. LEXIS 15443 (Sept. 24, 2001) ...................... 30

*Howes v. Atkins,*
    668 F. Supp. 1021 (E.D. Ky. 1987) ......................................................... 27

*In re IBP, Inc. Sec. Litig.,*
    328 F. Supp. 2d 1056 (D.S.D. 2004) ................................................... 5, 9, 26

*In re Ikon Office Solutions, Inc.,*
    194 F.R.D. 166 (E.D. Pa. 2000)............................................................. 35

*Jorstad v. IDS Realty Trust,*
    643 F.2d 1305 (8th Cir. 1981) ............................................................. 40

*In re King Resources Co. Sec. Litig.*,
    420 F. Supp. 610 (D. Colo. 1976).............................................................................. 4

*Koenig v. U.S. Bank N.A. (In re U.S. Bancorp Litig.)*,
    291 F.3d 1035 (8th Cir.), *cert. denied sub nom.*, 537 U.S. 823 (2002) .............. 26, 38

*Lockwood Motors, Inc. v. General Motors Corp.*,
    62 F.R.D. 569 (D. Minn. 1995)............................................................................... 19

*Maley v. Del Global Tech. Corp.*, 186 F. Supp. 2d 358, 368 (S.D.N.Y. 2002)................... 39

*In re McLeodUSA Incorporated Securities Litigation*,
    No. C02-001-MWB, 2004 U.S. Dist. LEXIS 8538 (N.D. Iowa Mar. 31, 2004) ......... 8

*In re Mego Fin. Corp. Sec. Litig.*,
    213 F.3d 454 (9th Cir. 2000) ................................................................................. 39

*In re Metris Cos., Inc. Sec. Litig.*,
    428 F. Supp. 2d 1004 (D. Minn. 2006)...................................................................... 8

*Miller v. Thane Int'l, Inc.*,
    372 F. Supp. 2d 1198 (C.D. Cal. 2005) ................................................................... 30

*In re Monosodium Glutamate Antitrust Litig.*,
    No. 00-MDL-1328 (PAM), 2003 U.S. Dist. LEXIS 1970
    (D. Minn. Feb. 6, 2003) ........................................................................................ 35

*Nelsen v. Craig-Hallum, Inc.*,
    659 F. Supp. 480 (D. Minn. 1987)........................................................................... 21

*Paxton v. Union Nat'l Bank*,
    688 F.2d 552 (8th Cir. 1982) ................................................................................. 18

*Petrovic v. Amoco Oil Co.*,
    200 F.3d 1140 (8th Cir. 1999) ................................................................... 4, 5, 6, 26

*Pfizer Inc. v. Lord*,
    456 F.2d 532 (8th Cir. 1972) ................................................................................... 4

*In re Potash Antitrust Litig.*,
    159 F.R.D. 682 (D. Minn. 1995).............................................................................. 23

*In re Ravisent Techs. Inc., Sec. Litig.*,
    No. Civ. A. 00-CV-1014, 2005 WL 906361 (E.D. Pa. Apr. 18, 2005) .................... 39

*Rentschler v. Carnhan,*
        160 F.R.D. 114 (E.D. Mo. 1995) .............................................................................. 19

*Report of the Third Circuit Task Force, Court Awarded Attorneys' Fees,*
        108 F.R.D. 237 (1985) ............................................................................................. 26

*Reynolds v. National Football League,*
        584 F.2d 280 (8th Cir. 1978) ................................................................................... 22

*Reiff v. Evans, et al.,*
        No. CE 35780 (Iowa Dt. Ct. Polk County, Oct. 7, 2005) ......................................... 38

*In re Rio Hair Naturalizer Prod. Liab. Litig.,*
        MDL No. 1055, 1996 U.S. Dist. LEXIS 20440 (E.D. Mich. Dec. 20, 1996)............ 30

*In re Rite Aid Sec. Litig, ("Rite Aid III"),*
        396 F.3d 294 (3d Cir. 2005)...................................................................................... 26

*Robbins v. Koger Props.,*
        116 F.3d 1441 (11th Cir. 1997) ............................................................................... 30

*In re Select Comfort Corp. Sec. Litig.,*
        202 F.R.D. 598 (D. Minn. 2001)....................................................................... 18, 20

*Searls v. Glasser,*
        No. 91 C 6796, 1994 U.S. Dist. LEXIS 13509 (N.D. IL. Sept. 21, 1994)
        *aff'd,* 64 F.3d 1061 (7th Cir. 1995)......................................................................... 31

*Snell v. Allianz Life Ins. Co. Of North America and Fidelity Union Life Ins. Co.,*
        Civ. No. 97-2784 (RLE), 2000 U.S. Dist. LEXIS 13611
        (D. Minn. Sept. 8, 2000) ................................................................................... passim

*Spencer v. Comserv Corp.,*
        No. 4-84-794, 1986 U.S. Dist. LEXIS 15863 (D. Minn. Dec. 30, 1986) ................... 5

*Stoneridge Inv. Partners LLC v. Charter Communs.,*
        Case No. 4:02-CV-1186 CAS, 2005 U.S. Dist. LEXIS 14772
        (E.D. Mo. June 30, 2005)......................................................................................... 25

*In re Sumitomo Copper Litig.,*
        189 F.R.D. 274 (S.D.N.Y. 1999) .............................................................................. 12

*Swedish Hosp. Corp. v. Shalala,*
        1 F.3d 1261 (D.C. Cir. 1993)............................................................................. 26, 27

*Taubenfeld v. Aon*,
    No. 04-3140, 2005 U.S. App. LEXIS 13310 (7th Cir. July 5, 2005) ...................... 39

*In re Telectronics Pacing Sys. Accufix Atrial "J" Lead Products Litig.*,
    137 F. Supp. 2d 985 (S.D. Ohio 2001) .................................................................... 32

*In re Texas Prison Litig.*,
    191 F.R.D. 164 (W.D. Mo. 2000) ............................................................................ 39

*In re Thirteen Appeals Arising out of the San Juan DuPont Plaza Hotel Fire Litig.*,
    56 F.3d 295 (lst Cir. 1995) ..................................................................................... 26

*Van Horn v. Trickey*,
    840 F.2d 604 (8th Cir. 1988) ................................................................................ 4, 6

*Vizcaino v. Microsoft Corp.*,
    290 F.3d 1043 (9th Cir. 2002) ................................................................................ 37

*In re Warner Communications Sec. Litig.*,
    618 F. Supp. 735 (S.D.N.Y. 1985)*, aff'd*, 798 F.2d 35, 37 (2d Cir. 1986) ......... 12, 35

*Welsch v. Gardebring*,
    667 F. Supp. 1284 (D. Minn. 1987) ......................................................................... 5

*Winkler v. NRD Mining, Ltd.*,
    198 F.R.D. 355 (E.D.N.Y. March 31, 2000),
    *aff'd*, 2000 U.S. App. LEXIS 31332 (2d Cir. Dec. 6, 2000) .................................... 30

*In re Wireless Tel. Fed. Cost Recovery Fees Litig.*,
    396 F.3d 922 (8th Cir. 2005) ......................................................................... 6, 14, 16

*In re Xcel Energy, Inc., Securities, Derivative & "ERISA" Litig.*,
    364 F. Supp. 2d 980, 992-994 (D. Minn. 2005) ............................................. 27, 37, 38

## DOCKETED CASES

*In re Ancor Communications, Inc. Sec. Litig.*,
    No. 97-CV-1696 ADM/JGL (D. Minn., Feb. 5, 2000) ............................................ 38

*In re Biogen Sec. Litig.*,
    No. 94-12177-PBS (D. Mass 1999) ........................................................................ 30

*Bovee v. Coopers & Lybrand*,
    Case No. 2:97-CV-449 ........................................................................................... 39

*In re Control Data Corp. Sec. Litig.*,
    No.3-85-1341 (D. Minn. Sept. 23, 1994)................................................... 39

*Gordon v. Am. Adjustable Rate Term Trust, et al.*,
    Civil No. 4-95-666 (Sept. 3, 1996) ............................................................ 39

*In re Health Management, Inc. Sec. Litig.*,
    No. 96-CV-889 (ADS) (E.D.N.Y. 1999) ................................................... 30

*KK Motors v. Brunswick Corp.*,
    Civil No. 98-2307 (D. Minn. March 6, 2000) ........................................... 39

*In re Nx Networks Sec. Litig.*,
    Civ. Action Nos. 00-CV-1185-JLT, 00-CV-10377-JLT
    (D. Mass. Nov. 22, 2004)........................................................................... 39

*Pozniak v. Imperial Chem. Ind., PLC*,
    Civil Case No. 1:03 cv 2457 (NRB) (S.D.N.Y. Sept. 18, 2006) .............. 39

*In re St. Paul Sec. Litig.*,
    Master File No. 02 Civ 3825 (D. Minn Aug. 13, 2004) ........................... 37

*Steiner v. CDSI*,
    Civ. No. 98-1489 (D. Minn. August 25, 1999)......................................... 39

*In re Supervalu Sec. Litig.*,
    02-CIV-1738 (D. Minn. Aug. 17, 2004)................................................... 37

## FEDERAL STATUTES

Fed. R. Civ. P. 23(a)(2)...................................................................................... 19
15 U.S.C. § 78-u4(a)(6) ..................................................................................... 26

## MISCELLANEOUS

*Manual for Complex Litigation*, § 30.43 at 289 (3d ed. 2002) ................................. 5
Newberg & Conte, *Newberg on Class Actions*, § 11.42 (3d ed. 1992) ................... 5
Newberg & Conte, *Newberg on Class Actions* § 3.05 at 3-25 (3d ed. 1992) ....................... 19

I.    **INTRODUCTION**

Lead Plaintiffs New Millennium Growth Fund LLC, Richard C. Chapman for the Chapman Trust and class representative Jeffrey H. Brandes (collectively, "Lead Plaintiffs") in the above-captioned action (the "Action") against Clark E. McLeod, Stephen C. Gray, J. Lyle Patrick and Chris A. Davis (collectively, "Defendants"), seek the Court's approval of a proposed Stipulation and Agreement of Settlement dated September 14, 2006 (the "Stipulation"), which resolves this action in its entirety for $30,000,000 in cash, plus interest, in exchange for a release of the Defendants and dismissal of the Action (the "Settlement").[1]   Lead Plaintiffs submit the proposed Settlement for final approval pursuant to Rule 23(e) of the Federal Rules of Civil Procedure.   Plaintiffs also seek the Court's approval of: (i) the plan of allocation; (ii) an award of attorneys' fees for Plaintiffs' Counsel's services in initiating, prosecuting and procuring the proposed Settlement, (iii) reimbursement of Plaintiffs' Counsel's out-of-pocket expenses, plus interest at the same rate as earned by the Settlement Fund; (iv) certification of the Class, as defined below; and (v) reimbursement to Lead Plaintiffs of their reasonable costs and expenses (including lost wages) directly relating to their representation of the Class.[2]

On September 19, 2006, the Court entered the Preliminary Order in Connection with Settlement Proceedings ("Preliminary Order"), directing that a final fairness hearing be held on November 29, 2006 to determine the fairness, reasonableness and adequacy of the Settlement. Pursuant to the Preliminary Order, 104,872 copies of the Notice of Proposed Settlement of Class

---

[1]  A copy of the Stipulation has been filed with the Court.

[2]   The facts supporting the approval of the settlement and the fee application are set forth in detail in the accompanying Declaration of Sanford P. Dumain, David Kessler, and Joseph H. Weiss in Support of Final Approval of Class Action Settlement and Application for Attorneys' Fees and Reimbursement of Expenses (the   "Joint Decl." or "Joint Declaration"), contemporaneously filed herewith.   Hereinafter, all exhibits to the Joint Declaration will be referred to as Exh. "__."

Action, Motion for Attorneys' Fees and Settlement Fairness Hearing (the "Notice") were mailed to potential Class Members or their nominees.[3]   In accordance with the Preliminary Order, notice was also published in the national edition of *The Wall Street Journal* on October 10, 2006.  *See* Affidavit of Paul J. Andrejkovics re: Publication of the Summary Notice of Pendency of Class Action, Proposed Settlement and Settlement Hearing ("Andrejkovics Aff."), Exhibit 2.

The Notice contained a detailed description of the nature and procedural history of the Action, as well as the material terms of the Settlement, including without limitation: (i) Plaintiffs' estimate of the per share recovery; (ii) the manner in which the Settlement Fund will be allocated among participating Class Members; (iii) a description of the claims that will be released in the Settlement; (iv) the right and mechanism for Class Members to opt-out or exclude themselves from the Class; and (v) the right and mechanism for Class Members to object to the Settlement.  The Notice also informed Class Members that Plaintiffs' Counsel would apply for an award of attorneys' fees of 33⅓ % of the Settlement Fund and reimbursement of litigation expenses not to exceed $900,000.  *See* Exh. 1(A).

The reaction of the absent Class Members to the Settlement, with *only one Class Member* objecting and only five purported Class Members requesting to be excluded, confirms the decision to resolve the Action in exchange for the payment of the Settlement Fund.[4]  *See* Joint Decl. & 73; Exh. 1, ¶ 10.  The virtual absence of objections and the very small number of requests for exclusion strongly support the inference that the Class agrees that the Settlement and Plan of Allocation are fair, reasonable, and adequate.

---

[3] *See* Affidavit of Richard W. Simmons Re: (A) Mailing of Settlement Notice and Claim Form; and (B) Report on Exclusion Requests Received (the "Simmons Aff."), attached to the Joint Declaration as Exh. 1.

[4]  As explained in more detail below, the one late objection to the Settlement was received and fails to state a substantive basis for objecting.  The Objection of Brian N. Neuerburg is attached to the Joint Declaration as Exhibit 8.

In light of the substantial recovery, as well as Plaintiffs' Counsel's informed assessment of the strengths and weaknesses of the claims and defenses asserted, the Class's support of the Settlement, and the considerable risks and delays associated with continued litigation and trial, Lead Plaintiffs and Plaintiffs' Counsel believe that the Settlement and Plan of Allocation are eminently fair, reasonable, and adequate and provide for an excellent recovery for the Settlement Class. Accordingly, Lead Plaintiffs respectfully request that the Court grant final approval to the Settlement and Plan of Allocation.

## II.     HISTORY AND BACKGROUND OF THE ACTION

The Joint Declaration is integral to plaintiffs' presentation of the Settlement to this Court and contains a complete recitation of the factual and procedural history of the Action. *See* Joint Decl. ¶¶16-63. Rather than repeat its contents here, Plaintiffs' Counsel respectfully refer the Court to the accompanying Joint Declaration for a full discussion of the factual background and procedural history of the Action.

## III.    THE SETTLEMENT

### A.      Summary of the Settlement

This Settlement will allow Class Members to recover extraordinary relief that would not otherwise be available to them. The Settlement provides for the payment of $30,000,000 (the "Settlement Amount"), plus interest (the "Gross Settlement Fund") for the benefit of the Class. The Gross Settlement Fund, less all taxes, approved costs, fees and expenses (the "Net Settlement Fund") shall be distributed to members of the Class who submit acceptable Proofs of Claim ("Authorized Claimants") in accordance with the Plan of Allocation described below in Section V. *See also* Joint Decl. ¶¶ 64-65.

## B.        The Settlement is Fair, Reasonable and Adequate

To be approved, a proposed class action settlement must be "fair, reasonable, and adequate." *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1148 (8th Cir. 1999); *Pfizer Inc. v. Lord*, 456 F.2d 532, 543 (8th Cir. 1972); *Van Horn v. Trickey*, 840 F.2d 604, 606 (8th Cir. 1988). Strong judicial policy favors resolution of litigation short of trial, particularly in class action suits. *Petrovic*, 200 F.3d at 1148 (8th Cir. 1999); *Pfizer*, 456 F.2d at 543 ("The policy of the law encourages compromise to avoid the uncertainties of the outcome of litigation as well as the avoidance of wasteful litigation and expense incident thereto."); *Snell v. Allianz Life Ins. Co. of North America,* Civil Action No. 97-2784(RLE), 2000 U.S. Dist. LEXIS 13611, at *52 (D. Minn. Sept. 8, 2000) ("settlements bring a certainty to the resolution of disputes that a Trial cannot. . ."). Settlements of complex cases contribute greatly to the efficient utilization of scarce judicial resources and achieve the speedy resolution of justice, for a "just result is often no more than an arbitrary point between competing notions of reasonableness." *In re Corrugated Container Antitrust Litig.*, 659 F.2d 1322, 1325 (5th Cir. 1981).   In evaluating the proposed Settlement, a court should

> consider the vagaries of litigation and compare the significance of immediate recovery by way of the compromise to the mere possibility of relief in the future, after protracted and expensive litigation.  In this respect, "[i]t [is] proper to take the bird in the hand instead of a prospective flock in the bush."

*In re Employee Benefit Plans Sec. Litig.*, No. 3-92-708, 1993 U.S. Dist. LEXIS 21226, at *15 (D. Minn. June 2, 1993) (quoting *In re King Resources Co. Sec. Litig.*, 420 F. Supp. 610, 625 (D. Colo. 1976)).

Courts in the Eighth Circuit recognize the overarching principle that the court "should not substitute [its] own judgment as to optimal settlement terms for the judgment of the litigants and their counsel." *Grove v. Principal Mut. Life Ins. Co.*, 200 F.R.D. 434, 445 (S.D. Iowa 2001)

(quoting *Petrovic*, 200 F.3d at 1148-49). Courts in the Eighth Circuit also recognize an initial presumption that the compromise is fair and reasonable, especially where the settlement was negotiated by experienced counsel. *See In re IBP, Inc. Sec. Litig.*, 328 F. Supp. 2d 1056, 1064 (D.S.D. 2004); *see also Employee Benefit Plans*, 1993 U.S. Dist. LEXIS 21226, at *17 (the court is entitled to rely on the judgment of experienced counsel in its evaluation of the merits of a class action settlement); *Spencer v. Comserv Corp.*, No. 4-84-794, 1986 U.S. Dist. LEXIS 15863, at *15-*16 (D. Minn. Dec. 30, 1986); *Manual for Complex Litigation*, § 30.43 at 289 (3d ed. 2002) (Because settlements are result of process by which opposing parties attempt to weigh and balance factual and legal issues neither side chooses to risk taking to final resolution, many courts afford a presumption of fairness if the settlement is reached following arm's-length negotiations); Newberg & Conte, *Newberg on Class Actions*, § 11.42 (3d ed. 1992) ("[a]n initial presumption of fairness is usually involved if the settlement is recommended by class counsel after arm's-length bargaining."); *Welsch v. Gardebring*, 667 F. Supp. 1284, 1295 (D. Minn. 1987) (same); *Moore's Federal Practice, Manual for Complex Litigation* (Third) §30.42, at 266 (1997) (a "presumption of fairness, adequacy and reasonableness may attach to a class settlement reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery").

Under the circumstances of this Settlement, which was reached after almost five years of active litigation, the completion of voluminous merits discovery and motion practice, among experienced counsel with the involvement of two experienced mediators over the course of three separate mediation sessions, and in light of this Court's grant of Preliminary Approval, this Court should find that this initial presumption of fairness applies. *See* Joint Decl. ¶¶ 16-63.

Courts in this Circuit consider the following factors when evaluating a Settlement: (1) the merits of the plaintiff's case, weighed against the terms of the settlement; (2) the defendant's financial condition; (3) the complexity and expense of further litigation; and (4) the amount of opposition to the settlement.  *See In re Wireless Tel. Fed. Cost Recovery Fees Litig.*, 396 F.3d 922, 932 (8th Cir. 2005).  *See also Van Horn*, 840 F.2d at 604; *Snell*, 2000 U.S. Dist. LEXIS 13611, at *51.  When these factors are collectively analyzed, they fully support approval of the Settlement.

### 1.       The Merits of Plaintiffs' Case Balanced Against the Terms of Settlement

Courts consider the merits of a plaintiff's case weighed against the terms of the settlement as "[t]he most important consideration" in reviewing the fairness of a settlement.  *See Wireless, supra.*, 396 F.3d at 933 (citing, *Petrovic*, 200 F.3d at 1150) (same).  The court's analysis of the benefits of the settlement need only be a rough approximation of the risks of continued litigation, rather than an attempt to reach conclusions as to the merits of the case.  As stated by the Court in *Employee Benefit Plans*, *supra*:

> In evaluating this factor, the Court's task is not to reach any conclusions as to the merits of the plaintiffs' case, nor should the Court substitute its opinion for that of plaintiffs' counsel and members of the class. . . .  Rather, the determination herein generally will not go beyond 'an amalgam of delicate balancing, gross approximation, and rough justice.'

*Id.* at *13 (citations omitted); *see also DeBoer v. Mellon Mortgage Co.*, 64 F.3d 1171, 1178 (8th Cir. 1995) ("the value of the settlement need not be determined with absolute precision").

The $30 million, plus interest, Settlement negotiated by Plaintiffs' Counsel in this case is substantial.  While the evidence adduced thus far could support the Class's claims, "the outcome of the litigation would be far from certain."  *Wireless*, 396 F.3d at 933.  The excellent recovery

of $30 million, when weighed against the complexities and uncertainties of this case, including the risk that the Class will not succeed in proving scienter, the issues surrounding loss causation, the certainty of additional lengthy and costly litigation in the absence of a settlement, and the time value of money, all support the conclusion that the Settlement is very reasonable in relation to the total likely recovery at trial.

> **a.** **The Likelihood of Plaintiffs' Success on the Merits Is Uncertain As Plaintiffs Faced Substantial Hurdles to Proving Liability**

As described above and throughout the Joint Declaration, plaintiffs contended that Defendants disseminated false and misleading statements concerning many aspects of McLeodUSA's business and finances.  If litigation were to continue, plaintiffs would be required to establish that, among other things, Defendants were responsible for material misstatements or omissions of fact in connection with the purchase or sale of McLeodUSA stock, that the Class justifiably relied upon Defendants' misconduct, that Defendants acted with the requisite scienter and that the Class suffered damages as a result of Defendants' conduct.  Plaintiffs faced considerable exposure with respect to difficulties specific to this Action, as well as difficulties which generally are present in complex securities litigation.  Most importantly, serious questions existed regarding plaintiffs' ability to sustain their burden of proof with respect to scienter.  From the beginning, Defendants hit hard on this issue, arguing that:

> (a) not one of these defendants is alleged to have sold a single share of McLeodUSA stock during the class period; (b) Mr. Gray actually spent more than half a million dollars of his own cash to <u>buy</u> 100,000 shares of McLeodUSA stock in May, the very time when Plaintiffs charge that he supposedly knew the stock price was artificially inflated by his fraud . . .; and (c) Ms. Davis did not join McLeodUSA until August 2001, and can hardly be expected to have jumped feet-first into already-established fraud from her first day on the job.  This context alone is sufficient to show that the 'strong inference' of scienter required by law B or, indeed, any reasonable inference of scienter at all B is wholly absent.

Motion to Dismiss, Docket No. 33, p. 19 (Emphasis in the original).[5]  Joint Decl. ¶ 78.

While plaintiffs believe that they could have overcome these adverse facts, proving scienter was certainly not a forgone conclusion.  Plaintiffs were extremely cognizant of the fact that in their respective opinions upholding the CAC, Magistrate Judge Shields characterized plaintiffs' scienter allegations as a "close call" (Report and Recommendation, p. 26), and Chief Judge Bennett referred to it as a "close question."  *In re McLeodUSA Incorporated Securities Litigation*, No. C02-001-MWB, 2004 U.S. Dist. LEXIS 8538, *18 (N.D. Iowa Mar. 31, 2004). Joint Decl. ¶ 79.  As many courts have recognized, "avoiding dismissal at the pleading stage does not guarantee that scienter will be adequately proven at trial."  *In re AOL Time Warner, Inc. Securities and AERISA@ Litigation*, No. 02 Civ. 5575, 2006 U.S. Dist. LEXIS 17588, *40 (S.D.N.Y. April 6, 2006); *see also In re Metris Cos., Inc. Sec. Litig.*, 428 F. Supp. 2d 1004, 1012-13 (D. Minn. 2006) (granting defendants' summary judgment motion based on plaintiffs' failure to prove scienter); *In re Acceptance Ins. Cos. Sec. Litig.*, 325 F. Supp. 2d 940 (D. Neb. 2004) (finding plaintiffs failed to prove scienter and granting summary judgment to defendants).

In addition to these specific risks, plaintiffs also recognize that if this Action proceeded to trial, plaintiffs would face and be required to overcome many other obstacles.  For instance, in the context of an unpredictable, lengthy, and complex trial, the Court and the jury could be presented with conflicting testimony and evidence, and the jury could react to evidence in unforeseen ways, find that some or all of the alleged misrepresentations were not material and that Defendants reasonably believed in the appropriateness of their actions at the time.  In

---

[5]  *See also Id*. at pp. 34-35 ("President and CEO Stephen Gray spent over half a million dollars of his own cash to *buy* McLeodUSA stock in May 2001, right in the middle of the supposed fraud.  This fact torpedoes any inference of scienter plaintiffs want to draw; otherwise, on plaintiffs' theory, Mr. Gray would have been choosing to make himself a victim of his own fraud.").

addition, this Action involves many technical accounting issues which hinge of questions of judgment. Joint Decl. ¶ 82; *see also In re AOL Time Warner, Inc. Securities and 'ERISA' Litigation*, 2006 U.S. Dist. LEXIS 17588, at *32 ("There is no question that the presentation of these transactions, and the conflicting interpretations which they would be subject to, would stretch the patience, attention, and understanding of even the most exemplary jury."). Plaintiffs, therefore, faced the additional risk that the jury may not understand the issues in this case, or that Defendants' arguments might find favor with a confused jury and result in the Class losing at trial. As one court recently stated, "[t]he difficulty in establishing liability is a common risk in securities cases." *Id.* at *39.

It also bears noting that this case was commenced almost five years ago. Formal discovery was stayed for over two years pursuant to the automatic stay provision of the PSLRA. The problems of proof that plaintiffs face has undoubtedly become exacerbated by the passage of time and the fact that many of the events pertaining to plaintiffs' claims occurred over six years ago. Memories have already faded, as demonstrated by the deposition testimony of several of plaintiffs' confidential sources who could not remember much of what they had originally told plaintiffs' investigators. Similarly, many of the e-mail, hard copy and electronic documents plaintiffs believe would have helped to prove their claims are no longer available as a result of McLeodUSA's document retention policies with respect employees who left the company during its downsizing in 2001. *See In re IBP, Inc. Sec. Litig.*, 328 F. Supp. 2d 1056, 1064 (D.S.D. 2004) (noting that approval of settlement was warranted in part because discovery had been stayed and further litigation would have involved extensive discovery and motion practice). Joint Decl. ¶ 80.

### b.      Plaintiffs' Ability to Prove Loss Causation Is Uncertain

In addition, proving loss causation is now more complicated than it was when Lead Plaintiffs filed this Action and when the Eighth Circuit issued its ruling denying Defendants' motion to dismiss.  In the Supreme Court's opinion in *Dura Pharma., Inc. v. Broudo*, 544 U.S. 336 (2005), the Court held that loss causation may not be established through an allegation of artificial inflation alone.   Here, Defendants have consistently argued that plaintiffs could not prove loss causation, and that the decline in the price of McLeodUSA stock was not due to fraud, but other external circumstances.  As Defendants stated in their motion to dismiss, "[t]hroughout 2001, with the economy in recession, the stock market in turmoil, and stocks of telecommunications companies under severe pressure, the stock of telecommunications provider McLeodUSA Incorporated . . . declined steadily."   Memorandum in Support of Defendants' Motion to Dismiss Consolidated Amended Class Action Complaint ("Motion to Dismiss"), Docket No. 33, p. 1; *see also* Motion for Judgment on the Pleadings, Docket No. 304, p. 1 ("plaintiffs fail to distinguish between the overall decline in stock prices in the telecommunication industry in 2001 and any factors specific to McLeodUSA that may have caused the drop in its stock price during 2001").  The existence of these external factors related to the stock market in general, and the telecommunications industry in particular, posed a significant risk for plaintiffs.  *See In re AOL Time Warner, Inc. Securities and 'ERISA' Litigation*, 2006 U.S. Dist. LEXIS  17588 at *46 ("Counsel also faced the challenge of distilling the impact of Defendants' accounting irregularities from the overlapping national recession and specific downturns in the Internet and media markets.").   Although plaintiffs alleged, and believe they would have been able to prove, that they incurred substantial damages due to the slow leakage into the market of information hidden by Defendants' fraud, the  recession, the end of the internet bubble and the meltdown of the telecommunications industry during this time frame

10

were not good facts for plaintiffs, and would have substantially increased the burden on plaintiffs' counsel at trial.  Joint Decl. ¶¶ 76-77.

Furthermore, plaintiffs and Defendants would no doubt disagree on the following additional damage-related issues: (a) the appropriate economic model for determining the amounts by which McLeodUSA common stock was allegedly artificially inflated (if at all) during the Class Period; (b) the amounts by which McLeodUSA common stock was allegedly artificially inflated (if at all) during the Class Period; (c) the effect of the recession on the trading price of McLeodUSA common stock during the Class Period; (d) the extent to which general market and industry conditions, such as the falling demand in the telecommunications industry during the year 2001, influenced the trading price of McLeodUSA' common stock at various times during the Class Period; and (e) the extent to which the various matters that plaintiffs alleged were materially false or misleading influenced (if at all) the trading price of McLeodUSA common stock at various times during the Class Period.  Joint Decl. ¶¶ 83-84.  Proving loss causation and damages would have entailed the presentation of detailed and complicated expert testimony – a "battle of experts" -- explaining the numerous price movements caused by the continuing, and in many cases inconsistent, disclosures into the market, which alternately inflated and deflated the price of McLeodUSA's common stock.  *See In re Charter Comm. Inc. Sec. Litig.*, MDL Docket No. 1506, 2005 U.S. Dist. LEXIS 14772, at *33-34 (E.D. Mo. June 30, 2005) (noting that issue of whether stock decline was significant would become a "battle of experts").  Because of the nature of this testimony, there existed a very real risk that the jury would not understand, or simply might not credit, the testimony of plaintiffs' experts, thereby reducing or even eliminating the damages recovered on behalf of the Settlement Class.  *In re*

*Sumitomo Copper Litig.*, 189 F.R.D. 274, 283 (S.D.N.Y. 1999).[6]   Settlement of the Action avoids the risks and costs of competing experts that could result in a dispositive finding or ruling against plaintiffs and the Class.

In short, Plaintiffs' Counsel have evaluated the relative merits of each side's case and entered into the Settlement with a full and fair view of the case's strengths and weaknesses.  The instant Settlement provides substantial present value to the Class without the risks associated with continued litigation. In light of the risks and vulnerabilities in Plaintiffs' claims, the $30,000,000 recovery represents a substantial immediate benefit to the Class when weighed against the ultimate likelihood of success on the merits.  *See Employee Benefit Plans*, 1993 U.S. Dist. LEXIS 21226, at *16 ("In addition to the complex nature of the claims, the defendants' aggressive – properly so – defense, as evidenced by their initial motions and opposition to merits discovery, indicates that each step of this litigation would be fully litigated.") (citation omitted).

### 2.    Defendants' Financial Condition

The deepest potential pocket in this litigation, McLeodUSA, filed for bankruptcy protection not once, but twice.[7]  *See Great Neck Capital Appreciation Investment partnership, LLP v. PricewaterhouseCoopers*, 212 F.R.D 400, 410 (E.D. Wis. 2002) (company's recent

---

[6]  As the court observed in *In re Warner Communications Sec. Litig.*, 618 F. Supp. 735, 744-45 (S.D.N.Y. 1985)*, aff'd*, 798 F.2d 35, 37 (2d Cir. 1986):

> Undoubtedly, expert testimony would be needed to fix not only the amount, but the existence, of actual damages.  In this "battle of experts," it is virtually impossible to predict with any certainty which testimony would be credited, and ultimately, which damages would be found to have been caused by actionable, rather than the myriad nonactionable factors ....

[7]  At least one study has found that securities settlements involving bankrupt entities are one-third lower than settlements for comparable cases.  Buckberg, Foster, and Miller, *Recent Trends in Shareholder Class Action Litigation: Are WorldCom and Enron the New Standard? (*NERA Economic Consulting, July 2005), pg. 7, available at www.nera.com/publication.

emergence from bankruptcy indicated inability to withstand greater judgment); *see also In re AOL Time Warner, Inc. Securities and 'ERISA' Litigation*, 2006 U.S. Dist. LEXIS 78101, at *46-47 (Sept. 28, 2006) ("attorneys often face the risk of nonpayment, especially in large class actions that could drive Defendants into bankruptcy or otherwise make a judgment uncollectible."). Consequently, the only remaining sources of funding for any settlement or jury verdict were the Defendants and the Company's Directors and Officers Liability Insurance Policies ("D&O policies"). With respect to the former, Plaintiffs' Counsel weighed the opportunity presented by the Settlement against the prospect of obtaining a cash contributions from the Defendants. However, obtaining cash contributions from individual defendants is rare in the context of securities litigation. In fact, Defendants here took the position that they would not contribute to a settlement until the insurance policies were exhausted. In addition, at the time of the Settlement, Clark McLeod was still the subject of an ongoing case by the New York State Attorney General's Office ("NYAG"), and, thus, plaintiffs were competing with the government for McLeod's assets.[8] Plaintiffs' Counsel also considered: (1) the likelihood that any one of the Defendants would personally be found liable; (2) the ease with which the material assets belonging to any one of the Defendants could be readily attached; and (3) the experience of Plaintiffs' Counsel that individual defendants who contribute to class-wide settlements out of their own pockets do not agree to do so in any material amount until, if ever, trial and its attendant costs and risks are upon them. Plaintiffs' Counsel concluded that the opportunity presented by pursuit of the Defendants did not change the outcome of the overall analysis. Joint Decl. ¶ 86.

---

[8] McLeod settled the action by the NYAG in August 2006, as the Parties were finalizing the Stipulation, for $4.4 million.

Regarding the D&O policies, litigating this Action to a jury verdict likely would not have enhanced the D&O carriers' willingness to contribute to a resolution as a verdict in plaintiffs' favor – for knowing fraud – would have encouraged the insurance companies to disclaim coverage. *See Great Neck Capital*, 212 F.R.D at 410 (finding that if litigation continued and plaintiffs proved intentional conduct, insurance coverage could be at risk). The result of such a circumstance would have been further litigation before any award was actually paid, and the possibility of losing D&O coverage entirely. Settlement avoids both of these uncertainties. Joint Decl. ¶¶ 83-87.

**3.      Continued Litigation Would Be Long, Complex and Expensive**

Courts have consistently viewed the expense and possible duration of litigation as factors appropriately considered in evaluating the reasonableness of a settlement. *DeBoer*, 64 F.3d at 1178 ("The very purpose of a compromise is to avoid the delay and expense of ... a trial.") (citations omitted); *EEOC v. McDonnell Douglas Corp.*, 894 F. Supp. 1329, 1334 (E.D. Mo. 1995); *see generally Class Plaintiffs v. Seattle*, 955 F.2d 1268, 1292 (9th Cir. 1992) ("complexity, duration, and sheer enormity of" the pending class action weighed heavily against a conclusion that the district court abused its discretion in approving the settlement). Here, there can be no question that the Action would "likely drag on for years, require the expenditure of millions of dollars, all the while class members would receive nothing." *Wireless* 396 F.3d at 933 (finding that where case had yet to complete discovery, "much less the inevitable appeals that would have been necessary before a final resolution," this factor favored settlement).

As set forth above and throughout the Declaration, this Action presents many complex issues related to establishing liability and proving damages.   If the Court approves the Settlement, $30,000,000, plus accrued interest, will be  recouped now, without taking any of the

risks set forth above.  However, if plaintiffs continue to prosecute the Action to trial, plaintiffs will not benefit from any recovery for two to three years, at best.  The prosecution of this Action to trial – through the completion of motion practice, depositions of at least 20 additional lay witnesses, preparation of expert reports, expert depositions, summary judgment and *Daubert* motions, and preparation for trial, let alone a trial itself, would require years of additional litigation and the expenditure of vast resources -- legal fees, expert fees, travel and lodging, photocopying, and electronic research.  *See Carlson v. C.H. Robinson Worldwide, Inc.*, Civ. No. 02-3780 (JNE/JJG), 2006 U.S. Dist. LEXIS 67108, *18 (D. Minn. Sept. 18, 2006) (finding that even where case had progressed to the eve of trial, delay caused and expenses incurred by continued litigation supported approval of settlement).  While Lead Counsel have already advanced significant expenses on behalf of the Class, those costs would be multiplied several times over if this case proceeded through to trial.   Joint Decl. ¶¶ 89-90.

Finally, the continuance of this litigation would have been taxing upon the resources of the judiciary.  As demonstrated thus far, Defendants will accept no ruling against them without pursuing every avenue of possible redress – filing objections to the Magistrate's Report and recommendation, requiring court-intervention early in the discovery phase, opposing class certification, and filing a Motion for Judgment on the Pleadings even before the close of discovery.  Plaintiffs' Counsel could foresee more discovery-related motions, an appeal of any court decision granting class certification, followed by *Daubert* and summary judgment motions at the close of expert discovery, numerous motions in limine in advance of a trial, and finally, appeals of any rulings adverse to Defendants.  Joint Decl. ¶¶ 89-90.  Indeed, at a hearing earlier this year, defense counsel affirmatively represented to magistrate Judge Shields that they intended to file summary judgment motions.

All of the foregoing would have delayed, for years, the ability of the Class to recover. Conversely, settlement at this juncture results in a substantial and tangible present recovery, without the attendant risk of delay of continued litigation.  Settlement of plaintiffs' claims at this point has therefore saved the Class years of complex, risky litigation and hundreds of thousands of dollars, if not millions, in litigation expenses.  The complexity, duration, and likely expense of continued litigation plainly weigh in favor of approving the settlement.

### 4.        The Class Members' Reaction Supports Approval of the Settlement

Courts in this Circuit also analyze the amount of opposition to a proposed settlement, though this factor is not conclusive as to whether the settlement is reasonable. *See Wireless* 396 F.3d at 933 (citation omitted) (affirming approval of settlement over objections of "several" groups of objectors constituting .00068% of the class objected);   *Carlson v. C.H. Robinson Worldwide, Inc.*, 2006 U.S. Dist. LEXIS 67108, *11 (lack of objections and small number of opt-outs demonstrates "strong support").   "The district court has a duty to the silent majority as well as the vocal minority."   *Wireless* 396 F.3d at 933 (citing, *DeBoer,* 64 F.3d at 1178).

Here, the reaction of the Class overwhelmingly supports the Settlement.   More than 104,000 notices of the proposed Settlement, in substantially the form approved by the Court, were mailed to potential Settlement Class Members by the Claims Administrator, and the Summary Notice was published in the national edition of *The Wall Street Journal* on October 10, 2006.  Exh. 1, ¶ 8; Exh. 2, ¶ 2.  Class Members had until November 15, 2006 to object to the Settlement.  To date, past the deadline for the submissions of objections, *only one recipient of the Notice has objected to the Settlement*, and only five recipients of the Notice have requested

exclusion from the Class.  Joint Decl. ¶ 91; Exh. 1, ¶ 10.[9]  Therefore, the Court should conclude

that an analysis of this factor militates in favor of approval of the Settlement.

> ### C.  The Settlement Merits Approval

The analysis set forth above -- of each of the factors the Eighth Circuit considers to

evaluate a class action settlement -- demonstrates that the Settlement is fair, reasonable and

adequate.  The proposed Settlement provides a substantial recovery to the Class and protects the

public interest by affording aggrieved Class Members an avenue of prompt, meaningful relief at

no cost to them and sparing judicial resources.  The Settlement also resolves Class Members'

claims globally, rather than through duplicative individual suits.  Without the global resolution of

these claims, duplicative individual suits would drain judicial resources while providing relief to

but a tiny fraction of all shareholders.  *See Carlson*, 2006 U.S. Dist. LEXIS 67108, at *18

("Because they are experienced litigators, the Court gives substantial weight to class counsel's

view that the settlement is fair, reasonable and adequate.").  Accordingly, the Court should

approve the Settlement.

## IV.  CERTIFICATION OF A SETTLEMENT CLASS IS APPROPRIATE AND WARRANTED

In reaching the terms of the Settlement of this Action, the parties agreed to the

certification of a Purchaser Class consisting of persons who purchased or otherwise acquired

McLeodUSA common stock between January 3, 2001 and December 3, 2001, inclusive (the

"Purchaser Class"), and a Merger Class of all Persons who acquired McLeodUSA common stock

---

[9]  The one objection received, from purported Class Member Brian Neuerburg, was submitted five days after the deadline for the submission of objections.  In addition, the objection fails to comply with the requirement, set forth in the Notice, that objections state the basis for the objection.  *See* Exh. 1(A) at ¶ 17.  More importantly, because the objection fails to state a reason for the objection, no substantive response can be made in these papers and Co-Lead Counsel reserve the right to respond fully if Mr. Neuerburg appears to voice his objection at the November 29, 2006 Final Settlement Hearing.  *See* Exh. 8.

pursuant to the Registration Statement and Prospectus issued in connection with McLeodUSA's

June 1, 2001 stock for stock acquisition of Intelispan, Inc. (the "Merger Class") (together, the

"Class").   In the Court's Preliminary Order in connection with settlement proceedings, dated

September 19, 2006, the Court certified the Class on a preliminary basis.  In connection with this

application, plaintiffs request final certification of a Class.

The benefits of the proposed Settlement can be realized only through the certification of a

settlement class.  The United States Supreme Court has emphatically confirmed the viability of

such settlement classes.  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997).   In *Amchem*, the

Supreme Court reiterated the "dominant concern" that governs the proper analysis under each

Rule 23 subsection: "whether a proposed class has sufficient unity so that absent members can

fairly be bound by decisions of class representatives."   *Id.* at 621.   Here, the proposed Class

satisfies this dominant concern, as well as all other prerequisites to certification set forth in

*Amchem* and Eighth Circuit precedent.

### A.     The Requirements of Rule 23 Are Met

Rule 23(a) requires that:

1.    the class be so numerous that joinder of all members is impracticable;

2.    there be questions of law or fact common to the class;

3.    the claims or defenses of the representative parties be typical of the claims or defenses of the class; and

4.    the representative parties will fairly and adequately protect the interests of the class.

*Alpern v. UtiliCorp United*, 84 F.3d 1525, 1539 (8th Cir. 1996); s*ee also Cooper v. Miller*

*Johnson Steichen Kinnard, Inc.*, No. 02-1236 (RHK/AJB), 2003 U.S. Dist. LEXIS 6946, at *4-5

(D. Minn. 2003).

### 1.     Numerosity

To establish numerosity, plaintiffs need simply demonstrate that joinder in this case would be difficult and inconvenient.  *Boyd v. Ozark Air Lines, Inc.*, 568 F.2d 50, 54 (8th Cir. 1977) (impracticability depends upon the facts of each case).  "Courts have typically established no arbitrary or rigid rules regarding the required size of a class, and what constitutes impracticality depends on the facts of each case."  *In re Select Comfort Corp. Sec. Litig.*, 202 F.R.D. 598, 603 (D. Minn. 2001) (citation omitted).  Relevant factors include the number of persons in the class, the size of the individual claims, the inconvenience of trying individual suits, and any other factor relevant to the impracticability of joining all the Class Members. *Paxton v. Union Nat'l Bank*, 688 F.2d 552, 560-61 (8th Cir. 1982).  The requirement is generally assumed to be met in class action suits involving nationally traded securities.  *In re Endotronics*, No. 4-87-130, 1988 U.S. Dist. LEXIS 745, at * 8-9 (D. Minn. Jan. 28, 1988) (numerosity uncontested in securities case).

A total of over 104,872 Notices were mailed to potential Class Members and/or nominees.  Thus, there are likely thousands of Class Members.  As courts in this Circuit have found that a class with forty or more members raises a presumption that joinder is impracticable, the numerosity requirement is easily satisfied here.  *See Lockwood Motors, Inc. v. General Motors Corp.*, 162 F.R.D. 569, 574 (D. Minn. 1995) (citing Newberg & Conte, *Newberg on Class Actions*  § 3.05 at 3-25 (3d ed. 1992) ("In light of prevailing precedent, the difficulty inherent in joining as few as 40 class members should raise a presumption that joinder is impracticable, and the plaintiff whose class is that large or larger should meet the test of Rule 23(a)(1) on that fact alone.")).

### 2.    Commonality

To satisfy Rule 23(a)(2), there must be "questions of law *or* fact common to the class." Fed. R. Civ. P. 23(a)(2) (emphasis added); *see generally DeBoer*, 64 F.3d at 1174 ("Commonality is not required on every question raised in a class action."). "There need only be a single issue common to all class members." *Rentschler v. Carnhan*, 160 F.R.D. 114, 116 (E.D. Mo. 1995). Rule 23 is satisfied when the legal question "linking the class members is substantially related to the resolution of the litigation." *DeBoer*, 64 F.3d at 1174 (quoting *Paxton*, 688 F.2d at 561); *Fielder v. Credit Acceptance Corp.*, 175 F.R.D. 313, 319-20 (W.D. Mo. 1997) (same); *see generally 1 Herbert B. Newberg and Alba Conte, Newberg on Class Actions ("Newberg")* §3.10 at 3-51 (December 1992) ("When the party opposing the class has engaged in some course of conduct that affects a group of persons and gives rise to a cause of action, one or more of the elements of that cause of action will be common to all the persons affected.").

Here, there are numerous issues of law and fact common to the Class, including the measure of damages for such actions and whether Defendants knowingly or recklessly issued materially false and misleading press releases and other statements regarding McLeod's business and financial results. Courts consistently certify class actions raising these common issues. *See Carpe v. Aquilla, Inc.,* No. 02-0388-CV-W-FJG, 2004 U.S. Dist. LEXIS 21590, at *6 (W.D. Mo. Sept. 13, 2004). "In sum, defendants' liability for their alleged conduct that purportedly artificially inflated the price of their common stock is the essential focus of this litigation, and it predominates over any individual issues that may arise." *Select Comfort*, 202 F.R.D. at 603-04 (citation omitted). Consequently, plaintiffs have clearly established the requirement of commonality.

### 3.      Typicality

Typicality under Rule 23(a)(3) means that there are "other members of the class who have the same or similar grievances as the plaintiff." *Alpern*, 84 F.3d at 1540 (quoting *Donaldson v. Pillsbury Co.*, 554 F.2d 825, 830 (8th Cir. 1977)). The burden is "fairly easily met so long as other class members have claims similar to the named plaintiff." *Id.* (emphasis added) (*quoting DeBoer*, 64 F.3d at 1174); *Fielder*, 175 F.R.D. at 320. Slight factual differences that may exist between the named class representatives and other class members will not defeat typicality. *Alpern*, 84 F.3d at 1540; *Donaldson*, 554 F.2d at 831. "A named plaintiff's claim is typical 'if the claims or defenses of the representatives and the members of the class stem from a single event or are based on the same legal or remedial theory.'" *Select Comfort*, 202 F.R.D. at 604 (citation omitted).

Plaintiffs here assert claims of centrally orchestrated misconduct that led to harms allegedly visited on the Class as a whole. Typicality is satisfied because plaintiffs' claims are the same as those of the Class they seek to represent. The proposed class representatives, like all Class Members, purchased and/or acquired McLeod common stock during the Class Period at prices or values that were directly impacted by Defendants' conduct.

Courts have repeatedly found the typicality requirement of Rule 23(a)(3) met if the plaintiff and the class sought to be represented relied on the integrity of the market to determine the price and value of the securities. *See Alpern*, 84 F.3d at 1540-41 (named plaintiff's participation in a dividend reinvestment plan did not render his claims atypical); *Nelsen v. Craig-Hallum, Inc.*, 659 F. Supp. 480, 488 (D. Minn. 1987) (typicality not vitiated simply by reliance on stock broker who acted as conduit for defendants' misrepresentations); *Biben v. Card*, No. 84-0844-CV-W-6, 1986 U.S. Dist. LEXIS 30808, at *12-13 (W.D. Mo. Jan. 6, 1986) (same).

Since the proposed representative plaintiffs and potential Class Members rely on the same legal theory for their claims, it is beyond dispute that Lead Plaintiffs satisfy the typicality requirement in the present case.

Thus, the typicality requirement is clearly established here.

### 4.      Adequacy of Representation

Rule 23(a)(4) requires that the representative plaintiffs fairly and adequately protect the interests of the class.  As the Supreme Court observed in *Amchem*, "[t]he adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." 521 U.S. at 625.  To satisfy the foregoing requirements, "the Plaintiffs must show 'that (1) the representatives and their attorneys are able and willing to prosecute the action competently and vigorously, and (2) each representative's interests are sufficiently similar to those of the class so that it is unlikely that their goals and viewpoints will diverge.'"  *Allianz*, 2000 WL 1336640 at *12 (citations omitted).

First, plaintiffs' team of legal counsel is composed of preeminent class action attorneys, many of whom have qualified as lead counsel in other nationwide securities class actions. Indeed, Plaintiffs' Counsel have a proven track record in the prosecution of class actions.  *See* Firm Biographies for Milberg Weiss Bershad & Schulman LLP, Schiffrin & Barroway, LLP, and Weiss & Lurie, Exhs. 3(3), 4(3) and 5(C).[10]  More importantly, however, Plaintiffs' Counsel have demonstrated their abilities to the Court through their aggressive pursuit of this litigation over the course of approximately five years. *Grasty v. Amalgamated Clothing & Textile Workers*

---

[10] The Affidavits of Sanford P. Dumain, Andrew L. Barroway and Joseph H. Weiss, Plaintiffs' Counsel, and Peter C. Riley, Liaison Counsel, in Support of Application for Attorneys' fees and Reimbursement of Expenses, are attached to the Joint Declaration as Exhibits 3-6.

*Union*, 828 F.2d 123, 129 (3d Cir. 1987) (the assurance of vigorous prosecution is ordinarily equated with the competence and experience of class counsel).

Second, the Lead Plaintiffs share interests with the other Class Members: it is in Lead Plaintiffs' interest to obtain approval of the Settlement and to achieve the best possible recovery for the Class, while minimizing the risks of continued litigation of the claims which could result in a smaller recovery or no recovery for the Class.  In addition, no conflicts of interest or other antagonisms exist between the Lead Plaintiffs and the Class Members.  *See generally  Reynolds v. National Football League*, 584 F.2d 280, 285-86 (8th Cir. 1978) (speculation as to potential conflicts not a valid reason to refuse to certify class).  Thus, Lead Plaintiffs share a "coincidence of interests" with all other potential Class Members.  *See Herbst v. Able*, 47 F.R.D. 11, 15 (S.D.N.Y. 1969).

The adequacy requirement of Rule 23(a)(4) is satisfied.

**B.**    **The Requirements of Rule 23(b)(3) Are Satisfied**

Rule 23(b)(3) authorizes certification where common questions of law or fact predominate over individual questions and the class action is superior to other available means of adjudication.  *Amchem*, 521 U.S. at 622-25.  Both requirements are satisfied here.

**1.**    **Common Legal and Factual Questions Predominate**

"Common questions need only predominate; they need not be dispositive of the litigation."  *In re Potash Antitrust Litig.*, 159 F.R.D. 682, 693 (D. Minn. 1995).  Where "the liability issue is common to the class, common questions are held to predominate over individual questions."  *Dura-Bilt Corp. v. Chase Manhattan Corp.*, 89 F.R.D. 87, 93 (S.D.N.Y. 1981). Significantly, the United States Supreme Court has ruled that "[p]redominance is a test readily met in certain cases alleging . . . securities fraud." *Amchem*, 521 U.S. at 623-24; *see also Dirks v.*

23

*Clayton Brokerage Co.*, 105 F.R.D. 125, 132 (D. Minn. 1985) ("Securities actions based on material omissions and failures to disclose meet the predominance requirement").   Here, the claims against Defendants arise out of the same set of operative facts and are based on common legal theories.   Each Lead Plaintiff and Class Member is confronted with identical issues. Because plaintiffs have alleged that Defendants committed the same unlawful acts in the same manner against the entire Class, the predominance requirement is satisfied.

**2.       A Class Action Is the Superior Means to Adjudicate Plaintiffs' Claims**

Under Rule 23(b)(3), a class action must be "superior to other available methods for the fair and efficient adjudication of the controversy."  Here, the evidence demonstrates conclusively that a class action is superior to any other procedural method available to adjudicate this action. Most Class Members have little incentive or ability to prosecute their claims against Defendants in separate individual actions.  *In re Endotronics*, 1988 U.S. Dist. LEXIS 745, at *20. The Class likely encompasses more than several thousand persons who purchased McLeodUSA common stock during the Class Period.   Aggregate representation through certification of these claims is not only superior, it is in all likelihood the only way small volume purchasers can pursue their claims.  *See Deposit Guaranty Nat'l Bank v. Roper*, 445 U.S. 326, 339 (1980) ("Where it is not economically feasible to obtain relief within the traditional framework of a multiplicity of small individual suits for damages, aggrieved persons may be without any effective redress unless they may employ the class-action device.").

Thus, for all of the foregoing reasons, plaintiffs submit that the Class should be certified and that the Settlement is fair, reasonable and adequate, and should be approved by the Court.

## V.    **PLAN OF ALLOCATION**

The proposed Plan of Allocation contained in the Notice mailed to the members of the Class provides for the distribution of the Net Settlement Fund on a *pro rata* basis, based on a formula tied to liability and damages.  The Plan of Allocation is not intended to provide an estimate of the amount of what a Class Member might have been able to recover after a trial; nor is it an estimate of the amount that will be paid to Authorized Claimants pursuant to the settlement.  The Plan of Allocation is the basis upon which the Net Settlement Fund will be proportionately allocated to the Authorized Claimants.

The Plan of Allocation reflects the proposition that the price of McLeodUSA common stock was inflated artificially during the Class Period by reason of allegedly false and misleading statements made by the Defendants.  The artificial inflation allegedly began on January 3, 2001 when McLeodUSA announced that it would meet or exceed the average current market consensus for the fourth quarter and year end of 2001.  McLeodUSA also announced that it would be making a substantial offering of Senior Notes.  The Plan of Allocation reflects that the price of McLeodUSA common stock allegedly continued to be artificially inflated throughout the Class Period, but the inflation began to be dissipated at intervals by certain revelations made by McLeodUSA on January 30, 2001, May 2, 2001, and August 1, 2001, and was fully dissipated by an announcement on December 3, 2001.  All Class Members are treated identically based upon the time period in which they purchased McLeodUSA stock during the Class Period and when they sold McLeodUSA stock during the Class Period or in the 90 day period following the Class Period or if they held throughout the Class Period.

An allocation formula only need have a reasonable and rational basis, particularly if recommended by experienced and competent class counsel.  *Stoneridge Inv. Partners LLC v.*

*Charter Communs.*, Case No. 4:02-CV-1186 CAS, 2005 U.S. Dist. LEXIS 14772, *34 (E.D. Mo.

June 30, 2005).  Accordingly, Plaintiffs' Counsel respectfully submit that this Plan of Allocation

is reasonable and rational and should be approved by the Court.

## VI.  THE COURT SHOULD APPROVE THE REQUESTED ATTORNEYS' FEES AND EXPENSES AS FAIR AND REASONABLE

Plaintiffs' Counsel initiated and prosecuted the Action on an entirely contingent basis,

without any compensation to date, and obtained an excellent result against a spirited defense by

formidable adversaries.   Plaintiffs' Counsel now apply to this Court for just and fair

compensation -- 33⅓% of the Gross Settlement Fund, and reimbursement of expenses incurred

in connection with the prosecution of these Actions, in the amount of $900,000, plus interest at

the same rate as earned by the Settlement Fund.  Plaintiffs' Counsel's request for 33⅓% of the

Gross Settlement Fund falls well within the range of attorneys' fee awards in similar class

actions in this jurisdiction and equates to less than the lodestar generated by Plaintiffs' Counsel

in prosecuting plaintiffs' claims.

### A.  The Common-Fund Approach is the Preferred Method for Awards of Attorneys' Fees in Class Actions

The Eighth Circuit Court of Appeals has specifically endorsed the percentage of the fund

approach as a method for the determination of attorneys' fees in common fund cases.  *See*

*Koenig v. U.S. Bank N.A. (In re U.S. Bancorp Litig.)*, 291 F.3d 1035, 1038 (8th Cir.), *cert.*

*denied sub nom.*, 537 U.S. 823 (2002) (approving award to class counsel of 36 percent of

settlement fund); *Petrovic*, 200 F.3d at 1157.[11]  More recently, courts in the Eighth Circuit have

---

[11]   Courts in other circuits favor the percentage-of-recovery approach for the award of attorneys' fees in common fund cases.  Two circuits have ruled that the *percentage method is mandatory in common fund cases*.  *Swedish Hosp. Corp. v. Shalala*, 1 F.3d 1261 (D.C. Cir. 1993); *Camden I Condo. Ass'n v. Dunkle*, 946 F.2d 768, 774-75 (11th Cir. 1991).   Other circuit courts have expressly approved the use of the percentage method.  *In re Thirteen Appeals Arising out of the San Juan DuPont Plaza Hotel Fire Litig.*, 56 F.3d 295, 307 (1st Cir. 1995); *In re Rite Aid Sec.*

held that this simple and direct method of computing fees, which is supported by the PSLRA,[12] is

the preferred method for awarding fees in common fund cases. *See Carlson,* 2006 U.S. Dist.

LEXIS 67108, at *20; *In re IBP, Inc. Sec. Litig.*, 328 F. Supp. 2d at 1064-65.

Courts endorse the percentage method of awarding attorneys' fees, in part, because it

directly aligns the interests of a class and its counsel and provides a powerful incentive for the

efficient prosecution and early resolution of litigation, which clearly benefits both litigants and

the judicial system. The percentage approach is also the most efficient means of rewarding the

work of class action attorneys, as it avoids the wasteful and burdensome process — to both

counsel and the courts — of preparing and evaluating fee petitions, which the Third Circuit Task

Force described as "cumbersome, enervating, and often surrealistic." *Report of the Third Circuit*

*Task Force, Court Awarded Attorneys' Fees*, 108 F.R.D. 237, 258 (1985); *see also* 2001 Task

Force Report at 105 ("Experienced practitioners know that a highly qualified and dedicated

attorney may do more for a class in an hour than another attorney could do in ten."). Further, the

percentage approach most closely approximates the manner in which private litigants

compensate their attorneys in the marketplace:

> [A] percentage-of-the-fund approach more accurately reflects the economics of
> litigation practice. The district court in *Howes v. Atkins*, 668 F. Supp. 1021 (E.D.
> Ky. 1987), noted that "plaintiffs' litigation practice, given the uncertainties and
> hazards of litigation, must necessarily be result-oriented. It matters little to the
> class how much the attorney spends in time or money to reach a successful
> result." *Id.* at 1025.

---

*Litig,* ("Rite Aid III"), 396 F.3d 294, 300 (3d Cir. 2005); *Gottlieb v. Barry*, 43 F.3d 474 (10th
Cir. 1994); *Harman v. Lyphomed, Inc.*, 945 F.2d 969, 975 (7th Cir. 1991).

[12] The PSLRA, 15 U.S.C. § 78-u4(a)(6), provides: "Total attorneys' fees and expenses awarded
by the court to counsel for the plaintiff class shall not exceed *a reasonable percentage* of the
amount of any damages and prejudgment interest actually paid to the class." (Emphasis added.)

*Swedish Hospital Corp. v. Shalala*, 1 F.3d 1261, 1269 (D.D.C. 1993).  As demonstrated below, not only is an award of 33⅓% of the common fund in compensation for Plaintiffs' Counsel's efforts supported by an analysis of the relevant factors, but the requested attorneys' fees are also reasonable and amply supported pursuant to a lodestar analysis.[13]

### B.   Factors In Determining Appropriate Fee Awards

While the Eighth Circuit has not formally adopted a list of factors to be considered when evaluating the reasonableness of a fee award calculated as a percentage of a common fund, courts in this Circuit have considered the following factors in awarding fees in similar litigations: (1) the benefit conferred on the class, (2) the risks assumed by counsel, (3) the difficulty and novelty of the legal and factual issues in the case, including whether plaintiffs were assisted by a relevant governmental investigation, (4) the skill of the lawyers, both plaintiffs and defendants, (5) the time and labor involved, (6) the reaction of the class and (7) a comparison of the requested fee to percentages awarded in similar cases.  *See Xcel Energy, Inc., Securities, Derivative & "ERISA" Litig.*, 364 F. Supp. 2d 980, 992-994 (D. Minn. 2005).

### 1.   The Value of the Benefit Obtained

Courts have consistently recognized that the result achieved for the benefit of the class on whose behalf the action was brought is one of the most important factors to be considered in making a fee and expense award.  *See, e.g., Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983) ("the most critical factor is the degree of success obtained").  The $30,000,000 benefit that Plaintiffs' Counsel obtained for the Class in this case is substantial and is both the largest settlement achieved in an Iowa securities class action, and the fifth largest settlement of such an action in the Eighth Circuit.  Joint Decl. ¶ 94.  Plaintiffs' Counsel secured this Settlement only after years

---

[13]  The lodestar analysis is presented under the "time and labor" analysis, below.

of hard-fought litigation, through a significant portion of merits discovery, but still sparing the Class the most expensive phases of litigation – depositions, expert discovery and trial -- and years of additional delays.  *See Goldsmith v. Technology Solutions Co.,* 92 C 4374, 1995 U.S. Dist. LEXIS 15093, at *14 (N.D. Ill. October 11, 1995) *(*noting "time value of money is another cost of continued litigation.").

In its effort to assess the Settlement, the Court should consider that "[a] settlement is, necessarily, a compromise between plaintiffs, who did not win their case and defendants who did not lose theirs."  *Snell,* 2000 U.S. Dist. LEXIS 13611 at *55 (quoting *In re Airline Ticket Comm'n Antitrust Litig.*, 953 F. Supp. 280, 282 (D. Minn. 1997)).  As stated by the Court in *Employee Benefit Plans*, 1993 U.S. Dist. LEXIS at *15 (citation omitted) (alteration in original):

> [C]onsider the vagaries of litigation and compare the significance of immediate recovery by way of the compromise to mere possibility of relief in the future, after protracted and expensive litigation.   In this respect, '[i]t [is] proper to take the bird in the hand instead of the prospective flock in the bush.'

As discussed in above in § III(B)(1), the Settlement was achieved despite serious challenges to plaintiffs' ability to prevail at summary judgment or trial, specifically with respect to proving scienter and loss causation.  *See also* Joint Decl., ¶¶ 76-85.  Plaintiffs' Counsel recognized that proving liability against Defendants at trial would be risky due to the defenses discussed above.  Accordingly, the Settlement is an excellent recovery under any circumstances, and Plaintiffs' Counsel respectfully submit that, in light of the substantial questions concerning scienter and loss causation, and considering the time value of money and the probability of lengthy litigation in the absence of a settlement, the benefit conferred on the Class by the Settlement warrants approval of the attorneys' fees requested by Plaintiffs' Counsel.

## 2.    The Risks Assumed By Counsel

It has been a long-recognized rule that an attorney is entitled to a much larger fee when the compensation is contingent rather than being fixed on a time or contractual basis. *See Flight Transp. Corp. Sec. Litig.*, 685 F. Supp. 1092, 1096  (D. Minn. 1987) ("The fact that counsel for the plaintiff classes prosecuted this case on a contingent fee basis warrants a multiplier of the lodestar."); *see also Snell*, 2000 U.S. Dist. LEXIS 13611, at *60 (stating that plaintiffs' counsel's prosecution of the action on a contingency basis supports granting fee requested). From the commencement of this litigation approximately five years ago, Plaintiffs' Counsel has been paid nothing for their efforts because of the contingent nature of this litigation.   The significant outlay of cash and personnel resources by Plaintiffs' Counsel has been completely at risk.[14]   Payment for their services has been wholly dependent on obtaining a recovery for the Class.  Taking into account the significant complexity and magnitude of the class action, as well as the risks of this litigation and contingent nature of the fee, the amount sought by Plaintiffs' Counsel is certainly reasonable.   *Brissette v. Heckler,* 784 F.2d 864, 866 (8th Cir. 1986) (reversing and remanding based on district court's failure to take "into account any contingency factor" in awarding attorneys' fees where plaintiff prevailed in "a case with a high risk of loss, which would, if lost, produce no fee").

---

[14]   *Cf. In re Chrysler Motors Corp. Overnight Evaluation Litig. Program*, 736 F. Supp. 1007, 1016 (E.D. Mo. 1990) ("percentage fee method is more predictable from plaintiff's counsel's view point and consistent with the practical economies of contingent fee practice based on the expectation of sharing a fair percent of the recovery *in return for assuming the risk of nonpayment if unsuccessful, regardless of the number of hours expended"*) (*quoting* 1 *Newberg*, §2.06 at 7 (Supp. 1989)) (emphasis added); *In re Rio Hair Naturalizer Prod. Liab. Litig.*, MDL No. 1055, 1996 U.S. Dist. LEXIS 20440, at *54 (E.D. Mich. Dec. 20, 1996) (recognizing risk entailed in a major investment of attorney time and financial resources over lengthy period of time); *Hawkins v. Throp Loan & Thrift Co.*, No. 85-6074, 1992 WL 585727, at *4 (D. Minn. Feb. 21, 1992) (same).

There are numerous cases where plaintiffs' counsel in contingent class actions such as this, after expenditures of thousands of hours and significant out-of-pocket expenditures, have received no compensation whatsoever. [15]   Often the plaintiffs' counsel who take on the most difficult cases and are among the most diligent members of the plaintiffs' bar, are also the most at risk.   The fact that Defendants and their counsel know that the leading members of the plaintiffs' bar are actually able to, and will, go to trial gives rise to meaningful settlements such as this.   *See e.g. Howard v. Everex Systems, Inc.*, 228 F.3d 1057 (9th Cir. 2000), *rev'd remanded, Howard v. Hui*, No. C9203742 CRB, 2001 U.S. Dist. LEXIS 15443 (Sept. 24, 2001) (W&L and co-counsel lost securities fraud trial when district court entered judgment as a matter of law then following successful appeal, case was retried and jury rendered verdict in defendants= favor); *Robbins v. Koger Props., Inc.*, 116 F.3d 1441 (11th Cir. 1997) (Milberg Weiss lost a large securities fraud class action when the Court of Appeals reversed jury verdict of $81 million against an accounting firm after a 19-day trial).   The losses suffered by plaintiffs' counsel in

---

[15]   Many cases have been lost on or after trial.   *See e.g., AUSA Life Ins. Co. v. Ernst & Young*, No. 00-9472, 2002 U.S. App. LEXIS 13845 (2d Cir. July 8, 2002) (affirming district court's dismissal after a full bench trial and earlier appeal and remand); *Robbins v. Koger Props.*, 116 F.3d 1441 (11th Cir. 1997) (verdict of $81 million for plaintiffs against an accounting firm reversed on loss causation grounds and judgment entered for defendant in case where Milberg Weiss served as lead counsel); *Miller v. Thane Int'l, Inc.*, 372 F. Supp. 2d 1198 (C.D. Cal. 2005) (defense verdict after bench trial); *In re Clarent Corp. Sec. Litig.*, No. C 01-03361 CRB (JCS), slip op. at 2 (N.D. Cal. Apr. 18, 2005) (defense verdict following trial); *Gompper v. VISX, Inc.*, 298 F.3d 893, 898 (9th Cir. 2002) (same); *Winkler v. NRD Mining, Ltd.*, 198 F.R.D. 355 (E.D.N.Y. March 31, 2000) (granting defendants' motion for judgment as a matter of law after jury verdict for plaintiffs), *aff'd* 2000 U.S. App. LEXIS 31332 (2d Cir. Dec. 6, 2000); *Howard v. Everex Systems, Inc.*, 228 F.3d 1057 (9th Cir. 2000), *rev'd remanded, Howard v. Hui*, No. C9203742 CRB, 2001 U.S. Dist. LEXIS 15443 (Sept. 24, 2001) (dismissal of claims against three defendants with prejudice by district court and defense verdict for fourth remaining defendant following successful appeal of district court's ruling for defendants as matter of law); *In re Health Management, Inc. Sec. Litig.*, No. 96-CV-889 (ADS)(E.D.N.Y. 1999) (jury verdict for auditor in securities case); *In re Biogen Sec. Litig.*, No. 94-12177-PBS (D. Mass 1999) (jury verdict for defendants); *Bentley v. Legent Corp.*, 849 F. Supp. 429 (E.D. Va. 1994), *aff'd sub nom, Herman v. Legent Corp.*, 50 F.3d 6 (4th Cir. 1995) (directed verdict in favor of defendants after plaintiffs' presentation of its case to the jury).

other actions where insubstantial settlement offers are rejected, and plaintiffs' counsel ultimately receive little or no fee, should not be ignored.   Plaintiffs' Counsel know from personal experience that despite the most vigorous and competent of efforts, attorneys' success in contingent litigation, such as this, is never assured.[16]   Joint Decl. ¶¶ 98, 102.

The risks of contingent litigation also are highlighted by the fact that a dramatic change in the law can result in the dismissal of a claim after a great deal of time and effort have been expended on the case.   For example, when the United States Supreme Court eliminated a cause of action for aiding and abetting under Section 10(b) of the Securities Exchange Act of 1994, *Central Bank, N.A. v. First Interstate Bank, N.A.*, 511 U.S. 164 (1994), many courts then dismissed long pending cases that otherwise stated a proper cause of action at the time they were brought.   Indeed, as described above, a similar change in the law occurred just recently, when the Supreme Court in *Dura Pharmaceuticals* rejected one of the theories of loss causation that plaintiffs had advanced in this litigation. Decl. ¶¶ 96-97.

Clearly, there is no truth to the argument that a large fee is guaranteed by virtue of the commencement of a class action.   It takes diligent work by skilled counsel to develop facts and theories which either will persuade Defendants to enter into serious settlement negotiations, or alternatively, to succeed at trial.   Moreover, to achieve an excellent result such as this result,

---

[16]   Many other cases are lost on summary judgment after thousands of hours and the expenditure of hundreds of thousands of dollars have been invested in successfully opposing the motions to dismiss and pursuing discovery.   *E.g.*, *Freedman v. Value Health, Inc.*, 34 Fed. Appx. 408 (2d Cir. 2002) (affirming district court's decision granting defendants' motion for summary judgment); *Eisenstadt v. Centel Corp.*, 113 F.3d 738 (7th Cir. 1997) (same); *Searls v. Glasser*, No. 91 C 6796, 1994 U.S. Dist. LEXIS 13509 (N.D. Ill. Sept. 21, 1994), *aff'd*, 64 F.3d 1061 (7th Cir. 1995) (same); *Carpe v. Aquila, Inc.*, No. 02-0388-CV-W-FJG (W.D. Mo. March 23, 2005) (granting summary judgment to defendants); *In re Clorox Co. Secs. Litig.*, 238 F. Supp. 2d 1139 (N.D. Cal. 2002) (granting summary judgment in favor of defendants); *In re Convergent Techs. Sec. Litig.*, 721 F. Supp. 1133 (N.D. Cal. 1988) (summary judgment against plaintiffs following five years of litigation), *aff'd*, No. 90-15156, 1991 U.S. App. LEXIS 19733 (9th Cir. Aug. 27, 1991), *amended*, 948 F.2d 507 (9th Cir. 1991).

counsel, as they did on multiple occasions, must be willing to walk away from the bargaining table.  By walking away, counsel recognize that they will be required to invest more time and money in the case and that they may never be paid.  Indeed, because the fee to be awarded in this matter is entirely contingent, the only certainty from the outset has been that there would be no fee without a successful result.

Finally, it is important to recognize that lawsuits such as these are exceedingly expensive to successfully litigate.  Outsiders often focus on the gross fee awarded, but ignore the fact that those fees are used to fund large overhead expenses incurred during the course of many years of litigation, are taxed by federal, state and local authorities, and when reduced to a bottom line, are far less imposing to each individual firm involved than the gross fee awarded appears.[17]  Decl. ¶¶ 98.  Here, Plaintiffs' Counsel has invested over $11 million of time and over $900,000 in out-of-pocket expenses.

In sum, Plaintiffs' Counsel faced substantial risk in this litigation that they would not be paid for their efforts.  Despite those risks, Plaintiffs' Counsel advanced over $10 million of time and expenses to litigating plaintiffs' claims.  The economics of Plaintiffs' Counsel's pursuit of plaintiffs' interests in this action therefore strongly support the fee request.

### 3.    The Difficulty and Novelty of the Litigation

"Most class actions are inherently complex and settlement avoids the costs, delays, and a multitude of other problems associated with them."  *In re Telectronics Pacing Sys. Accufix Atrial "J" Lead Products Litig.,* 137 F. Supp. 2d 985, 1013 (S.D. Ohio 2001) (citation omitted).  As discussed above at length and in the Joint Declaration, the pursuit of a recovery for plaintiffs presented a plethora of complex issues and complicating circumstances.   Furthermore,

---

[17] For additional risks typically assumed by contingent fee firms, the Court is respectfully referred to the Decl. ¶¶ 95-111.

Defendants' resistance to plaintiffs' claims was aggressive and dogged.  *Employee Benefit Plans,* 1993 U.S. Dist. LEXIS at *16 (finding that complexities and aggressive defense of the action supported approval of settlement).

This case presented complex issues of law and fact that plaintiffs' counsel had to navigate to prove plaintiffs' claims and obtain the settlement.  Many uncertainties existed with respect to plaintiffs' ability to establish their claims against Defendants as a legal matter, irrespective of the facts upon which those claims were based.  For example, Defendants argued during the motion to dismiss stage of the litigation that the group pleading doctrine was not longer valid following the passage of the PSLRA. Courts have split on the issue, and the Eighth Circuit had not decided it.   Plaintiffs, however, convinced this Court to adopt the majority position and apply the doctrine.  Likewise, as noted above, the Supreme Court's decision in *Dura* midway through this case presented a new and unforeseen hurdle to recovery.  Joint Decl. ¶ 112.

Company specific issues such as McLeodUSA's acquisition of Splitrock and CapRock, and their respective computer and e-mail systems, as well as McLeodUSA's laying off of thousands of workers in conjunction with a massive restructuring during the class period, added further complexity to this case.   Discovery, and in particular document discovery, became incredibly complicated and the subject of a great deal of motion practice and many hearings before Magistrate Judge Shields.  For example, when a worker was laid off or left McLeodUSA, his or her files were disbursed to the persons who assumed the former employee's job responsibilities.   A complete copy of the former employee's files was not maintained.   Thus, plaintiffs could not simply ask the Company to produce the files of employee "X."   Given the size and reach of the restructuring, the employee turnover was extremely problematic.   Joint Decl. ¶ 113.

Moreover, many potentially relevant electronic documents and/or e-mail were unavailable due to McLeodUSA's retention policies with respect to the electronic materials of former employees, and/or computer problems related to the attempted integration of the Splitrock and CapRock systems.  For example, many of the CapRock backup tapes could not be accessed without substantial cost.  As McLeodUSA's attorneys stated in a letter to Magistrate Judge Shields dated November 7, 2005:

> As McLeodUSA has previously reported, there are 443 backup tapes from the former CapRock server.  Although the data on these tapes is intact, it is inaccessible absent substantial expense and effort, because after the server was retired the database software somehow became unusable. . . .  Accordingly, the Company does not intend at this time to restore any of these tapes.

*See* Letter to the Honorable Thomas J. Shields from McLeodUSA dated November 7, 2005; Joint Decl. ¶ 114.

Other circumstances augmenting the difficulty of pursuing this litigation included: (a) the lack of a restatement of McLeodUSA's financial statements; (b) the lack of insider trading; (c) defendant Gray's purchase of $500,000 worth of McLeodUSA stock in the middle of the Class Period; (d) the SEC's decision not to file charges following its investigation into McLeodUSA's accounting practices; (e) McLeodUSA's two bankruptcy filings; and (f) the fact that many of the complicated accounting issues that were the subject of some of plaintiffs' claims were questions of judgment, successful resolution of which would have require expert analysis of McLeodUSA's accounting policies and procedures.  Joint Decl. ¶ 115.

In short, this factor clearly weighs in favor of plaintiffs' fee request.[18]

---

[18]   It is also significant that even though McLeodUSA was investigated by the SEC, plaintiffs received no assistance from governmental entities.  This factor weighs in favor of plaintiffs' fee request.  *See, e.g., In re Warner Communications Sec. Litigation*, 618 F. Supp. 735, 748 (S.D.N.Y. 1985); *In re Ikon Office Solutions, Inc.*, 194 F.R.D. 166, 194 (E.D. Pa. 2000) ("The

4.      **The Professional Skill and Standing of Respective Counsel**

The expertise and experience of counsel is another important factor in setting a fair fee. Our firms, which acted as lead counsel for plaintiffs and the class, have many years of experience in complex federal civil litigation, particularly the litigation of securities and other class actions, and have achieved significant acclaim for their work, as set forth in the exhibits accompanying the fee affidavits. *See* Joint Decl., Exhs. 3-6. Our experience in the field allowed us to identify the complex issues involved in this case and to formulate strategies to prosecute it effectively. Our experience also permitted us to litigate an extremely complex matter, involving various approaches to discovery, which generated millions of pages of documents for review and analysis, without duplication of effort. Our reputations as attorneys able and unafraid to carry a meritorious case through to trial gave us strong leverage in the settlement negotiations with Defendants. Joint Decl. ¶ 117.

The quality of the work performed by counsel for the plaintiffs also may be evaluated, in part, in light of the quality of the opposition. *See In re Monosodium Glutamate Antitrust Litig.*, No. 00-MDL-1328 (PAM), 2003 U.S. Dist. LEXIS 1970, at *5-6 (D. Minn. Feb. 6, 2003) (noting that the Court had been impressed with the advocacy on both sides); *see also, In re Aetna Inc. Sec. Litig.*, MDL No. 1219, 2001 U.S. Dist. LEXIS 68, *47 (E.D. Pa. January 4, 2001) (considering skill and standing of plaintiffs' and defense counsel). Defense counsel in this Action were both numerous and highly skilled. Counsel for Defendants – Jones Day and Fried, Frank, Harris, Shriver & Jacobson LLP (subsequently replaced by Simpson Thatcher & Bartlett LLP) -- and McLeodUSA, represented by Skadden, Arps, Slate, Meagher & Flom, LLP, are

---

settlement size is particularly noteworthy as class counsel did not have the benefit of an SEC or other regulatory agency investigation and so prosecuted the case without assistance.").

highly regarded and experienced in defending actions such as these, and senior litigation partners headed teams from each of these firms in vigorously defending against this action. Plaintiffs' Counsel were thus confronted with formidable opposition. Joint Decl. ¶ 118.

**5.     The Time and Labor Involved (the Lodestar/Multiplier Cross-Check)**

An analysis of this factor clearly supports an award of the requested attorneys' fees. In assessing this factor, courts typically look to the "lodestar" of class counsel and compare it to the percentage fee requested by plaintiffs counsel. Courts then determine whether it is appropriate to apply a risk multiplier. *See Brissette v. Heckler,* 784 F.2d at 866 (multiplier should be applied to hourly rate in consideration of the high risks of contingency fees). Here, the reasonableness of the requested fee is confirmed by the absence of a request to apply any multiplier at all to Plaintiffs' Counsel's lodestar.

This action followed a long and complicated path through a significant portion of merits discovery. In the course of this litigation, Plaintiffs' Counsel undertook the following: (i) an informal investigation involving the research of McLeodUSA's business and the review of all publicly available information concerning McLeodUSA, its two bankruptcy filings, and the Defendants from January 2002 to June 2006; (ii) interviews and follow-up with numerous confidential witnesses and former McLeodUSA employees; (iii) drafting a detailed 74-page amended complaint; (iv) briefing the motion to dismiss; (v) filing a motion to lift the PSLRA stay of discovery; (vi) briefing McLeodUSA's and Defendants' objections to the Magistrate's Report and Recommendation for the disposition of the motion to dismiss; (vii) serving over 300 written document requests and 80 interrogatories on Defendants and McLeodUSA, responding to voluminous written discovery served by McLeodUSA and Defendants on Lead Plaintiffs, and litigating, through innumerable meet and confer sessions, court conferences, and several motions

to compel, each Parties' respective obligations to respond to the written discovery requests; (viii) serving 69 subpoenas on third-parties; (ix) reviewing 2.4 million pages of documents produced by McLeodUSA, Defendants, and third-parties; (x) defending and taking 10 depositions; (xi) briefing the class certification motion three times; (xii) briefing full rounds of McLeodUSA and Defendants' Motion for Judgment on the Pleadings; (xiii) drafting three versions of a lengthy mediation statement; and (xiv) consulting with damage and accounting experts.  Joint Decl. ¶¶ 16-63.

As a result, Plaintiffs' Counsel expended a total of 29,915.19 hours and generated a lodestar of $11,057,641.70.  Applying the lodestar/multiplier approach as a cross-check supports the reasonableness of the requested 33⅓ percent fee award as the fee request is **lower** than Plaintiffs' Counsel's lodestar.  The requested fee, amounting to $10 million, plus interest, represents a **negative** multiple of approximately 0.9 times the lodestar.  By way of comparison, courts typically award multipliers of between 2 and 5 in this jurisdiction and across the country. Joint Decl. ¶ 122. *See Cohn v.* Nelson, 375 F. Supp. 2d 844, 862 (E.D. Mo. 2005) (stating that in shareholder litigation, courts typically apply a multiplier of 3 to 5 to compensate for contingent risk); In *re Xcel Energy, Inc.*, 2005 U.S. Dist. LEXIS 6432, at *39-41 (D. Minn. Apr. 8, 2005) (awarding 4.7 multiplier); *In re St. Paul Sec. Litig.*, Master File No. 02 Civ 3825 (D. Minn. Aug. 13, 2004) (awarding 2.4 multiplier where settlement at motion to dismiss stage);  *In re Supervalu Sec. Litig.*, 02-CIV-1738 (D. Minn. Aug. 17, 2004) (awarding 1.32 multiplier where settlement at motion to dismiss stage); *see also Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1052-54 (9th Cir. 2002) (listing 23 settlements and multipliers for each, in which the average multiplier is 3.28).

Thus, the negative multiplier that results from the lodestar cross-check strongly supports approval of the requested fee award.[19]

### 6. The Reaction of the Class

The reaction of the Class to the Settlement has been only positive. As described above, out of more than 104,000 notices sent, there has not been a single objection to the attorneys' fees noticed. Joint Decl. ¶ 123. *See Carlson,* 2006 U.S. Dist. LEXIS 67108, at *21 (citing absence of objections in favor of granting fee request); *Xcel Energy, Inc.*, 2005 U.S. Dist. LEXIS at *39-41 (where 265,000 notices sent, and only 7 class members objected to fee request, court referred to objections as "miniscule" and awarded requested fee). Thus, this Court should find that the reaction of the Class to the request for attorneys' fees supports approval of Plaintiffs' Counsel's request.

### 7. Fees Customarily Charged For Similar Legal Services

The requested attorneys' fees, 33⅓% of the Gross Settlement Fund, is within the range of awards made in similar cases, including securities class actions, in the Eighth Circuit and Iowa state courts. Joint Decl. ¶¶ 124-25. *See, e.g. In re US Bancorp Litig.,* 291 F.3d 1035, 1038 (8th Cir. 2002) (affirming award of 36% of settlement fund, plus expenses); *In re Engineering Animation Sec. Litig.*, 203 F.R.D. 417 (S.D. Iowa 2001) (awarding 33⅓% of settlement fund, plus expenses); *Carlson,* 2006 U.S. Dist. LEXIS 67108, *22 (awarding 35.5% of $15,000,000 settlement fund, plus expenses); *In re Ancor Communications, Inc. Sec. Litig.*, No. 97-CV-1696 ADM/JGL (D. Minn. Feb. 5, 2000) (awarding 33⅓% of settlement fund, plus expenses); *In re Texas Prison Litig.* 191 F.R.D. 164, 176-78 (W.D. Mo. 2000) (awarding 36% of common fund for attorneys fees); *KK Motors v. Brunswick Corp.*, Civil No. 98-2307 (D. Minn. March 6, 2000)

---

[19]   Unpublished fee opinions are attached to the Joint Declaration as Exh. 7.

(awarding 33⅓% of settlement fund, plus expenses); *Steiner v. CDSI*, Civ. No. 98-1489 (D.

Minn. August 25, 1999) (awarding 33⅓% of settlement fund, plus expenses); *Employee Benefit

Plans*, 1993 U.S. Dist. LEXIS 21226, at *22 (awarding 33⅓% of settlement fund); *In re Control

Data Corp. Sec. Litig.*, No.3-85-1341 (D. Minn. Sept. 23, 1994) (awarding attorneys' fees of

36.96% of settlement fund, plus expenses); *Gordon v. Am. Adjustable Rate Term Trust, et al.,*

Civil No. 4-95-666 (Sept. 3, 1996) (awarding 33⅓% of settlement fund); *Airline Ticket*, 953

F. Supp. at 286 (D. Minn. 1997) (awarding attorneys' fees of 33⅓%); *Farmers Cooperative

Elevator Co., v. Akzo Nobel, Inc., et al.*, Case No. LACV035453 (Iowa District Court, Carroll

County, May 10, 2006) (awarding 33⅓% of settlement fund); *Reiff v. Evans, et al.*, No. CE

35780 (Iowa District Court, Polk County, Oct. 7. 2005).[20]

---

[20] The requested attorneys' fees, 33⅓% of the Settlement Fund, is also within the range of awards made in similar cases, including securities class actions, in other jurisdictions around the country. *See e.g. Maley v. Del Global Tech. Corp.*, 186 F. Supp. 2d 358, 368 (S.D.N.Y. 2002) (awarding 33⅓%, plus expenses, and observing that courts recently in the jurisdiction and others recently awarded 33⅓% in securities class actions where significant monetary recovery); *Pozniak v. Imperial Chem. Ind., PLC,* Civil Case No. 1:03 cv 2457 (NRB) (S.D.N.Y. Sept. 18, 2006) (awarding 33⅓% of settlement fund, plus expenses); *In re Heritage Bond Litig.*, 2005 U.S. Dist. LEXIS 13555, at *61 (C.D. Ca. June 10, 2005) (awarding 33⅓% of settlement fund, plus expenses); *Bovee v. Coopers & Lybrand*, Case No. 2:97-CV-449 (awarding 33⅓% of settlement fund, plus expenses); *Taubenfeld v. Aon*, No. 04-3140, 2005 U.S. App. Lexis 13310 (7th Cir. July 5, 2005) (upholding award of 33⅓% of settlement fund, plus expenses); *In re Nx Networks Sec. Litig.*, Civ. Action Nos. 00-CV-1185-JLT, 00-CV-10377-JLT (D. Mass. Nov. 22, 2004) (awarding 33⅓% of settlement fund, plus expenses); *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 463 (9th Cir. 2000) (upheld fee award of 33⅓% of settlement); *In re Ravisent Techs. Inc., Sec. Litig.*, No. Civ. A. 00-CV-1014, 2005 WL 906361, at *1, *12 (E.D. Pa. Apr. 18, 2005) (acknowledging that attorney fees of 30-35% were commonly granted in awarding 33⅓% of settlement fund); *Cullen v. Whitman Med. Corp.*, 197 F.R.D. 136, 152 (E.D. Pa. 2000) (awarding 33 1/3% of settlement fund, plus expenses); *In re Neuberger v. Shapiro*, 110 F. Supp. 2d 273 (E.D. Pa. 2000) (awarding 33⅓% of settlement fund); *In re Combustion, Inc.*, No. 94 MDL 4000, 1997 U.S. Dist. LEXIS 15041 (W.D. La. June 4, 1997) (awarding 36% of settlement fund).

C.      **Reimbursement of Expenses**

Plaintiffs' Counsel are seeking reimbursement of costs and expenses in an aggregate amount of $900,000 for prosecuting this Action on behalf of the Class.[21]   As itemized in Exhibits 3-6 to the Joint Declaration, these expenses were incurred on an ongoing basis for consultant and expert fees, including experts in the areas of accounting, loss causation and damages, an investigator, three mediations with two difference mediators, photocopying and scanning of documents, including the production of 2.4 million pages of documents by McLeodUSA, Defendants, and various third-parties, on-line research, messenger service, postage, express mail and next day delivery, long distance and facsimile expenses, meals, travel and other incidental expenses directly related to the prosecution of this Action.  Joint Decl. ¶¶ 126.

Expenses are compensable in a common fund case of this type if they are of the nature typically billed by attorneys to paying clients in the marketplace.  *See Jorstad v. IDS Realty Trust*, 643 F.2d 1305, 1315 (8th Cir. 1981); *see also In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 535 (E.D. Mich. 2003) ("class counsel is entitled to reimbursement for all reasonable out-of-pocket litigation expenses and costs in the prosecution of claims and in obtaining settlement, including expenses incurred in connection with document production, consulting with experts and consultants, travel . . ."); *In re Continental Ill. Sec. Litig.*, 962 F.2d 566, 570 (7th Cir. 1992) (approving reimbursement for costs of Lexis and Westlaw research).

Accordingly, Plaintiffs' Counsel respectfully request reimbursement for these reasonable expenses in the amount of $900,000, plus interest.

---

[21] Plaintiffs' Counsel in fact incurred $953,535.59 in expenses in prosecuting the Action. However, in recognition of the fact that the Class was apprised that Plaintiffs' Counsel would not seek reimbursement for an amount greater than $900,000, Plaintiffs' Counsel are confining their request to that amount.

## VII.   **CONCLUSION**

For the foregoing reasons, plaintiffs respectfully request that the Court: (1) approve the Settlement and Plan of Allocation as fair, reasonable and adequate; (2) certify the Class as hereinafter defined; and (3) approve the requested attorneys' fees of 33⅓ of the Gross Settlement Fund and expenses of $900,000, plus interest on both amount, as fair and reasonable.

DATED:   November 22, 2006

**THE TOM RILEY LAW FIRM, P.L.C.**

By:     /s/ Peter C. Riley
Tom Riley (#LI0004610)
Peter C. Riley (#LI0004605)
4040 First Avenue NE
P.O. Box 998
Cedar Rapids, Iowa  52406-0998
Telephone:  (319) 363-4040
Facsimile:  (319) 363-9789

**Liaison Counsel for the Class**
Sanford P. Dumain
Rachel S. Fleishman
**MILBERG WEISS BERSHAD
   & SCHULMAN LLP**
One Pennsylvania Plaza
New York, New York 10119
(212) 594-5300

Andrew Zivitz
Trevan Borum
**SCHIFFRIN & BARROWAY, LLP**
Three Bala Plaza East, Suite 400
Bala Cynwyd, Pennsylvania  19004
(610) 667-7706

**Co-Lead Counsel for the Class**

Joseph H. Weiss
Joseph D. Cohen
**WEISS & LURIE**
551 Fifth Avenue
New York, New York 10176
(212) 682-3025

**Counsel for Plaintiffs**

42

Certificate of Service

      The undersigned hereby certifies that a true and correct copy of the above and foregoing was served by United States Mail, Postage Prepaid upon all non-ECF firms, on the 22nd day of November, 2006.

By:     /s/ Peter C. Riley
          Tom Riley (#LI0004610)
          Peter C. Riley (#LI0004605)
          **TOM RILEY LAW FIRM, P.L.C.**
          4040 First Avenue NE
          P.O. Box 998
          Cedar Rapids, IA 52406-0998
          Ph.:  (319) 363-4040
          Fax:  (319) 363-9789
          E-mail: peterr@trlf.com

          **Lead Plaintiffs' Liaison Counsel**